SEALED

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA, et al.,    )
                                     )
             **Plaintiff,**         )
             *Ex rel.*            )
                                     )
[UNDER SEAL]                  )
                                     )
             **Plaintiff-Relator,**   )
                                     )
v.                                 )
                                     )
[UNDER SEAL,                  )
             **Defendants.**       )
                                     )

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**

## SA15CA0191 FB

No. _____

**ORIGINAL COMPLAINT**

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

# FILED IN CAMERA AND UNDER SEAL





# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., )<br>)<br>**Plaintiff,** )<br>*Ex rel.* )<br>)<br>NANCY ALANIS )<br>)<br>**Plaintiff-Relator** )<br>v. )<br>)<br>WELLS FARGO BANK, )<br>NATIONAL ASSOCIATION; )<br>WELLS FARGO BANK NATIONAL )<br>ASSOCIATION, AS TRUSTEE FOR )<br>THE POOLING AND SERVICING )<br>AGREEMENT DATED AS OF )<br>OCTOBER 1, 2006 SECURITIZED )<br>ASSET BACKED RECEIVABLES )<br>LLC TRUST 2006-NC3 )<br>MORTGAGE PASS-THROUGH )<br>CERTIFICATES SERIES 2006 NC3; )<br>OCWEN LOAN SERVICING, LLC; )<br>OCWEN FINANCIAL CORPORATION; )<br>DEUTSCHE BANK NATIONAL TRUST )<br>COMPANY; )<br>**Defendants.** ) | **FILED UNDER SEAL**<br>**Pursuant to 31 U.S.C. § 3730(b)(2)**<br><br>**SA15CA0191FB**<br><br>No. _____<br>**ORIGINAL COMPLAINT**<br><br><br><br><br><br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER** |

**SEALED**

## **PLAINTIFF-RELATOR  ATTORNEYS:**

**PHILIP M ROSS**
SBN 17304200
1006 Holbrook Road
San Antonio, Texas 78218
Tel: (210) 326.2100
E-Mail/Fax:  ross_law@hotmail.com
*Attorney for Nancy Alanis, Plaintiff*

## TABLE OF CONTENTS

I.    **INTRODUCTION** ............................................................................................1

II.   **JURISDICTION AND VENUE** ....................................................................11

III.  **PARTIES** .......................................................................................................11

     A.   Relator ...................................................................................................11

     B.   Defendants ............................................................................................12

IV.  **BACKGROUND**

     A.   Summary of Mortgage Finance, Closing and Foreclosure ....................14

     B.   Relator Mortgage Loan with Original Lender ...........................................16
         New Century Mortgage Corporation, a Subsidiary of
         New Century Financial Corp., ("New Century")

           &bull;  New Century Mortgage Corporation, a subsidiary of
              New Century Financial Corp., ("New Century", *herein*).
           &bull;  2006-Relator Loan Origination
           &bull;  2006-Relator No-Escrow Affidavit

     C.   Relator Loan Allegedly Conveyed to Securitized ....................................18
         Asset Backed Receivable LLC Trust 2006-NC3
         with Stringent PSA Requirements and Transfer
         of "Loan Servicing" Rights to Loan Servicer HOMEQ

           &bull;  2006 –   NEW CENTURY was Original Lender and Loan Servicer
           &bull;  2006 –   NEW CENTURY Transferred "Loan Servicing" to HOMEQ
           &bull;  2006 –   NEW CENTURY Allegedly Conveys Relator Mortgage
                   Loan To Securitized Asset Backed Receivables, LLC
                   Pooling And Servicing Agreement Dated As Of
                   October 1, 2006 ("10.1.06 PSA") And WELLS FARGO
                   Provides During 2015 Discovery, *The Prospectus*
                   *Supplement Dated October 30, 2006*
           &bull;  2006 –   Wells Fargo Produces *The Securitized Asset Backed*
                   *Receivables, LLC Pooling And Servicing Agreement*
                   *Dated As Of October 1, 2006* ("10.1.06 PSA")
                   In A 2015 State Court Judicial Proceeding

D.   Relator Original Lender New Century Dissolved in ....................................................25
     a 2007 Liquidation Bankruptcy Proceeding
     Leaving Obscured Note / Clouded Title

        • 2007  -   New Century & Liquidation Bankruptcy

E.   WELLS FARGO and Loan Servicer *HOMEQ* Fraudulent ...........................................27
     Loan Servicing Practices Breaching PSA, Deed of Trust
     and Violating RESPA, FDCPA and TDCA and Attempted
     Unlawful Foreclosure Proceedings Against Relator

        • 2007 –   Loan Servicer Homeq Violations of RESPA, FDCPA
                   and TDCA and Tortious Interference With Note
                   and Deed of Trust

F.   WELLS FARGO and Loan Servicer *OCWEN* Fraudulent ............................................31
     Loan Servicing Practices Breaching PSA, Deed of Trust
     and Violating RESPA, FDCPA, and TDCA and Attempted
     Unlawful Foreclosure Proceedings Against Relator

        • 2010 –   Loan Servicer "Ocwen" & FDCPA Requirements
        • 2010 –   Loan Servicer "Ocwen" & TDCA Requirements
        • 2010 –   Loan Servicer "Ocwen" & RESPA Requirements
        • 2010 –   Ocwen Ignores 10.1.06 PSA and Knowingly Violates
                   FDCPA, TDCA and RESPA by Ignoring Relator
                   Timely Certified "Debt Dispute" Letters & Returns
                   Relator Timely Remitted Loan Payments
        • 2010 –   Ocwen Knowingly Violated the 10.1.06 PSA Loan
                   Servicing Agreements
        • 2011 –   Ocwen Pursues Unlawful Foreclosure Action Using
                   Knowingly Fabricated, False and/or Forged Instruments
                   in Violation of 10.1.06 PSA Relator Commences
                   Litigation

G.   2014  Notice of Rescission of Acceleration of Loan .......................................................37
     Maturity & State Court Litigation Continues

        • 2011–
          2014     Wells Fargo, Homeq And Ocwen Breach of
                   Contract and Continuing Tortious Interference
                   With Note and Deed of Trust

ii.

**V.**    **WELLS FARGO AND APRIL 13, 2011 OCC CONSENT ORDER** ................................39

**VI.**    **OCWEN AND DECEMBER 12, 2013 CFPB CONSENT JUDGMENT**...............44

**VII.**    **THE UNIFORM COMMERCIAL CODE** .................................................................48

**VIII.**    **THE WELLS FARGO FORECLOSURE TRAINING** ....................................52
        **MANUAL FOR ATTORNEYS IGNORES THE UNIFORM**
        **COMMERCIAL CODE & H JOHN KENNERTY 2010 DEPOSITION**
        (a)    Robo-signed Affidavits
        (b)    Manufactured Endorsements to Satisfy Standing To Foreclose
        (c)    Fabricating Allonges to Satisfy Standing to Foreclose
        (d)    The H John Kennerty 2010 Deposition Highlighting the
              Unlawful Custom and Practices Of Wells Fargo

**IX.**    **THE MORTGAGE BACKED SECURITIES MARKET** ...........................................56
        (a)    Agency v Non-Agency MBS
        (b)    The Securitization Process
        (c)    A Trustees Duties And Obligations

**X.**    **THE DEFENDANTS' "MBS" ENRICHMENT** ...................................................64
        **SCHEMES AGAINST THE U.S. GOVERNMENT AND INVESTORS**

        (a)    Troubled Asset Relief Program (TARP) & WELLS FARGO Bailout
        (b)    FANNIE MAE and FREDDIE MAC & Purchase of
              WELLS FARGO & DEUTSCHE BANK
              Toxic Mortgage-Backed Securities
        (c)    FHFA Sues Wells Fargo and Deutsche
              over Toxic Mortgage-Backed Securities
        (d)    National Credit Union Sues Wells Fargo
              over Toxic Mortgage-Backed Securities
        (e)    SEC Settles Claims with Wells Fargo over
              Concealing Risks with Mortgage-Backed Securities
        (f)    CFPB Settles with OCWEN over Federal Consumer
              Law Violations In Connection With Mortgage Servicing
              And NY Department of Financial Services 2014
              Investigation of OCWEN for Mortgage Servicing and SEC Violations

**XI.   RELATOR STATE COURT ACTION REVEALS THE** ...........................................70
**DEFENDANTS KNOWING, INTENTIONAL AND RECKLESS**
**FRAUDULENT "MBS" SCHEME AGAINST THE**
**U.S. GOVERNMENT AND INVESTORS VIOLATING**
**THE FALSE CLAIMS ACT**

    (a)   Relator's State Court Defendant Revelations with
           Mortgage Loan, Alleged Trust Conveyance &
           Knowing PSA Non-Compliance
    (b)   Relator & WELLS FARGO Unlawful Foreclosure(s) Violating
           Consumer Laws and Using a Forged *Transfer Of Lien*
    (c)   Relator's State Court Litigation "2012/2015 Discovery" Uncovers
           WELLS FARGO Knowing and Intentional Fraud
           In Connection with 10.1.06 PSA
           ***(i.e. Ignore Chain Of Title/No Certification Into Trust)***
    (d)   Relator State Court Litigation
           *(October 24, 2014 WELLS FARGO / OCWEN*
           *Counter Motion For Summary Judgment)*
           Uncovers WELLS FARGO Knowing and Intentional Fraud
           In Connection with 10.1.06 PSA
           ***(i.e. Ignore Public Recording & No Certification Into Trust)***
    (e)   Relator State Court Litigation
           *(2.17.15 Plea To The Jurisdiction)*
           Uncovers WELLS FARGO Knowing and Intentional Fraud
           In Connection with 10.1.06 PSA
           ***(i.e. Ignore Trust Closing Date & No Certification Into Trust)***

**XII.   DEFENDANTS' 2015 KNOWING, INTENTIONAL AND** ........................................82
**RECKLESS ACTS NON-COMPLIANT WITH MBS TRUST**
**POOLING AND SERVICE AGREEMENTS CAUSED THE U.S.**
**GOVERNMENT FINANCIAL HARM AND VIOLATED**
**THE FALSE CLAIMS ACT**

    (a)   Damages To The Government:
           False MBS Certifications Demonstrated by WELLS FARGO & OCWEN
           In State Court Litigation

    (b)   Damages To The Government:
           Knowing Fraudulent Concealment Of Impaired Value of MBS

    (c)   Damages To The Government:
           Knowing Artificial Inflated Value of MBS Trusts & No Safe Harbor

(d)   Damages To The Government:
      Knowing False MBS Certifications and Reckless
      Manipulation Of Publicly Recording Fees and
      Causing the US Government to be Overcharged
      For The Purchase Of Artificially Inflated MBS

(e)   Damages To The Government
      Reliance on Defendants Public Filings When Defendants Violated
      Multiple Federal & SEC Violations

(f)   Damages To The Government
      Federal Taxes From Trusts' Loss Of Tax Status
      *(Assignments After Trust Formation Closing Date)*

XIII.   **RELATOR REPORTS THE DEFENDANTS KNOWING,** .........................................93
        **INTENTIONAL AND RECKLESS FRAUDULENT**
        **"MBS" SCHEME AGAINST THE U.S. GOVERNMENT,**
        **SEC AND INVESTORS AND VIOLATED THE FALSE CLAIMS**

XIV.    **CAUSES   OF   ACTION**...........................................................................................95

XV.     **PRAYER FOR RELIEF** ........................................................................................105

XVI.    **REQUEST FOR JURY TRIAL** ........................................................................106

Plaintiff/Relator NANCY ALANIS ("Relator"), by and through her attorney, Philip M Ross,  files this original complaint against Defendants and alleges as follows:

## I. INTRODUCTION

1.01        This action arises out of the Defendants' knowing, intentional and reckless fraudulent acts in their role as "Trustee", "Custodian" and/or "Servicer" in connection with approximately one hundred mortgage-backed securitization trusts (the "MBS Trusts"), identified in Exhibit A. The Defendants named herein include: (i) a national banking association organized under the laws of the United States to carry on the business of a limited purpose trust company; (ii)  a trustee which control an MBS trust whose assets consisted of pools of residential mortgages alleged to be in Texas and throughout the United States, and (ii) the mortgage servicing companies that managed the day-to-day operations of the payment processing and foreclosure proceedings at the direction of the trustee banks.

1.02        The U.S. Securities and Exchange Commission ("SEC") defines MBS as follows: "…Mortgage-backed securities (MBS) are debt obligations that represent claims to the cash flows from pools of mortgage loans, most commonly on residential property. Mortgage loans are purchased from banks, mortgage companies, and other originators and then assembled into pools by a governmental, quasi-governmental, or private entity. The entity then issues securities that represent claims on the principal and interest payments made by borrowers on the loans in the pool, a process known as securitization.   Most MBSs are issued by the Government National Mortgage Association (Ginnie Mae), a U.S. government agency, or the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), U.S. government-sponsored enterprises. Ginnie Mae, backed by the full faith and credit of the U.S. government, guarantees that investors

receive timely payments. Fannie Mae and Freddie Mac also provide certain guarantees and, while not backed by the full faith and credit of the U.S. government, have special authority to borrow from the U.S. Treasury. Some private institutions, such as brokerage firms, banks, and homebuilders, also securitize mortgages, known as "private-label" mortgage securities. Mortgage-backed securities exhibit a variety of structures. The most basic types are pass-through participation certificates, which entitle the holder to a pro-rata share of all principal and interest payments made on the pool of loan assets. More complicated MBSs, known as collaterized mortgage obligations or mortgage derivatives, may be designed to protect investors from or expose investors to various types of risk. An important risk with regard to residential mortgages involves prepayments, typically because homeowners refinance when interest rates fall. Absent protection, such prepayments would return principal to investors precisely when their options for reinvesting those funds may be relatively unattractive...." (http://www.sec.gov/answers/mortgagesecurities.htm).

1.03        Each MBS Trust is a reporting entity under the Securities Exchange Act of 1934. For MBS Trusts offered post 2006, at the end of the trust's first year, the Depositor files with the SEC with respect to each MBS Trust a report on Form IO-K that contains a certification from the Trustee that collateral securing the loans held by the MBS Trust has been maintained as required by the relevant transaction agreements and that pool assets and related documents are safeguarded. *See* SEC Regulation AB, 17 C.F.R § 229. I 122(d)(4)(i) and (ii).   The Servicers make similar certifications. A Trustee re-certifies annually that the servicing requirements are met with respect to all MBS Trusts that they administer.

1.04        In connection with the MBS Trusts, the Defendants created registration statements, pooling and servicing agreements, prospectuses, supplemental prospectuses, and other written offering materials (collectively, "Offering Documents") that Defendants

2

signed and/or circulated, and which contained knowing and patently false statements of material facts and omitted to state material facts necessary in order to make the Offering Documents not misleading.

1.05      The Defendants knowingly, intentionally and/or recklessly committed multiple fraudulent and deceptive acts in promoting and selling its Mortgaged Backed Securities (MBS). MBS are mortgage pass-through certificate securities entitling the holder to income payments from pools of mortgage loans. The securities are referred to as "private label" because they are issued by private entities instead of the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which are U.S. government-sponsored enterprises ("GSEs"). Mortgage securities issued by Fannie Mae and Freddie Mac are referred to as "agency" mortgage securities.

1.06      For example, in their publicly filed documents and marketing materials, Defendants led the U.S. government, Securities and Exchange Commission and investors to believe that Defendants fully complied with MBS Pooling and Servicing Agreements ("PSA") and "publicly recorded" mortgages and subsequent assignments and transfers to ensure an accurate chain of title when they knowingly, intentionally and recklessly did not. While there were representations that the Defendants would continue to monitor the loans in their MBS Trusts for compliance with the pooling and servicing agreements and other laws, the Defendants knowingly, intentionally and recklessly failed to abide by their own PSA agreements to ensure a proper chain of title of "...**the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee** (or, in the case of a MERS Designated Loan, MERS) **with evidence of recording thereon....".** Absent "proper public recording", there is no transparency or paper trail to the mortgage assignments and consumers are adversely

impacted because their mortgage loans change hands multiple times throughout the life of the loan.  The lack of a contemporaneous public recorded mortgage stymies the consumer's ability to enforce their legal rights with their true lender and/or holder of Note.  Further, without a recorded assignment or transfer, a consumer's property can become encumbered with a seller's or creditor's lien or judgment and/or be subject to barriers preventing the sale, refinance or qualification for a home equity loan.

1.07         The Master Servicers and Servicers were also supposed to ensure the proper servicing and administration of the mortgage loans in the Covered Trusts for the benefit of MBS Certificateholders. The PSA required the Master Servicers and Servicers (and their subservicers) to exercise customary and "prudent" loan servicing practices in servicing the mortgage loans in compliance with federal and state laws. The Master Servicers and Servicers knowingly and intentionally failed to meet even the most prudent servicing standards because they regularly overcharged for various erroneous default services provided in connection with the mortgage loans and failed to (i) properly post payments from borrowers and remit them to the MBS Trusts; (ii) mailed false delinquency notices to borrowers who were not late on their payments; (iii) failed to ensure the proper maintenance and reporting of accurate information regarding the mortgage loans; (iv)  ignored all FDCPA and TDCA timely remitted "debt dispute" letters; and (v) vigorously sought improper, imprudent, incorrect and untruthful institution and prosecution of foreclosure proceedings using unlawful practices to achieve an unlawful favorable outcome.

1.08         Systematically, the Defendants knowingly, intentionally and recklessly failed to "publicly record" mortgages and fully certify the loans in the MBS Trusts and routinely ignored the defects that their limited review did uncover, and concealed from the government and investors the inadequacy of their review procedures and the defects

4

associated with the underlying loans.   They also knowingly and intentionally falsified their loan servicing compliance.

1.09        When Defendants were made aware of these problems, they used an internal manual designed to instruct attorneys on how to employ unlawful methods to correct errors and/or fabricate mortgage instruments and knowingly, intentionally and/or recklessly failed to reform their practices or disclose material information to the government and investors. As a result, many of the loans in the MBS Trusts are in fact "non-mortgaged backed securities".

1.10        Defendants also failed to respond properly to defects identified after securitization as evidenced by their unlawful post-endorsement/allonge quality control process. Defendants knowingly concealed this unlawful quality control process, they did nothing to reform the process,  and they failed to inform the government and the investors about their unconscionable deception to fabricate false mortgage documents as needed and defend the same as recently as 2015.

1.11        Defendants misconduct in connection with their due diligence and quality control processes constituted a systemic fraud on the government and thousands of investors. As a result of this fraudulent misconduct, the government and investors were deceived about the fundamentally defective character of the mortgages underlying the MBS they purchased. While many Mortgagors defaulted on their loans in exceedingly large numbers, causing the value of these securities to plummet, the value of the MBS plummeted even further when assignments were not "publicly recorded" as required by the pooling and servicing agreements and the servicing of the loans were knowingly subpar thereby compromising the true value of the MBS Trusts which caused investors in MBS to incur monumental losses. The performance of the MBS Trusts depended on the Sponsors depositing properly

underwritten mortgage loans and thereafter, ensuring proper loan servicing and a complete documentation of "Chain of Title" into the MBS Trusts.   While the quality of the mortgage loans is critical, numerous provisions of the governing agreements assured that only "properly certified" loans would be deposited into the MBS Trusts. Because the securities were to be "mortgage-backed," numerous other provisions also assured that complete documentation for each loan, including an original mortgage note and a properly "recorded" assigned mortgage, would be delivered to the Trustee by the MBS Trust "closing date".

1.12        Relator alleges the following based upon personal knowledge with regard to its own acts, and upon public information as well as information and belief as to all other matters. The Relator's investigation included but was not limited to: (1) review and analysis of the Offering Documents for the certificates that are the subject of this action; (2) review the internal foreclosure training manual for attorneys promulgated by WELLS FARGO (i.e. creating false endorsements and allonges); (3) review the depositions of former WELLS FARGO employees, individuals with first hand knowledge of ("Wells Fargo Note Endorsement teams) and the events alleged herein; (4) examination of relevant SEC filings, press releases and other public statements; (5) review and analysis of pleadings involving certain Defendants; (6) review and analysis of investigations of and complaints filed by state and federal authorities against certain Defendants; (7) review of published materials, media reports, congressional testimony, and additional related materials; (8) analysis of the performance and composition of the loan pools underlying the certificates; and (9) review of false and fabricated mortgage instruments and other documents of WELLS FARGO in Relator's case. Many of the facts related to Relator's allegations are known only by the Defendants, or are exclusively within their custody or control. Relator believes that

substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

1.13      The knowing, intentional and/or reckless fraudulent acts carried out by the Defendants and defended in state court as recently as 2015 in violation of pooling and servicing agreements with Securitized Asset Backed Receivables, LLC Pooling and Servicing Agreement Dated as Of October 1, 2006, *inter alia* (which potentially extends to over one hundred MBS Trusts) where Defendants are either, "Trustees", Custodian" and /or "Servicers" includes among other things:

(a) Executing fraudulent, fabricated and/or forged mortgage assignments under jurat;

(b) Executing fraudulent, fabricated and/or forged mortgage assignments under jurat with the signature of the loan servicer employee signing as Attorney-In-Fact under a false Power Of Attorney that pre dated the Relator loan

(c) Executing fraudulent, fabricated and/or forged mortgage assignments under jurat and signed as Attorney-In-Fact by a known loan servicer employee "robo-signer" for a mortgage company dissolved in a liquidation bankruptcy years prior to the assignment;

(d) Executing fraudulent, fabricated and.or forged mortgage assignments under jurat with purported effective dates unrelated to the date of any actual or attempted transfer (and in the case of trusts, years after the agreed "closing date" of the trusts);

(e) Executing fraudulent, fabricated and/or forged mortgage assignment under jurat prepared on behalf of grantor who had previously transferred ownership of the mortgages and notes by a valid transfer and/or no longer held an interest in the mortgage

(f) Undermining all PSA's when seeking summary judgment in 2014 on grounds there was "no duty to 'publicly record' assignments to Wells Fargo" and then falsely representing to the government and investor's compliance with "public recording" of mortgages to ensure accurate chain of title.

(g) Undermining all PSA's when using an internal training manual to execute false allonges and/or endorsements for mortgage notes missing critical documents and unable to be properly certified for the same.

(h) Undermining all PSA's when ignoring and/or contributing to unlawful loan servicing practices in violation of RESPA and the FDCPA and other state consumer laws (i.e. ignoring with impunity, timely remitted debt dispute letters from borrowers) thereby

compromising the value of the MBS Trust and then falsely representing to the government and investor's compliance with loan servicing requirements.

(i) Undermining all PSA's when using MBS funds to pursue unlawful foreclosures on mortgage loans falsely alleged to be securitized in the MBS Trust where there is no legal or equitable interest in the Note and Deed Of Trust by the MBS Trustee, thereby compromising the value of the MBS Trust and falsely representing to the government and investor's compliance with MBS Trust.

1.14     The Defendants at all times fraudulently concealed from the U.S. government and investor's that there was a custom and a practice to knowingly, intentionally and/or recklessly ignore the PSA requiring "public recording" of mortgage assignments to ensure a proper chain of title. This intentional oversight by the Defendants to not "publicly record" assignments caused notes and mortgage assignments to lack the required PSA "certifications" which would automatically preclude their placement in the MBS Trust. Without proper recording and PSA certifications, said notes and mortgages could never be delivered to the MBS Trusts by the trust "closing date". The Defendants' fraudulent acts resulted in the dissemination of false and misleading statements to the investors and the U.S. government.

1.15     The U.S. government financed the purchase of the MBS where Defendants acted as trustees or servicers of fabricated and forged assignments; assignments that were knowingly never "publicly recorded" as required by the PSA; assignments that were never certified and properly placed in the MBA Trust by the trust closing date pursuant to the PSA; and loan servicing that was knowingly subpar and not compliant with federal and state laws.     As a result, the Defendants have violated at least (26) federal criminal and other statutes as follows:

**Title 15, Chapter 2b – Securities Exchange Offenses**
15U.S.C.§78j - Manipulative and deceptive devices
15U.S.C.§78ff - Willful violations; false and misleading statements

**Title 18, Chapter 47 – Fraud and False Statement Offenses**
18 U.S.C.§1001 - False Statements or Entries
18 U.S.C.§1005 - Bank Entries, Reports and Transactions
18 U.S.C.§1010 - HUD and Federal Housing Administration transactions
18 U.S.C.§1016 - Acknowledgment/Oath
18 U.S.C.§1028 - Fraud and related activity in connection with identification documents

**Title 18, Chapter 63 – Mail Fraud Offenses**
18U.S.C.§1341–Mail Fraud
18U.S.C.§1342 - Fictitious name or address
18U.S.C.§1343–Wire Fraud
18U.S.C.§1344 - Bank Fraud
18U.S.C.§1346 - Honest Services Clause
18U.S.C.§1348 - Securities Fraud
18U.S.C.§1349 - Attempt/Conspiracy to commit Chapter 63 offenses
18U.S.C.§1350 - Certification of Financial Reports

**Title 18, Chapter 73 – Obstruction Offenses**
18U.S.C.§1505 - Obstruction of Proceedings
18U.S.C.§1510 - Obstruction of Criminal Investigations
18U.S.C.§1512 - Witness Tampering
18U.S.C.§1516 - Obstruction of Federal Audit
18U.S.C.§1517 - Obstructing the Examination of a Financial Institution
18U.S.C.§1519 - Destruction, Alteration, or Falsification of Records
18U.S.C.§1520 - Destruction of Corporate Audit Records

**Title 18, Chapter  79– Crimes and Criminal Procedure**
18U.S.C. § 1621 - Perjury generally
18U.S.C. § 1622 - Subornation of perjury
18U.S.C. § 1623 - False declarations before grand jury or court

**Other Relevant Criminal Statutes**
18U.S.C.§371  - Conspiracy

**Other Related SEC Regulations**
17C.F.R.§240.10b-5–Employment of Manipulative and Deceptive Devices
17C.F.R.§240.10b-5-1–Insider Trading
17C.F.R.§240.10b5-2–Duties of trust/confidence in misappropriation insider trading cases
17C.F.R.§240.12b–Registration and Reporting
17C.F.R.§240.12b-2–Maintenance of records and preparation of required reports
17C.F.R.§240.13a–Reports of issuers of securities registered pursuant to section 12

1.16        On September 19, 2008 President Bush announced his financial bailout plan, the

Emergency Economic Stabilization Act of 2008 to confront the national financial crisis.

This plan was initially rejected by the U.S House of Representatives on September 29. After

9

a great deal of public lobbying, on October 1, the U.S. Senate passed an amended version of the bill, which was subsequently accepted by the House two days later. This legislation created the $700 billion Troubled Assets Relief Program (TARP). Banks participating in TARP II were the biggest institutions in the US banking system. They included (in order of their Treasury equity) Citigroup, Bank of America, JP Morgan Chase, Wells Fargo, Goldman Sachs, Morgan Stanley, PNC Financial, US Bancorp, GMAC, Capital One, Regions Financial, American Express, Bank of New York Mellon, State Street Bank, and Discover Financial. The U.S. Treasury Department has invested about $200 billion in hundreds of banks through its *Capital Purchase Program* in an effort to prop up capital and support new lending.   The U.S. government has been harmed by and through the U.S. Dept. of The Treasury investment of $25,000,000,000 to WELLS FARGO on or about October 28, 2008, at the height of the national mortgage crisis (See LINK):

http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/cap/Contracts%20and%20Agreements/Wells_Fargo_Agreement_Dated_26_October_2008.pdf

1.17       The MBS  trustees, custodians, depositors and servicing companies knowingly, intentionally and/or recklessly misrepresented to the U.S. government and the public the assets of the Trusts and issued false statements in their prospectuses and certifications of compliance.   The Defendants at all times knew of their intentional and reckless non-compliance with the PSA, which resulted in a grossly impaired value of the purchased securities and also created false and inflated MBS Trust charges for services imposed by the MBS Trust "Trustee" and "Loan Servicer" particularly where there was "no public recording" of assignments and corresponding certification of mortgage loans to place into the trust by the trust "closing date" as required by the PSA.  The U.S. Government is further harmed by payments made on mortgage guarantees to Defendants lacking valid notes and

assignments of mortgages Defendants were not entitled to demand or receive said payments because of their knowing and intentional disregard of the PSA agreements.

1.18        Pursuant to the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*1 (the "FCA") damages and civil penalties resulted from the sale by Defendants of MBS, and other forms of asset-backed securities, using funds provided by the United States ("U.S.") government.

## II. JURISDICTION AND VENUE

1.19        The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts related to the State False Claim Act pursuant to 28 U.S.C. § 1367.

1.20        This Court has personal jurisdiction over the Defendants pursuant to subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) because Defendants transacted the business that is the subject matter of this lawsuit in the State of Texas and numerous acts proscribed by 31 U.S.C. § 3729 occurred in Texas.

1.21        Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1) and (c) because Defendants transact the business that is the subject matter of this lawsuit in the State of Texas and numerous acts proscribed by 31 U.S.C. § 3729 occurred in the State Of Texas.

## III.  PARTIES

### (A) Relator

1.22        **RELATOR NANCY ALANIS** brings this action on behalf of herself and the federal government pursuant to 31 U.S.C. §§ 3729-3733.  Relator obtained her degree in accounting and is a trained paralegal residing in San Antonio, Texas.  During a pending unlawful foreclosure litigation with WELLS FARGO and OCWEN in state court *(Cause*

*No. 2011-CI-02839),* Relator obtained compelling evidence of Defendants knowing fraud in connection with mortgage-backed securities. Relator's review of Defendants' discovery responses and court filings provided her direct and personal knowledge of the Defendants FCA violations as described herein.

## (B) Defendants

1.23     **DEFENDANT WELLS FARGO BANK, NATIONAL ASSOCIATION** ("WELLS FARGO") is organized as a national banking association under the laws of the United States. Upon information and belief, WELLS FARGO is also the parent company of Wells Fargo Home Mortgage, a mortgage lender headquartered in Des Moines, Iowa, with branches and offices in all states, and they are also the subsidiary of WELLS FARGO & COMPANY. WELLS FARGO's corporate headquarters is located at 101 North Phillips Avenue, Sioux Falls, South Dakota.

1.24     **DEFENDANT WELLS FARGO BANK NATIONAL ASSOCIATION, AS TRUSTEE** FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2006 NC3 ("WELLS FARGO", *herein*) is a national banking association acting as "Trustee" for the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 30, 2006* and also acting as "Trustee", Custodian" and/or "Loan Servicer" in over one hundred mortgage backed securitization trusts. Upon information and belief, WELLS FARGO is also the parent company of Wells Fargo Home Mortgage, a mortgage lender headquartered in Des Moines, Iowa, with branches and offices in all states and they are also the subsidiary of Wells Fargo & Company. The corporate trust office of the trustee is located (i) for purposes

of certificate transfers, at Wells Fargo Center, Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479 and (ii) for all other purposes, at 9062 Old Annapolis Road, Columbia, Maryland 21045, Attention: Client Manager – SABR 2006-NC3, and its telephone number is (410) 884-2000.

1.25        **DEFENDANT OCWEN LOAN SERVICING, LLC** ("OCWEN") is a subsidiary of OCWEN Financial Corporation and is a publicly traded Florida corporation headquartered in Atlanta, Ga., and the largest nonbank mortgage servicer on behalf of lenders and investors, and the fourth-largest servicer overall in the United States and registered to do business in Texas. In 2010, OCWEN acquired HOMEQ SERVICING CORPORATION the former loan servicer for WELLS FARGO.  OCWEN is also a mortgage servicer for WELLS FARGO, As Trustee for the Pooling and Servicing Agreement dated as of October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass Through Certificates Series 2006 NC3.  OCWEN maintains its principal place of business at 1661 Worthington Rd, Suite 100, West Palm Beach, Florida, 33409.

1.26        **DEFENDANT OCWEN FINANCIAL CORPORATION** ("OCWEN") is the parent company of Ocwen Loan Servicing, LLC (collectively, "OCWEN") and is a financial services holding company incorporated in Florida and maintains offices at its  principal place of business at 1661 Worthington Rd, Suite 100, West Palm Beach, Florida, 33409. OCWEN is traded on the New York Stock Exchange under ticker symbol (OCN).

1.27        **DEFENDANT DEUTSCHE BANK NATIONAL TRUST COMPANY** ("DBNTC") is a national banking association organized under the laws of the United States of America to carry on the business of a limited purpose trust company.  DBNTC's main office and principal place of business is located at 300 South Grand Avenue, Suite 3950,

Los Angeles, California 90071, and the principal site of its trust administration is located at 1761 East St. Andrew Place, Santa Ana, California 97025.

1.28    Upon information and belief, Plaintiff alleges and would prove that each of the Defendants was and is an agent of the other Defendants. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

## IV.    BACKGROUND

### A.    *Summary of Mortgage Finance, Closing and Foreclosure*

1.29    In June 2006, Relator purchased a home in Texas by financing the acquisition with a "mortgage loan" in the amount of $195,000 and executing a "mortgage deed of trust" as security interest for the repayment of the loan.  Thereafter, the mortgage loan was allegedly placed in an MBS Trust with no evidence of assignment into the MBS Trust by the trust "closing date". Following years of suspicious loan servicing misconduct including failing to properly post timely remitted loan payments and imposing inflated force-placed insurance during periods the Relator had purchased insurance, a subsequent foreclosure action ensued exposing fraudulent forged mortgage instruments and non compliance with RESPA, FDCPA and TDCA.   After receiving PSA documents through discovery and/or filed in state court judicial proceedings in January and February 2015 from WELLS FARGO and OCWEN, Relator's investigations revealed that Defendants' practices in her pending case occurred in numerous other cases, clouded titles and compromised foreclosures in Texas and nationwide because the Defendants' all-but-admitted-to

knowingly, intentionally and/or recklessly violating pooling and servicing agreements with impunity when failing to "publicly record and properly certify" mortgage loans into MBS Trust by the trust "closing date".

1.30    As it pertains to obtaining a mortgage loan, a borrower obtains money from a bank or mortgage company to finance the purchase and sale of real estate.   Generally a promissory note and deed of trust are the documents executed at closing between the borrower and by an officer of the mortgage lender to document the mortgage loan transaction with a contemporaneous public recording of the mortgage deed of trust.

1.31    Thereafter, the lender records the mortgage deed of trust as a lien against the property by filing a copy with the county recorder's office in the county in which the property is located. Any assignment of a note and mortgage from the lender to a purchaser is attested simply by the signatures of the parties involved, which are often notarized or witnessed.

1.32    A subsequent purchaser traditionally records its ownership of the note and mortgage by filing the assignment with the county recorder's office. But in this case involving the mortgage-backed securities trusts, "public recording" of the assignments rarely and possibly never occurred and mortgage loans were not properly certified and placed in the trust by the "closing date".

1.33    At closing or "settlement", the borrower signs the final mortgage documents and the property is legally transferred to the borrower. It typically involves the borrower and any co-borrowers, a closing agent and a real estate agent, although closing practices may vary. Many documents are signed at closing including but not limited to:

    **(1)**   **The Mortgage Note**. A legal document that provides evidence of your debt and your formal promise to repay the mortgage loan.

    **(2)**   **The Mortgage or Deed of Trust**. The security instrument that you give to the lender that protects the lender's interest in your property. When you sign the deed

of trust, you are giving the lender the right to take the property back by foreclosure if you fail to pay the mortgage according to the set terms.

(1) **The final Truth-in-Lending Disclosure**. This document reflects any changes to the terms of your mortgage loan since your application date.

(2) **Affidavits and Declarations**. Statements declaring something to be true, such as the property will be your principal place of residence.

(3) **The HUD-1 Statement**. Discloses the final details of your mortgage loan including:

    a. The actual settlement charges you will be paying

    b. A comparison of the costs disclosed on your GFE to the costs being charged at closing

    c. Your final loan terms

1.34       If the borrower defaults on the payments, the lender, or a new owner of the note and mortgage, can advance a foreclosure action pursuant to the statutory requirements in state court to obtain a court order for the auction of the property, and in this manner can receive payment on the loan by sale of the asset.  Prior to advancing a foreclosure lawsuit, the plaintiff must prove that they have a legal or equitable interest in the note and deed of trust and/or that the plaintiff is the entity that lawfully owns the note and mortgage, and a default by non-payment occurred.

### B. Relator Mortgage Loan with Original Lender
### New Century Mortgage Corporation,
### a subsidiary of New Century Financial Corp., ("New Century", herein)

1.35      **2006 – RELATOR LOAN ORIGINATION**:  On June 15, 2006 Relator entered into an adjustable rate loan transaction ("Loan") with New Century Mortgage Corporation, a subsidiary of New Century Financial Corporation ("NEW CENTURY").  By virtue of an executed Note and Deed, Relator alleges a right, title, or ownership interest in the property. NEW CENTURY loaned Relator $193,500 for the purchase of an improved residential property commonly known as 13210 Hunters View, San Antonio, Texas, Bexar County and legally described as Lot 2, Block 6, New City Block 16984, Hunters Creek North, Unit-3 in the City Of San Antonio, Bexar County, Texas according to the map or plat

thereof recorded in Volume 8200, pages 215-216 of the Deed and Plat Records of Bexar

County, Texas ("Property", herein).  The Deed Of Trust contained provisions as follows:

(a)  In pertinent part, the provisions of the Deed Of Trust ¶2. ***Application of Payments and Proceeds*** states as follows:  "*…Except as otherwise described in this Section 2, all payments accepted by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b)  principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note…*".  There are no exceptions in Section 2 for application of N ALANIS regular monthly payments.

(b)  In pertinent part, the Deed Of Trust on pg 5 of 16 @ ¶ 3 (cont)  states as follows:  "*…Borrower shall pay directly, when and where payable, the amounts due for the Escrow Items for which payment of Funds has been waived by Lender **and, if Lender requires, shall furnish Lender receipts evidencing such payment** within such time period as Lender may require….**Lender may revoke the waiver as to any or all Escrow Items** at any time **by notice given in accordance with Section 15**….*"

(c)  In pertinent part, the provisions of the Deed Of Trust  ¶5. ***Property Insurance*** states as follows:  Borrower shall keep the improvements now existing or hereafter erected on the Property insured…**If Borrower fails to maintain any of the coverages** described above, Lender may obtain insurance coverage, at Lenders option and Borrowers expense…".

(d)  In pertinent part, the provisions of the Deed Of Trust ¶22. ***Acceleration: Remedies*** states as follows: "*…Lender shall give notice to Borrower prior to acceleration following Borrowers breach of any covenant …The **notice shall specify:  (a) the default**; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to the Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security instrument…The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action…*"

1.36    **2006 - RELATOR NO ESCROW AFFIDAVIT**:  As part of her loan terms,

Relator was required to sign a "No Escrow" agreement.  Monthly "Mortgage" payments

were $1,631.71 and totaled $19,580.52 per year.  Section 3 of the Deed of trust deals with

Escrow items (i.e. Taxes and Insurance premiums).  The lender waived the requirement for

escrow of taxes taxes and insurance premiums when the loan was closed, and at no time

17

throughout the duration of the loan did the lender provide Relator a *Notice of Revocation of Escrow* as required by paragraph # 3 of the Deed Of Trust.

### C. Relator Loan  Allegedly Conveyed to Securitized Asset Backed Receivable LLC Trust 2006-NC3 With Stringent PSA Requirements and Transfer Of "Loan Servicing" Rights To Loan Servicer HOMEQ

1.37      **2006 – NEW CENTURY WAS ORIGINAL LENDER AND LOAN SERVICER:** NEW CENTURY was Relator's original lender and loan servicer from June to October 2006.  At closing, Mission Title helped facilitate communication with NEW CENTUR, and Relator obtained written permission from NEW CENTURY to remit multiple payments to cover multiple months due to out of state travel to address her mothers healthcare.  After closing, Relator obtained refund checks from the taxing authority and Mission Title and Realtor was advised by the taxing authority and Mission Title that she overpaid on her taxes. To address this issue, Mission Title promptly facilitated Relator communication with NEW CENTURY and Relator agreed with NEW CENTURY request to submit additional funds directly to them to pay the "Sellers" portion of the 2006 taxes. NEW CENTURY also requested and approved a revised insurance policy for a reduced period in 2006,  when Relator apprised them of issues with her insurance company and documents not signed at closing.   Relator was never in default with her loan with her original lender NEW CENTURY.

1.38      **2006 - NEW CENTURY TRANSFERRED "LOAN SERVICING" TO HOMEQ:** On or about February 22, 2007, NEW CENTURY apprised Relator that only the "Servicing" of the Loan had been transferred in September 2006 to HomEq Servicing Corporation ("HOMEQ") and Relator was instructed to remit her loan payments to HOMEQ.  Because Relator never received the September 15, 2006 notice, she continued to

remit payments and all loan matters to NEW CENTURY until NEW CENTURY provided

Relator a copy of the September 2006 loan servicing transfer notice in 2007.

1.39     **2006 - NEW CENTURY ALLEGEDLY CONVEYS RELATOR MORTGAGE LOAN TO SECURITIZED ASSET BACKED RECEIVABLES, LLC POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 ("10.1.06 PSA") AND WELLS FARGO PROVIDES DURING 2015 DISCOVERY, *THE PROSPECTUS SUPPLEMENT DATED OCTOBER 30, 2006*:**

Four months after closing on the Relator loan, NEW CENTURY allegedly transferred

Relator mortgage loan into the Trust identified as "Prospectus Supplement dated October

30, 2006" in connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage*

*Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated*

*as of October 1, 2006,* and WELLS FARGO and OCWEN provided this LINK during

discovery in 2015 in state court action *(Cause No. 2011-CI-02839)* as follows:

https://www.sec.gov/Archives/edgar/data/1378964/000091412106003360/0000914121-06-003360.txt

The LINK was directed to an internet page with the document identified as the *Prospectus*

*Supplement dated October 30, 2006* in connection with the *Securitized Asset Backed*

*Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under*

*Pooling and Servicing Agreement Dated as of October 1, 2006* (**"10.30.06 Prospectus**

**PSA"**).

In pertinent part, the **10.30.06 Prospectus PSA** provides on pg. S-46 that NEW

CENTURY transferred its mortgage loans to NC CAPITAL as follows:

> "**...RESPONSIBLE PARTY...** General
>
>      The information set forth under this heading "The Responsible Party" has been provided by NC Capital Corporation ("NC Capital") and relates solely to the mortgage loans acquired from NC Capital.
> **New Century Mortgage Corporation transferred the mortgage loans to its affiliate, NC Capital, which, in turn, sold the mortgage loans to an affiliate of the depositor. New Century Mortgage Corporation is a wholly owned operating subsidiary of New Century Financial Corporation, a publicly traded company...."**

19

Thereafter, NC CAPITAL sold the NEW CENTURY mortgage loans to SUTTON and in pertinent part, the **10.30.06 Prospectus PSA** states the same on pg. S-65 as follows:

> "…Assignment of the Mortgage Loans
>
> Pursuant to a mortgage loan purchase and warranties agreement, NC Capital Corporation sold the mortgage loans, without recourse, to Sutton, and Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans, including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, without recourse, to the depositor on the closing date…."

Relator's loan was also required to be delivered to the Trust "**on or before the closing date**" of October 2006. In pertinent part, the **10.30.06 Prospectus PSA** states on pg. S-65 – S66 as follows:

> Delivery of Mortgage Loan Documents
>
> In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:
>
> (a) **the original mortgage note**, endorsed without recourse in blank by the last endorsee, including all intervening endorsements **showing a complete chain of endorsement from the originator to the last endorsee**;
>
> (b) the original of any guaranty executed in connection with the mortgage note (if provided);
>
> (c) the related original mortgage and evidence of its recording or, in certain limited circumstances, a copy of the mortgage certified by the originator, escrow company, title company, or closing attorney;
>
> (d) originals of all assumption, modification, consolidation and extension agreements, with evidence of recording on them (if provided);
>
> (e) **the mortgage assignment(s), or copies of them certified by the applicable originator, escrow company, title company, or closing attorney, if any, showing a complete chain of assignment from the originator of the related mortgage loan to the last endorsee**--which assignment may, at the originator's option, be combined with the assignment referred to in clause(f) below;

20

(f) a mortgage assignment in recordable form, which, if acceptable for recording in the relevant jurisdiction, may be included in a blanket assignment or assignments, of each mortgage from the last endorsee in blank;

(g) an original or a copy of a mortgagee title insurance policy or, in the event the policy is unavailable, a copy of the related policy binder or commitment for title insurance; and

(h) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided). Pursuant to the pooling and servicing agreement, **the custodian will agree to execute and deliver on or prior to the closing date an acknowledgment of receipt of the original mortgage note, item (a) above, with respect to each of the mortgage loans delivered to the custodian, with any exceptions noted. The custodian will agree, for the benefit of the holders of the certificates, to review, or cause to be reviewed, each mortgage file within ninety days after the closing date--or, with respect to any Substitute Mortgage Loan delivered to the custodian, within 30 days after the receipt of the mortgage file by the custodian--and to deliver a certification generally to the effect that, as to each mortgage loan listed in the schedule of mortgage loans,**

- **all documents required to be reviewed by it pursuant to the pooling and servicing agreement are in its possession;**

- each such document has been reviewed by it and appears regular on its face and relates to such mortgage loan;

- based on its examination and only as to the foregoing documents, **certain information set forth on the schedule of mortgage loans accurately reflects the information set forth in the mortgage file delivered of such date;** and

- **each mortgage note has been endorsed as provided in the pooling and servicing agreement.**

In pertinent part, the "closing date" is identified in the **10.30.06 Prospectus PSA** on pg. S-8 as follows:

**Relevant Dates**

```
Cut-off Date................. October 1, 2006.

Closing Date................. On or about October 31, 2006.
```

Additionally, the loan servicer was identified as HOMEQ Servicing Corporation

and in pertinent part, "HOMEQ" is identified in the **10.30.06 Prospectus PSA** on pg. S-52

as follows:

General

HomEq Servicing Corporation ("HomEq") **will act as servicer for the mortgage loans**. The servicer will service the mortgage loans in accordance with the pooling and servicing agreement.

The HOMEQ policies and procedures are identified in the Prospectus Supplement

dated October 30, 2006 and states on pg. S-52 as follows:

Once a mortgage loan has been boarded, **HomEq begins to collect mortgage payments in adherence to the applicable servicing agreement and customary industry standards.** HomEq's collections strategy is based on a predictive behavioral scoring system that enables collection efforts to be focused on mortgage loans that represent the greatest risks within the servicing portfolio and is intended to address potential collection problems as soon as possible before they migrate into more costly delinquency, foreclosure and REO status.

1.40 **2006 – WELLS FARGO PRODUCES THE SECURITIZED ASSET BACKED RECEIVABLES, LLC POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 ("10.1.06 PSA") IN A 2015 STATE COURT JUDICIAL PROCEEDING:**

On February 10, 2015 WELLS FARGO, by and through their attorneys Mark

Cronenwett and Jeffrey Hiller, filed in a Bexar county judicial proceeding the 2.10.15

Affidavit Of Katherine Ortwerth with attached exhibits identified as "...*The records attached*

*hereto are the originals or exact duplicates of the originals*...".  Exhibit "A-5" was a

document identified as the *Pooling and Servicing Agreement, with attached Schedule I*

("10.1.06 PSA", *herein*).  The cover page of the document is titled *Securitized Asset Backed*

*Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under*

*Pooling and Servicing Agreement Dated as of October 1, 2006.* While WELLS FARGO successfully used this document to support their "standing" to foreclose the Relator's Property, the document appears to be fatally defective as it contains computer generated signatures with "No Current and/or Effective Date" entered on the agreements. Many of the important representations and warranties by the contracting parties to the Trust ("Trustee", "Custodian", "Servicer"), which were filed with the Securities and Exchange Commission and represented to the holders of the bonds (the "Certificate holders") issued by the Trust in connection with the PSA mortgage loans would reveal the contracting parties knowing and intentional pattern of fraud and deception eight years later between 2014- 2015. After the national financial crisis, valuation issues surfaced with MBS.

1.41        Pursuant to **Sec 2.01, Article II, Conveyance Of Mortgage Loans**; **Representation And Warranties** in connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* **("10.1.06 PSA"),** a secure chain of title with "recording" is a prerequisite for certification of mortgage loans placed into the MBS trust by the "closing date". The **10.1.06 PSA** states in relevant part:

(a)   The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund.   On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b)   **In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian** for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

   (i)   **The original Mortgage Note bearing all intervening endorsement showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee.** To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party;

   (ii)   The original of any guarantee executed in connection with Mortgage Note;

   (iii)   **the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording.** If, in connection with any Mortgage Loan, the original Mortgage cannot be delivered with evidence of recording thereon on or prior to the Closing Date because a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage the Responsible Party shall deliver or cause to be delivered to the Custodian a photocopy of such Mortgage, together with (A) in the case of a delay caused by the public recording office, an officer's Certificate of the Responsible Party (or certified by the title company, escrow agent, or closing attorney) stating that such Mortgage has been dispatched to the appropriate recording office for recordation and the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by Responsible Party; or (B) in the case of a Mortgage where a recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage

   (iv)   the originals of all assumptions, modification, consolidation and extension agreement, if any, **with evidence of recording thereon;**

   (v)   **the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee** (or, in the case of a MERS Designated Loan, MERS) **with evidence of recording thereon.**

1.42        Pursuant to *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* Section 10.03 Governing Law states as follows:

> THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

### D. Relator Original Lender New Century
### Dissolved in a 2007 Liquidation Bankruptcy Proceeding
### Leaving Obscured Note/Clouded Title

1.43        **2007 - NEW CENTURY & LIQUIDATION BANKRUPTCY**:  Government websites contain orders, rulings and evidence in connection with the NEW CENTURY liquidation bankruptcy and further proof the Relator original lender NEW CENTURY was a dissolved entity beginning in 2007 as follows:

(a)   **WEBSITE:**
http://www.deb.uscourts.gov/sites/default/files/opinions/judge-kevin-j.carey/kjc02200807-10416.pdf

**DOCUMENT: 2.14.08**
*In re New Century TRS Holdings, Inc., et al*
Case No. 07-10416 (KJC)
"…New Century TRS Holdings, Inc. and its affiliates (the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code on April 2, 2007…"

(b)   **WEBSITE:**
http://www.deb.uscourts.gov/sites/default/files/opinions/judge-kevin-j.carey/kjc2012020707-10416_1.pdf

**DOCUMENT: 2.7.12**
*In re New Century TRS Holdings, Inc., et al 1*
Case No. 07-10416 (KJC)

"**…1The Debtors are the following entities**: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware

corporation; **New Century Mortgage Corporation** (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), **a California corporation**; **NC Capital Corporation,** a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; ....

(c)   **WEBSITE:**
**http://www.deb.uscourts.gov/sites/default/files/opinions/judge-kevin-j.carey/kjc05060907-10416ord.pdf**

**DOCUMENT: 5.1.09**
*In re New Century TRS Holdings, Inc., et al*
Case No. 07-10416 (KJC)

"...The Examiner shall transfer to the Liquidating Trustee, as requested by the Liquidating Trustee, copies of all of (a) the that were produced to the examiner by a number of parties, including the Debtors...."

(d)   **WEBSITE:**
http://www.deb.uscourts.gov/sites/default/files/opinions/judge-kevin-j.carey/kjc07030807-10416.pdf

**DOCUMENT: 7.2.08**
In re New Century TRS Holdings, Inc., et al
Case No. 07-10416 (KJC)

"...(pg 9) PLAN SUMMARY. The Plan is the result of extensive negotiations between the Debtors, the Creditors Committee...as well as other creditor groups. n.12 On April 9, 2007, the US Trustee appointed the Creditors' Committee, consisting of seven creditors holding claims of various types against different Debtors capital structure...." (Declaration of Holly Felder Etlin In Support Of Confirmation of the Second Amended Joint Chapter 11 Plan Of Liquidation dated as of April 23, 2008 (docket no. 6407)....The Creditors Committee consists of three creditors of NCFC (i) Credit Suisse First Boston Mortgage Capital LLC...(ii) Wells Fargo Bank, NA, an indenture trustee for junior subordinated noteholders..."....(pg 10) (a) The Debtor Groups...The plan structure separates the Debtors into three groups (each, a "Debtor Group") to facilitate the distribution to the unsecured creditors: (1) The Holding Company Debtors, (2) the Operating Debtors, and (3) Access Lending.... The Holding Company Debtors consist of NCFC, New Century TRS Holdings, Inc ("TRS Holdings"), New Century Credit Corporation ("NC Residual IV"). The Holding Company Debtors were real estate investment entities that typically held residual interests in securitizations trusts, owned stock in the Operating Debtors, and provided overall direction and to the Operating Debtors....(b) Classification of Claims. The Plan classifies claims based upon the three Debtor Groups. Claims against the Holding Company Debtors are placed in classes HC1 through HC13...(pg 21)...Holding Company Assets.... (b) The Deferred Compensation Trust. **In January 1999, New Century Financial Corporation entered into "The New**

**Century Financial Corporation Supplemental Benefit and Deferred Compensation Trust Agreement" with Wells Fargo Bank, NA to establish a funding source for benefit plans adopted by TRS Holdings (The Deferred Compensation Trust was owned by TRS Holdings.** (Tr. 4/25/08 at 66:13-18)… Although the Debtors Schedules were amended in March 2008, Schedule B for NCFC continues to list Deferred Compensation Trust as being owned by NCFC (See docket no. 1004; Tr. 4/25/08 @ 76:1-79:3)….

**(g)**    **WEBSITE:**
**NEW CENTURY LIQUIDATING TRUST**
**2nd Distribution:**
http://ncliquidatingtrust.com/distro2.html

**3rd Distribution:**
**http://www.ncliquidatingtrust.com/**
**Review Schedule I, II, III, IV:**
There is no reference to the WELLS FARGO National Bank, as Trustee for the Pooling And Servicing Agreement Dated As Of October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3

*E.  WELLS FARGO and Loan Servicer HOMEQ*
*Fraudulent  Loan Servicing Practices Breaching PSA, Deed Of Trust and Violating*
*RESPA, FDCPA, and TDCA and Attempted*
*Unlawful Foreclosure Proceedings Against Relator*

1.44        **2007 – LOAN SERVICER HOMEQ VIOLATIONS OF RESPA, FDCPA AND TDCA AND TORTIOUS INTERFERENCE WITH NOTE AND DEED OF TRUST**

Shortly after HOMEQ began servicing Relator's loan, Relator received routine HOMEQ notices beginning in 2007 advising that the loan was in default for non-payment of mortgage payments, which was patently false because Relator was current with her loan payments, taxes and insurance. HOMEQ secured unlawful and ultra-inflated force-placed insurance and escrowed her for the same without prior notice and during periods she was separately paying insurance and taxes, in part approved by her original lender NEW CENTURY. HOMEQ also sought duplicate "2006 tax payments" from Relator in early 2008 and Relator relied on HOMEQ representations the 2006 taxes remained unpaid and promptly paid the 2006 taxes again to HOMEQ after Relator remitted the "Sellers" portion of the 2006 taxes

to NEW CENTURY in 2006 shortly after the loan closed.   After Relator made repeated complaints to HOMEQ about their questionable loan servicing practices and failure to properly post her loan payments, HOMEQ refused to accurately advise Relator of the specific loan issues and falsely reported Relator timely remitted payments as "late payments" to the credit bureaus and HOMEQ's alleged "late payment" records conflicted with the "late payments" actually reported to third parties through the credit bureaus. HOMEQ also made repeated calls to Relator's business and shared her account information with Relator's staff and used profane language to convey messages.   In 2008, after Relator learned of the HOMEQ false reporting with credit bureaus that compromised a loan re-finance opportunity at a 4% fixed interest rate, Relator was placed in contact with a HOMEQ escalation supervisor (Tammy Fair) who reviewed Relator loan payment history and issues with insurance and false reporting to credit bureaus.  Thereafter, Tammy Fair apprised Relator she agreed there were HOMEQ loan errors with incorrect posting of Relator loan payments and insurance and promised to correct the same and provide credit to her account so Relator could obtain the 4% loan.  Those statements were false as Relator's loan issues were never corrected.   Relator also complained to the Federal Reserve in 2009 and provided them proof of her insurance coverage for the HOMEQ disputed periods and was advised by the Federal Reserve in early 2010 that HOMEQ was instructed to remove the force-placed insurance but they did not.  In 2010, HOMEQ accelerated Relator loan, set the Property for foreclosure, but then cancelled the same. Relator learned in 2015 that HOMEQ never held any assignment from NEW CENTURY and was unable to pursue a foreclosure action in 2010.  HOMEQ also refused and returned Relator's timely remitted loan payments beginning on or about April 2010. After commencing a litigation in 2011 to stop an unlawful foreclosure action by WELLS FARGO, Relator obtained discovery

documents from WELLS FARGO and OCWEN in April 2012 and learned that HOMEQ failed to comply with the Federal Reserve instructions to remove their force-placed insurance and breached the deed of trust repeatedly when applying her loan payments first to unlawful and ultra inflated force-placed insurance and 2006 tax Escrow sums (after Relator retained separate insurance coverage and paid the 2006 taxes twice). HOMEQ did not apply Relator loan payments to "Interest and then Principal" as required by the Deed Of Trust (Deed Of Trust ¶2. **Application of Payments and Proceeds**) thereby knowingly breaching the deed of trust and causing her loan to appear in default when it was not. Relator also discovered through reviewing WELLS FARGO/OCWEN April 2012 discovery documents that the letter HOMEQ mailed to the Federal Reserve in 2009 was filled with false statements and concealment of the Relator timely remitted loan payments, tax and insurance payments. Through review of the documents, Relator learned that HOMEQ did not remove the force-placed insurance as required by the Federal Reserve, but continued to use her timely remitted loan payments to apply to unauthorized escrow sums for unlawful force-placed insurance and 2006 taxes that had already been paid. HOMEQ also admitted to the Federal Reserve, that they placed the Relator loan payments in Suspense accounts, which violated the Deed Of Trust. (Deed Of Trust ¶2. **Application of Payments and Proceeds).** HOMEQ breached the deed of trust and placed Relator "September 2007" payment in a "Suspense" account and did not correct the mistake until two years later in August 2009 and fraudulently concealed this information from Relator. That September 2007" payment placed in a "Suspense" account, caused Relator loan to falsely appear delinquent for over two years and during that two year period, HOMEQ harassed and falsely accused Relator of being delinquent with mortgage payments when she was not. The Deed Of Trust did not authorize the diversion of principal and interest payments to other

29

applications as was done by HOMEQ. The result of HOMEQ's unauthorized diversion of Relator timely remitted Mortgage payments into "ESCROW", "Suspense" and "Unapplied" accounts was that HOMEQ's records falsely reflected Relator as delinquent in principal and interest payments, which was not a legitimate delinquency. As a result of this unauthorized diversion of Relator timely remitted Mortgage payments, unauthorized "Late and/or Other Interest Charges" on monthly principal and interest payments began to accrue. HOMEQ also falsely reported to Relator and other third parties that she was delinquent with her loan payments and/or failed to timely remit payments when those statements were patently false.

1.45      In summary, prior to learning the Defendants held no legal or equitable interest in her note and deed of trust, Relator was advised by multiple federal and state agencies to write timely "debt dispute" letters to WELLS FARGO loan servicer HOMEQ because they were engaging in unfair, deceptive and unlawful servicing processes in connection with the Relator loan and were subject to RESPA and the consumer protection laws in the conduct of their debt collection and foreclosure activities. Under federal and state consumer protection laws, the banks and loan servicers are prohibited from engaging in unfair or deceptive practices with respect to consumers. In the course of their conduct, management and oversight of loan servicing with the Relator loan, WELLS FARGO and their loan servicer HOMEQ engaged in a pattern of unfair and deceptive practices in the discharge of their loan servicing activities, including, but are not limited to, the following: (1) failing to timely and accurately apply payments made by Relator and failing to maintain accurate account statements; (2) refusing and returning Relator timely remitted loan payments; (3) charging excessive or improper fees for "no" default-related services; (4) imposing force-placed insurance before properly notifying the borrower when borrower already had adequate coverage and failing to remove force placed insurance pursuant to Federal Reserve

instructions; (5)   providing false or misleading information in response to borrower complaints; (6)  concealing the liquidation bankruptcy of NEW CENTURY and the trustee non- compliance with the trust "closing date"; and (7) violating state and federal debt collection laws and RESPA with impunity.

### F.  WELLS FARGO  and Loan Servicer OCWEN
### Fraudulent  Loan Servicing Practices Breaching PSA, Deed Of Trust and
### Violating RESPA, FDCPA, and TDCA and
### Attempted Unlawful Foreclosure Proceedings Against Relator

1.46        **2010 – LOAN SERVICER "OCWEN" & FDCPA REQUIREMENTS**:  In May 2010, OCWEN Loan Servicing, LLC ("OCWEN" herein) purchased HOMEQ. Thereafter, OCWEN advised Relator by mail in August 2010, they were the new loan servicer.    On September 13, 2010, OCWEN mailed Relator an "unpaid debt" notice. Among other things, OCWEN identified itself as a debt collector and provided Alanis the FDCPA "thirty days" notice to dispute the debt.  In pertinent part, the OCWEN notice read *"…If, within thirty days after receipt of this notice, you dispute the validity of this debt,  or any portion thereof, is disputed, we will: (1)  Obtain verification of the debt…"*

1.47        **2010 – LOAN SERVICER "OCWEN" & TDCA REQUIREMENTS**:

Similarly and in pertinent part, the Texas Finance Code provides as follows:

Sec. 392.202.  CORRECTION OF THIRD-PARTY DEBT COLLECTOR'S OR CREDIT BUREAU'S FILES.
(a)  **An individual who disputes the accuracy of an item that is in a third-party debt collector's or credit bureau's file on the individual and that relates to a debt being collected by the third-party debt collector may notify in writing the third-party debt collector of the inaccuracy.  The third-party debt collector shall make a written record of the dispute.......**
(b)  **Not later than the 30th day after the date a notice of inaccuracy is received, a third-party debt collector who initiates an investigation shall send a written statement to the individual:**
    (1)  **denying the inaccuracy;**
    (2)  **admitting the inaccuracy;  or**
    (3) stating that the third-party debt collector has not had sufficient time to complete an investigation of the inaccuracy.

1.48        **2010 – LOAN SERVICER OCWEN & "RESPA" REQUIREMENTS**:
Additionally, RESPA relies on existing Authority: 12 U.S.C. 2603--2605, 2607, 2609,
2617, 5512, 5532, 5581 and imposes a deadline for a loan servicer to respond to any written
notice from the borrower that asserts an error.  TITLE 12 – Banks and Banking, Chapter X –
Bureau of Consumer Financial Protection, Part 1024 – Real Estate Settlement Procedures
Act (Regulation X) (All Subparts).    Pursuant to Part 1024 – Real Estate Settlement
Procedures Act (Regulation X), Subpart C- Mortgage Servicing:

**§1024.35  Error resolution procedures.**
   (a) *Notice of error.* A servicer shall comply with the requirements of this section for any
   written notice from the borrower that asserts an error and that includes the name of the
   borrower, information that enables the servicer to identify the borrower's mortgage loan
   account, and the error the borrower believes has occurred. A notice on a payment
   coupon or other payment form supplied by the servicer need not be treated by the
   servicer as a notice of error. **A qualified written request that asserts an error relating
   to the servicing of a mortgage loan is a notice of error for purposes of this section,
   and a servicer must comply with all requirements applicable to a notice of error
   with respect to such qualified written request.**
                          \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
   (d) *Acknowledgment of receipt.* **Within five days (excluding legal public holidays,
   Saturdays, and Sundays) of a servicer receiving a notice of error from a borrower,
   the servicer shall provide to the borrower a written response acknowledging
   receipt of the notice of error**.  (emphasis added)

1.49        **2010 – OCWEN IGNORES 10.1.06 PSA AND KNOWINGLY VIOLATES
           FDCPA, TDCA AND RESPA BY IGNORING RELATOR TIMELY CERITIFIED
           "DEBT DISPUTE" LETTERS & RETURNS RELATOR TIMELY REMITTED
           LOAN PAYMENTS**:

Relator relied on OCWEN's FDCPA, RESPA and TDCA representations and after
consulting with the Federal Reserve and Office Of The Comptroller Of The Currency for
guidance on how to respond to OCWEN's September 2010 false unpaid debt letter, Relator
retained an attorney and timely mailed multiple "debt dispute" letters by regular and
certified mail between September 2010 and December 2010 to OCWEN disputing the
alleged debt and inquiring about the identity of her Creditor. OCWEN intentionally ignored
all the Relator's "debt dispute" letters and never responded to Relator or her attorney.

OCWEN never provided payment coupons to Relator and also refused and returned the Relator timely remitted loan payments.

1.50      **2010 - OCWEN KNOWINGLY VIOLATED THE 10.1.06 PSA LOAN SERVICING AGREEMENTS:** The PSA expressly prohibited OCWEN from engaging in unfair or deceptive practices with respect to consumers, but OCWEN  and ignored federal and state consumer protection laws with impunity.   In the course of their conduct, management and oversight of loan servicing with the Relator's loan, WELLS FARGO and their loan servicer OCWEN engaged in a pattern of unfair and deceptive practices in the discharge of their loan servicing activities, include, but are not limited to, the following: (1) failing to timely and accurately apply payments made by Relator and failing to maintain accurate account statements;   (2) refusing and returning the Relator timely remitted loan payments; (3) charging excessive or improper fees for "no" default-related services;   (4) maintaining force-placed insurance without properly notifying the borrower when borrower already had adequate coverage and failing to remove force placed insurance pursuant to Federal Reserve instructions; (5)  providing false or misleading information in response to borrower complaints; (6) violating state and federal debt collection laws and RESPA with impunity; (7)  communicating with Relator while she was represented by an attorney; (8) ignoring a court order to continue to make the Relator loan appear delinquent; (9) altering and forging mortgage loan records and filing the same in judicial proceedings; (10) concealing the liquidation bankruptcy of NEW CENTURY and the trustee non- compliance with the trust "closing date"; and (11) filing false affidavits with fraudulent exhibits (ie 2.2.11 *Transfer of Lien*,  HOMEQ Servicing History and 12/2010 Default Notice) in a judicial proceeding to cause Relator additional financial harm.

1.51      **2011 - OCWEN PURSUES UNLAWFUL FORECLOSURE ACTION USING KNOWINGLY FABRICATED, FALSE AND/OR FORGED INSTRUMENTS IN VIOLATION OF 10.1.06 PSA AND RELATOR COMMENCED LITIGATION:**

Without providing Relator a *Notice Of Default/Notice of Acceleration* and the requisite "20 day to cure" as provided by the Texas Property Code 51.002(d), on January 13, 2011, OCWEN, by and through their debt collector law firm of Mackie Wolf Zientz & Mann, PC, mailed Relator a *Notice Of Acceleration of Loan Maturity* and *Notice of Foreclosure Sale*. In pertinent part, the letter stated: "***...We have been employed by our client to represent it in collecting the indebtedness and enforcing the Deed Of Trust....This firm is a debt collector attempting to collect the debt***...". Relator commenced a state court action and through discovery and other research, uncovered Defendants monumental fraud in connection with the 10.1.06 PSA. Among other things, the Defendants:

    (a) Executed a February 2, 2011 fraudulent, fabricated and/or forged "*Transfer Of Lien*" under jurat. *The Transfer Of Lien* purported to show a transfer of the Relator note and deed of trust from NEW CENTURY to WELLS FARGO, effective February 22, 2014.

    (b) Executed a February 2, 2011 fraudulent, fabricated and/or forged *Transfer of Lien* under jurat with the signature of an OCWEN loan servicer employee signing as Attorney-In-Fact under a false Power Of Attorney that pre dated the Relator loan. A New York Court identified OCWEN employee Christina Carter as a known "robo-signer"

          **WEBSITE:**
          http://api.ning.com/files/oy9fgeV30PEwLoJigjTNqRDeHpPyLLg798trIgDgpftqi
          Uy5luJUzqCdrVIuKt9tFS81NVdBtGs0sSIs7i**vJuTk2KeaIiJ/christina_carter.jp
          g
          **DOCUMENT: 5.24.10**
          Florida Department Of State Notary Commissions Notary Public Commission
          Application For ***Christina Carter***

          **WEBSITE:**
          http://www.nycourts.gov/reporter/3dseries/2011/2011_51208.htm
          **DOCUMENT: July 1, 2011**
          *HSBC Bank USA, N.A. v Taher*
          Slip Copy2011 WL 2610525, 2011 N.Y. Slip Op. 51208(U)

    (c) Executed a February 2, 2011 fraudulent, fabricated and/or forged *Transfer of Lien* under jurat and signed as Attorney-In-Fact by a known OCWEN loan servicer

employee "robo-signer" for a mortgage company dissolved in a liquidation bankruptcy years prior to the assignment. OCWEN robo-signer Christina Carter signed a *Transfer Of Lien* in February 2011 as the Attorney-In-Fact for NEW CENTURY, a dissolved entity as a result of a 2007 liquidation bankruptcy. *Id.*

(d) Executed a February 2, 2011 fraudulent, fabricated and/or forged mortgage assignments under jurat with purported effective dates unrelated to the date of any actual or attempted transfer (and in the case of trusts, years after the agreed "closing date" of the trusts). The 10.1.06 PSA Trust had a "closing date" of 10.1.06 and the forged *transfer of lien* was executed four years after the trust closed on February 2, 2011. WELLS FARGO knowingly and intentionally violated NEW YORK trust laws when executing a fabricated and forged February 2, 2011 *Transfer of Lien* four years after the trust closed (between WELLS FARGO and original lender dissolved in a 2007 liquidation bankruptcy NEW CENTURY) and unlawfully placing the loan in said trust. In *Wells Fargo Bank, N.A. v. Erobobo*, 39 Misc.3d 1220(A), the court reviewed EPTL 7-2.4. New York's EPTL §7-2.4 has erected an impenetrable legal barrier that prevents the Bank's trust from acquiring a note and mortgage after the Trust's closing date regardless of whether the transfer is being challenged by a nonparty or non-third- party beneficiary.

> **EPTL 7-2.4 states:**
> If the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized by this article and by any other provision of law, is void.
> *(See Wells Fargo Bank, NA v. EROBOBO*, 2013 NY Slip Op 50675 – NY)

(e) Executed fraudulent, fabricated and forged mortgage assignment under jurat prepared on behalf of grantor who had previously transferred ownership of the mortgages and notes by a valid transfer and/or no longer held an interest in the mortgage. In pertinent part, the Prospectus Supplement dated October 30, 2006 provides on pg. S-46 that NEW CENTURY transferred its mortgage loans to NC CAPITAL as follows:

> `"…RESPONSIBLE PARTY…` General
>
> The information set forth under this heading "The Responsible Party" has been provided by NC Capital Corporation ("NC Capital") and relates solely to the mortgage loans acquired from NC Capital.
> **New Century Mortgage Corporation transferred the mortgage loans to its affiliate, NC Capital, which, in turn, sold the mortgage loans to an affiliate of the depositor. New Century Mortgage Corporation is a wholly owned operating subsidiary of New Century Financial Corporation, a publicly traded company….`"`**

Thereafter, NC CAPITAL sold the NEW CENTURY mortgage loans to SUTTON and in pertinent part, the Prospectus Supplement dated October 30, 2006 states the same on pg. S-65 as follows:

> ```
> "...Assignment of the Mortgage Loans
>
> Pursuant  to  a  mortgage  loan  purchase  and
> warranties  agreement,  NC Capital  Corporation  sold
> the  mortgage  loans,  without  recourse,  to  Sutton,
> and  Sutton  will  sell,  transfer,  assign,  set  over
> and  otherwise  convey  the  mortgage  loans,  including
> all  principal  outstanding  as  of,  and  interest  due
> and  accruing  after,  the  close  of  business  on  the
> cut-off  date,  without  recourse,  to  the  depositor
> on  the  closing  date....
> ```
> "

In this scenario, SUTTON (not NEW CENTURY) was the proper party to execute a *Transfer of Lien* with WELLS FARGO prior to the trust closing date.

(f) Failed to "publicly record" the assignments from NEW CENTURY to NC CAPITAL and from NC CAPITAL to SUTTON and all other assignments so the chain of title could be verified and they could be properly certified and placed in the MBS Trust on or before the trust "closing date" as required by the 10.1.06 PSA Prospectus Supplement dated October 30, 2006 on pg. S-65 – S66 and as required by **Sec 2.01, Article II, Conveyance Of Mortgage Loans; Representation And Warranties** in connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* where a secure chain of title is a prerequisite for certification of mortgage loans placed into the MBS trust by the "closing date" and in support of the same, the 10.1.06 PSA states in relevant part:

(a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund.  On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) **In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian** for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) **The original Mortgage Note bearing all intervening endorsement showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee.**  To the extent that there is no room on the face of the

Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party;

(ii) The original of any guarantee executed in connection with Mortgage Note;

(iii) **the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording**. ….

(iv) the originals of all assumptions, modification, consolidation and extension agreement, if any, **with evidence of recording thereon**;

(v) **the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee**(or, in the case of a MERS Designated Loan, MERS) **with evidence of recording thereon.**

(g) Filed OCWEN employee Affidavits in 2014 / 2015 judicial proceedings containing knowing false statements and/or exhibits in connection with Relator loan, including a forged and fabricated *"Transfer of Lien"* and *"HOMEQ Loan History"* in connection with Relator loan that conflicted with the HOMEQ loan history produced in discovery in 2012.

(h) Made false representations as to legal and equitable ownership of NEW CENTURY notes and deeds of trust and Relator placed full reliance on the representations of WELLS FARGO by and through their loan servicer OCWEN who made demands for payment in connection with her note and deed of trust and Relator timely remitted her loan payments to WELLS FARGO and OCWEN when they held no legal or equitable interest in her note and deed of trust.

(i) Defendants knowingly rejected Relator timely remitted payments to pursue an unlawful foreclosure on a note and deed of trust they knew they held no legal or equitable interest in and used a fraudulent, fabricated and forged *"Transfer of Lien"* executed four years in February 2011 after the 10.1.06 PSA Trust "closing date".

### G. 2014 Notice Of Rescission Of Acceleration
### Of Loan Maturity & State Court Litigation Continues

1.52    On May 28, 2014, OCWEN, by and through their *(not bonded)* legal agent and debt collector law firm of MACKIE WOLF ZIENTZ & MANN mailed ALANIS a *Notice Of Rescission Of Acceleration Of Loan Maturity.* This May 28, 2014 *Notice of Rescission* was not "recorded" in public records on the notice date and was filed more than four years after the 1st posted May 5, 2010 *Notice Of Substitute Trustees Sale* by former loan servicer HOMEQ. Relator submits there was no notice as to the reasons for rescission provided and

submits that the OCWEN employee affidavits with corresponding exhibits filed in multiple judicial proceedings (including her note as an exhibit) reveals a lack of endorsement and/or allonge from NEW CENTURY on the face of the note that could form the basis of the rescission.

1.53     **WELLS FARGO, HOMEQ and OCWEN BREACH OF CONTRACT AND CONTINUING TORTIOUS INTERFERENCE WITH NOTE AND DEED OF TRUST:** Prior to learning that the Defendants held no legal or equitable interest in her note and deed of trust,  the Defendants breached the Deed Of Trust by not properly posting Relator's timely remitted loan payments to "interest and then principal", unlawfully placed Relator's loan payments in "Suspense" and /or "Unapplied" accounts, failed to post 2006 timely remitted (seller tax payment) and unlawfully imposing ultra-inflated force-placed insurance when the Federal Reserve ordered the removal of the same because Relator had already paid insurance for the disputed period.  Additionally, OCWEN ignored the HOMEQ letter to Relator advising that she alone was responsible for her taxes.  Disregarding this instruction, WELLS FARGO and OCWEN knowingly and intentionally interfered with Relator's ability to remit tax payments to the taxing authority and routinely paid the Relator taxes earlier than the due date so the taxing authority would reject the Relator's tax payment when attempting to pay the same on or before the due date.  Courts have found "a party to a contract who is himself in default cannot maintain a suit for its breach." *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) (quoting *Gulf Pipe Line Co. v. Nearen*, 138 S.W.2d 1065, 1068 (Tex. Comm'n App. 1940).   At all times, Relator performed her obligations under the note and never defaulted on her mortgage payments, tax payments or insurance coverage.

| **V.  WELLS FARGO AND APRIL 13, 2011 OCC CONSENT ORDER** |
| --- |

1.54        In October 2008, bailouts were the proximate cause of the nationwide foreclosure fraud and "robo-signer" scandals.   By April 2011, following the national mortgage crisis and government distribution of TARP funds to leading banks holding or servicing securitized mortgages, the Office Of The Comptroller Of The Currency ("OCC") signed Consent Orders with the leading banks including WELLS FARGO, holding them accountable for past mortgage servicing and foreclosure abuses which included hiring $10-an-hour third party contractors to pose as "Vice Presidents" of national banks in order to sign thousands of fraudulent foreclosure documents.   Among other things, the Consent Orders required banking mortgage reform as follows:

### ARTICLE I COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)  The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 8,900,000 residential mortgage loans. During the recent housing crisis, a substantially large number of residential mortgage loans serviced by the Bank became delinquent and resulted in foreclosure actions. The Bank's foreclosure inventory grew substantially from January 2009 through December 2010.

(2)  In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

   (a)  **filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;**

   (b)  filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

2(c)  **litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;**

   (d)  failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

   (e)  failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

   (f)  failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

(3)  By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking

practices. Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

## ARTICLE IV COMPLIANCE PROGRAM

(1) **Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the requirements of this Order and are conducted in a safe and sound manner ("Compliance Program"). The Compliance Program shall be implemented within one hundred twenty (120) days of this Order.** Any corrective action timeframe in the Compliance Program that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The Compliance Program shall include, at a minimum:

   (a) **appropriate written policies and procedures to conduct, oversee, and monitor mortgage servicing, Loss Mitigation, and foreclosure operations;**

   (b) **processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete, and reliable; and that affidavits and declarations are based on personal knowledge or a review of the Bank's books and records when the affidavit or declaration so states;**

   (c) **processes to ensure that affidavits filed in foreclosure proceedings are executed and notarized in accordance with state legal requirements and applicable guidelines, including jurat requirements;**

   (d) **processes to review and approve standardized affidavits and declarations for each jurisdiction in which the Bank files foreclosure actions to ensure compliance with applicable laws, rules and court procedures;**

   (e) **processes to ensure that the Bank has properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation, including appropriate transfer and delivery of endorsed notes and assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security, and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership;**

   (f) **processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration,** in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

   (g) **processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmations are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;**

   (h) **processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance;**

   (i) **processes to ensure that the Bank has the ability to locate and secure all documents, including the original promissory notes if required, necessary to perform mortgage servicing, foreclosure and Loss Mitigation, or loan modification functions;**

   (j) ongoing testing for compliance with applicable Legal Requirements and OCC

supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(k) **measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;**

(l) processes to ensure the qualifications of current management and supervisory personnel responsible for mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation and loan modification, are appropriate and a determination of whether any staffing changes or additions are needed;

(m) processes to ensure that staffing levels devoted to mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, are adequate to meet current and expected workload demands;

(n) processes to ensure that workloads of mortgage servicing, foreclosure and Loss Mitigation, and loan modification personnel, including single point of contact personnel as hereinafter defined, are reviewed and managed. Such processes, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of Article IX of this Order, and necessary adjustments to workloads shall promptly follow the completion of the reviews. An initial review shall be completed within ninety (90) days of this Order, and subsequent reviews shall be conducted semi-annually;

(o) processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within the organization so that appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied;

(p) appropriate training programs for personnel involved in mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, to ensure compliance with applicable Legal Requirements and supervisory guidance; and

(q) appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

## ARTICLE V THIRD PARTY MANAGEMENT

(1) **Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge acceptable policies and procedures for outsourcing foreclosure or related functions,** including Loss Mitigation and loan modification, and property management functions for residential real estate acquired through or in lieu of foreclosure, to any agent, independent contractor, consulting firm, law firm (including local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of the owners of mortgages), property management firm, or other third-party (including any affiliate of the Bank) ("Third- Party Providers"). **Third-party management policies and procedures shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The policies and procedures shall include, at a minimum:**

(a) **appropriate oversight to ensure that Third-Party Providers comply with all applicable Legal Requirements, OCC supervisory guidance (including applicable portions of OCC Bulletin 2001-47), and the Bank's policies and procedures;**

(b) measures to ensure that all original records transferred from the Bank to Third-Party

41

Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the appropriate court or the loan is otherwise transferred to another party), and are returned to the Bank or designated custodians at the conclusion of the performed service, along with all other documents necessary for the Bank's files, and that the Bank retains imaged copies of significant documents sent to Third-Party Providers;

(c) **measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of mortgages in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced;**

(d) **processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability, and to ensure adequacy of Third-Party Provider staffing levels,** training, work quality, and workload balance;

(e) processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to Bank foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(f) processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements and supervisory guidance, and to ensure that foreclosures are conducted in a safe and sound manner;

(g) **processes to review customer complaints about Third-Party Provider services;**

(h) processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Bank, consistent with federal banking agency guidance, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(i) a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume and/or meeting processing timelines; and

(j) **a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Bank, on a periodic basis, as qualified to serve as Third-Party Providers to the Bank including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.**

## ARTICLE VII FORECLOSURE REVIEW

(1) **Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio. The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").**

42

(2) Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

    (a) **the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii)** other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and **(iv)** any proposed sampling techniques. In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank. The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

    (b) **expertise and resources to be dedicated to the Foreclosure Review;**

    (c) **completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and**

    (d) **a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.**

(3) **The purpose of the Foreclosure Review shall be to determine, at a minimum: (a) whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;**

    (b) **whether the foreclosure was in accordance with applicable state and federal law,** including but not limited to the SCRA and the U.S. Bankruptcy Code;

    (c) whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

    (d) **whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default** period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

    (e) **whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;**

    (f) whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

    (g) whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

    (h) **whether any errors, misrepresentations, or other deficiencies identified in the**

Foreclosure Review **resulted in financial injury to the borrower or the mortgagee.**

(4) **The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review. Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.**

(5) **Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:**

    (a) **reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and**

    (b) **taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.**

(6) **Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.**

---

## VI.  OCWEN AND DECEMBER 12, 2013
## CFPB  CONSENT JUDGMENT

1.55        In December 2013, the Consumer Financial Protection Bureau (CFPB) signed a

Consent Judgment with OCWEN, holding it accountable for past mortgage servicing and

foreclosure abuses and among other things, entered required reforms as follows:

### CONSENT JUDGMENT

**WHEREAS, Plaintiffs, the Consumer Financial Protection Bureau (the "CFPB" or "Bureau"), and the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of Columbia (collectively, "Plaintiff States") filed their complaint on December 19, 2013, alleging that Ocwen Financial Corporation and Ocwen Loan Servicing, LLC (collectively, "Defendant" or "Ocwen") violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the Plaintiff States and the Consumer Financial Protection Act of 2010.**

### Settlement Term Sheet

The provisions outlined below are intended to apply to loans secured by owner-occupied properties that serve as the primary residence of the borrower unless otherwise noted herein.

**I.      FORECLOSURE AND BANKRUPTCY INFORMATION AND DOCUMENTATION.** Unless otherwise specified, these provisions shall apply to bankruptcy and foreclosures in all

jurisdictions regardless of whether the jurisdiction has a judicial, non-judicial or quasi-judicial process for foreclosures and regardless of whether a statement is submitted during the foreclosure or bankruptcy process in the form of an affidavit, sworn statement or declarations under penalty of perjury (to the extent stated to be based on personal knowledge) ("Declaration").

**A.      Standards for Documents Used in Foreclosure and Bankruptcy Proceedings.**

1.     **Servicer shall ensure that factual assertions made in pleadings (complaint, counterclaim, cross-claim, answer or similar pleadings),** bankruptcy proofs of claim (including any facts provided by Servicer or based on information provided by the Servicer that are included in any attachment and submitted to establish the truth of such facts) ("POC"), **Declarations, affidavits, and sworn statements filed by or on behalf of Servicer in judicial foreclosures or bankruptcy proceedings and notices of default, notices of sale and similar notices submitted by or on behalf of Servicer in non-judicial foreclosures are accurate and complete and are supported by competent and reliable evidence. Before a loan is referred to non-judicial foreclosure, Servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.**

2.     **Servicer shall ensure that affidavits, sworn statements, and Declarations are based on personal knowledge,** which may be based on the affiant's review of Servicer's books and records, in accordance with the evidentiary requirements of applicable state or federal law.

3.     **Servicer shall ensure that affidavits, sworn statements and Declarations executed by Servicer's affiants are based on the affiant's review and personal knowledge of the accuracy and completeness of the assertions in the affidavit, sworn statement or Declaration, set out facts that Servicer reasonably believes would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.** Affiants shall confirm that they have reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and required loan ownership information. **If an affiant relies on a review of business records for the basis of its affidavit, the referenced business record shall be attached if required by applicable state or federal law or court rule.** This provision does not apply to affidavits, sworn statements and Declarations signed by counsel based solely on counsel's personal knowledge (such as affidavits of counsel relating to service of process, extensions of time, or fee petitions) that are not based on a review of Servicer's books and records. Separate affidavits, sworn statements or Declarations shall be used when one affiant does not have requisite personal knowledge of all required information.

4.     Servicer shall have standards for qualifications, training and supervision of employees. Servicer shall train and supervise employees who regularly prepare or execute affidavits, sworn statements or Declarations. Each such employee shall sign a certification that he or she has received the training. Servicer shall oversee the training completion to ensure each required employee properly and timely completes such training. Servicer shall maintain written records confirming that each such employee has completed the training and the subjects covered by the training.

5.     Servicer shall review and approve standardized forms of affidavits, standardized forms of sworn statements, and standardized forms of Declarations prepared by or signed by an employee or officer of Servicer, or executed by a third party using a power of attorney on behalf of Servicer, to ensure compliance with applicable law, rules, court procedure, and the terms of this Agreement ("the Agreement").

6.     Affidavits, sworn statements and Declarations shall accurately identify the name of the affiant, the entity of which the affiant is an employee, and the affiant's title.

7.     Affidavits, sworn statements and Declarations, including their notarization, shall fully comply with all applicable state law requirements.

8.  **Affidavits, sworn statements and Declarations shall not contain information that is false or unsubstantiated. This requirement shall not preclude Declarations based on information and belief where so stated.**

9.  Servicer shall assess and ensure that it has an adequate number of employees and that employees have reasonable time to prepare, verify, and execute pleadings, POCs, motions for relief from stay ("MRS"), affidavits, sworn statements and Declarations.

10. Servicer shall not pay volume-based or other incentives to employees or third-party providers or trustees that encourage undue haste or lack of due diligence over quality.

11. Affiants shall be individuals, not entities, and affidavits, sworn statements and Declarations shall be signed by hand signature of the affiant (except for permitted electronic filings). For such documents, except for permitted electronic filings, signature stamps and any other means of electronic or mechanical signature are prohibited.

12. **At the time of execution, all information required by a form affidavit, sworn statement or Declaration shall be complete.**

13. **Affiants shall date their signatures on affidavits, sworn statements or Declarations.**

14. Servicer shall maintain records that identify all notarizations of Servicer documents executed by each notary employed by Servicer.

15. Servicer shall not file a POC in a bankruptcy proceeding which, when filed, contained materially inaccurate information. In cases in which such a POC may have been filed, Servicer shall not rely on such POC and shall (a) in active cases, at Servicer's expense, take appropriate action, consistent with state and federal law and court procedure, to substitute such POC with an amended POC as promptly as reasonably practicable (and, in any event, not more than 30 days) after acquiring actual knowledge of such material inaccuracy and provide appropriate written notice to the borrower or borrower's counsel; and (b) in other cases, at Servicer's expense, take appropriate action after acquiring actual knowledge of such material inaccuracy.

16. Servicer shall not rely on an affidavit of indebtedness or similar affidavit, sworn statement or Declaration filed in a pending pre- judgment judicial foreclosure or bankruptcy proceeding which (a) was required to be based on the affiant's review and personal knowledge of its accuracy but was not, (b) was not, when so required, properly notarized, or (c) contained materially inaccurate information in order to obtain a judgment of foreclosure, order of sale, relief from the automatic stay or other relief in bankruptcy. In pending cases in which such affidavits, sworn statements or Declarations may have been filed, Servicer shall, at Servicer's expense, take appropriate action, consistent with state and federal law and court procedure, to substitute such affidavits with new affidavits and provide appropriate written notice to the borrower or borrower's counsel.

17. In pending post-judgment, pre-sale cases in judicial foreclosure proceedings in which an affidavit or sworn statement was filed which was required to be based on the affiant's review and personal knowledge of its accuracy but may not have been, or that may not have, when so required, been properly notarized, and such affidavit or sworn statement has not been re-filed, Servicer, unless prohibited by state or local law or court rule, will provide written notice to borrower at borrower's address of record or borrower's counsel prior to proceeding with a foreclosure sale or eviction proceeding.

18. **In all states, Servicer shall send borrowers a statement setting forth facts supporting Servicer's or holder's right to foreclose and containing the information required in paragraphs I.B.6 (items available upon borrower request), I.B.10 (account statement), I.C.2 and I.C.3 (ownership statement), and IV.B.13 (loss mitigation statement) herein. Servicer shall send this statement to the borrower in one or more communications no later than 14 days prior to referral to foreclosure attorney or foreclosure trustee.** Servicer shall provide the Monitoring Committee with copies of proposed form statements for review before implementation.

B.  **Requirements for Accuracy and Verification of Borrower's Account Information.**

1. Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information, which may be in either electronic or paper format.

2. **For any loan on which interest is calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower payments, including cure payments** (where authorized by law or contract), trial modification payments, as well as non-conforming payments, unless such application conflicts with contract provisions or prevailing law. Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the address specified by Servicer and credited as of the date received to borrower's account. Each monthly payment shall be applied in the order specified in the loan documents.

3. For any loan on which interest is not calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower conforming payments, including cure payments (where authorized by law or contract), unless such application conflicts with contract provisions or prevailing law. Servicer shall continue to accept trial modification payments consistent with existing payment application practices. Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the address specified by Servicer. Each monthly payment shall be applied in the order specified in the loan documents.

   a. Servicer shall accept and apply at least two non-conforming payments from the borrower, in accordance with this subparagraph, when the payment, whether on its own or when combined with a payment made by another source, comes within $50.00 of the scheduled payment, including principal and interest and, where applicable, taxes and insurance.

   b. Except for payments described in paragraph I.B.3.a, Servicer may post partial payments to a suspense or unapplied funds account, provided that Servicer (1) discloses to the borrower the existence of and any activity in the suspense or unapplied funds account; (2) credits the borrower's account with a full payment as of the date that the funds in the suspense or unapplied funds account are sufficient to cover such full payment; and (3) applies payments as required by the terms of the loan documents. Servicer shall not take funds from suspense or unapplied funds accounts to pay fees until all unpaid contractual interest, principal, and escrow amounts are paid and brought current or other final disposition of the loan.

4. Notwithstanding the provisions above, Servicer shall not be required to accept payments which are insufficient to pay the full balance due after the borrower has been provided written notice that the contract has been declared in default and the remaining payments due under the contract have been accelerated.

5. Servicer shall provide to borrowers (other than borrowers in bankruptcy or borrowers who have been referred to or are going through foreclosure) adequate information on monthly billing or other account statements to show in clear and conspicuous language:

   a. total amount due;

   b. allocation of payments, including a notation if any payment has been posted to a "suspense or unapplied funds account";

   c. unpaid principal;

   d. fees and charges for the relevant time period;

   e. current escrow balance; and

   f. reasons for any payment changes, including an interest rate or escrow account adjustment, no later than 21 days before the new amount is due (except in the case of loans as to which interest accrues daily or the rate changes more frequently than once every 30 days). Statements as described above are not required to be delivered with

respect to any fixed rate residential mortgage loan as to which the borrower is provided a coupon book.

6. **In the statements described in paragraphs I.A.18 and III.B.1.a, Servicer shall notify borrowers that they may receive, upon written request:**
   a. A copy of the borrower's payment history since the borrower was last less than 60 days past due;
   b. A copy of the borrower's note;
   c. If Servicer has commenced foreclosure or filed a POC, **copies of any assignments of mortgage or deed of trust required to demonstrate the right to foreclose on the borrower's note under applicable state law; and**
   d. **The name of the investor that holds the borrower's loan.**

7. Servicer shall adopt enhanced billing dispute procedures, including for disputes regarding fees. These procedures will include:
   a. Establishing readily available methods for customers to lodge complaints and pose questions, such as by providing toll-free numbers and accepting disputes by email;
   b. Assessing and ensuring adequate and competent staff to answer and respond to consumer disputes promptly;
   c. Establishing a process for dispute escalation; A-6
   d. Tracking the resolution of complaints; and
   e. Providing a toll-free number on monthly billing statements.

8. Servicer shall take appropriate action to promptly remediate any inaccuracies in borrowers' account information, including:
   a. Correcting the account information;
   b. Providing cash refunds or account credits; and
   c. Correcting inaccurate reports to consumer credit reporting agencies.

9. Servicer's systems to record account information shall be periodically independently reviewed for accuracy and completeness by an independent reviewer.

10. As indicated in paragraph I.A.18, Servicer shall send the borrower an itemized plain language account summary setting forth each of the following items, to the extent applicable:
   a. The total amount needed to reinstate or bring the account current, and the amount of the principal obligation under the mortgage

---

## VII. THE UNIFORM COMMERCIAL CODE

1.56        Article 3 of the Uniform Commercial Code ("UCC") has been adopted in all jurisdictions in the United States.   UCC Article 3 addresses the issue of mortgage note foreclosure. When someone signs a promissory note as its maker ("issuer"), he/she automatically incurs the obligation in UCC §3-412 that the instrument will be paid to a "person entitled to enforce" the note.

> Uniform Commercial Code §3-412. Obligation of Issuer of Note or Cashier's Check. ("The issuer of a note . . . is obliged to pay the instrument (i) according to its terms at the time it was issued . . . . The obligation is owed to a *person entitled to enforce* the instrument . . . . ") (emphasis added).

48

1.57 **"Person entitled to enforce"**—hereinafter abbreviated to "PETE"—is in turn defined in §3-301:

> "Person entitled to enforce" an instrument means (i) **the holder** of the instrument, (ii) **a nonholder in possession** of the instrument **who has the rights of a holder**, or (iii) **a person not in possession of the instrument who is entitled to enforce the instrument** pursuant to Section 3-309 or 3-418(d) . . . .

1.58 Three primary entities are involved in this definition that have to do with missing promissory notes: (1) a "holder" of the note, (3) a "non-holder in possession who has the rights of a holder, and (3) someone who recreates a lost note under §3-309.

1.59 *"Holder":* Essentially a "holder" is someone who possesses a negotiable instrument payable to his/her order or properly negotiated to the later taker by a proper chain of indorsements. This result is reached by the definition of "holder" in §1-201(b)(21):

> (21) "Holder" means:
> (A) the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession . . . .and by §3-203:
> > (a) "Negotiation" means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder.
>
> > (b) Except for negotiation by a remitter, if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its endorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of possession alone.

1.60 *"Negotiation":* A proper negotiation of the note creates "holder" status in the transferee, and makes the transferee a PETE. The two terms complement each other: a "holder" takes through a valid "negotiation," and a valid "negotiation" leads to "holder" status. This is accomplished in two ways: a *blank* endorsement or a *special* endorsement by the original payee of the note.

With a blank endorsement (one that doesn't name a new payee) the payee simply signs its name on the back of the instrument. If an instrument has been thus indorsed by the payee, anyone acquiring the note thereafter is a PETE.   Once a blank endorsement has been placed on the note by the payee, all later parties in possession of the note qualify as "holders," and therefore are PETEs   *See e.g. Riggs v. Aurora Loan Services*, 36 So. 3d 932 (Fla. 4th Dist. App. 2010).   A few states allow an endorsement on the back of the last page of the note but the majority requires it at the "foot" or "bottom" of the last page of the note.

1.61        If the payee's endorsement on the back of the note names a new payee ("pay to X Company"), that's called a "special endorsement." Now only the newly nominated payee can be a "holder" (a status postponed until the new payee acquires the note—you have to hold to be a holder). The special endorsee, wishing to negotiate the note to a new owner, may now sign in blank, creating a bearer instrument, or may make another special endorsement over to the new owner. Only if there is a valid chain of such endorsements has a negotiation taken place, thus creating "holder" status in the current possessor of the note and making that person a PETE. With the exception mentioned next, the endorsements have to be written on the instrument itself (traditionally on the back).

1.62        *The Allonge*":  Sometimes the endorsement is not made on the promissory note, but on a separate piece of paper, called an "allonge," which is formally defined as a piece of paper attached to the original note for purposes of endorsement. *See* Uniform Commercial Code § 3-204, Official Comment 1.  The Uniform Commercial Code still allows the use of an allonge, and given the large number of transfers that some mortgage promissory notes have had in the last few years, there are many new cases dealing with the allonge. These cases frequently reveal problems with negotiation that give the current holder of the instrument difficulties in trying to establish "holder" status. For example, the allonge must

50

be "affixed to the instrument" per §3-204(a)'s last sentence. It is not enough that there is a separate piece of paper which documents the transfer unless that piece of paper is "affixed" to the note. *Adams v. Madison Realty & Dev., Inc.*, 853 F.2d 163, 167 (3d Cir. 1988) (Mere folding of the alleged allonge around the note insufficient—$19.5 million lost because of this legal error!); *HSBC Bank USA v. Thompson*, 940 N.E.2d 986 (Ohio App. 2nd Dist. 2011) (unattached pages cannot be an allonge); *In re Weisband*, 427 B.R. 13, 20 (Bankr. D. Ariz. 2010) (same). Thus a contractual agreement by which the payee on the note transfers an interest in the note, but never signs it, cannot qualify as an allonge (it is not affixed to the note), and no proper negotiation of the note has occurred. If the endorsement by the original mortgagee/payee on the note is not written on the note itself, there must be an allonge or the note has not been properly negotiated, and the current holder of that note is not a PETE (since there is no proper negotiation chain). Courts have identified difficulty with allonges where the promissory note apparently has a valid endorsement of the payee's name either on the back of the note or on the accompanying allonge, but the evidence shows that when the note was transferred to the current possessor that signature was not then on the note. When the current possessor, realizing the problem, went back to the payee and had it indorse the note over to the current possessor, it believed it cleared up the negotiation issue. But some courts have disallowed such a late negotiation by the original payee on the theory that by the time the payee's signature was added to the note, the payee no longer had an "ownership" interest in the note and thus no title to convey, which supposedly invalidates the late endorsement. *Anderson v. Burson*, 424 Md. 232 (2011). Alternatively, the Code does allow for correction of a missing endorsement. Section 3-203(c) provides as follows:

> (c) Unless otherwise agreed, **if an instrument is transferred for value** and the transferee does not become a holder because of lack of indorsement by **the transferor, the transferee has a specifically enforceable right to the unqualified indorsement of the transferor,**

**but negotiation of the instrument does not occur until the indorsement is made.**

And Official Comment 3 explains: "The question may arise if the transferee has paid in advance and the indorsement is omitted fraudulently or through oversight. . . . Subsection (c) **provides that there is no negotiation of the instrument until the indorsement by the transferor is made. Until that time the transferee does not become a holder** . . . ."

---

**VIII.  THE WELLS FARGO FORECLOSURE TRAINING MANUAL FOR ATTORNEYS IGNORES THE UNIFORM COMMERCIAL CODE, 10.1.06 PSA & H. JOHN KENNERTY 2010 DEPOSITION**

---

1.63        In 2015, Relator discovered the 2011-2012 *WELLS FARGO Home Mortgage Foreclosure Attorney Procedure Manual, Version* which was updated in 2012 after the OCC entered its April 2011 Consent Order.  The manual describes how WELLS FARGO trains their attorneys to prepare fake and forged foreclosure documents, which they did not have in their possession at the time of foreclosure and then present them to courts in states across the county to support their foreclosure actions against borrowers.   When WELLS FARGO begins a foreclosure case, page 14 identifies the process as follows:

### (a)   *Robo-signed Affidavits*

Documents include the **original note, recorded mortgage, title policy,** and recorded and unrecorded assignments. Documents are sent to imaging so that at the time of referral they can be uploaded via VendorScape or Desktop to the Foreclosure Attorney.

On page 15, if the original note never makes it to the attorney, they communicate that fact back to Wells Fargo through the "VendorScape" or "Desktop" system—basically, an instant-message and tracking system between the lawyers and their supposed clients:

Attorney: If after the third business day of the referral date you have not received the note, add log code NOTRRP in VendorScape or add the Note Not Received in Referral Package Issue in Desktop. This can be done by selecting Issues from the Tool Menu and selecting Add Issue.
WFHM Default Docs Team: Research missing note:

• If note is found: complete the K64 step with the actual date the note was

provided/sent to the Attorney. If the state does not require the original note, the document will be uploaded to LIV. Otherwise, send the note via mail and track for delivery.

• If note is not found: complete the K64 step, delete the N82 step, and add step N83, LOST NOTE AFFIDAVIT NEEDED. Only the Default Doc Team should be adding the N83 step to FOR3.

The attorney prepares a form affidavit, and without any investigation as to whether the Note accurately states the facts of how the Note was supposedly lost or what search was done for the note, the attorney then sends it to Wells Fargo for signature (ie Robo Signature). And then someone at Wells Fargo just signs the affidavit:

Attorney: Once the N83 step is placed on the loan, this will authorize your office to create and forward a lost note affidavit as described in the Lost Note Affidavits (LNA) process in this manual.
WFHM Default Docs Team: Once you receive, execute, and return the LNA to the Attorney, close the N83 step.

### (b) Manufactured Endorsements To Satisfy Standing To Foreclose

Once the attorney has the original note in their custody, if it's missing an endorsement (the mark that legally transfers the note to the foreclosing bank), Wells Fargo employees "execute the endorsement" and then send it to the attorney—who already has the original note. This means that they aren't applying the endorsement to the note itself, but to a separate document which the attorney must apparently attach to the note later. This is legally insufficient to transfer the note, and an Note Endorsement instruction is provided on page 17 as follows:

**Note Endorsement**
**Please Note** This process is only to be used if your office has already received the note. If you have not received the note, follow process for requesting the note listed in the Missing Note Process section of this manual.
Attorney: Enter step Z02 (Endorsed Note Needed) to the FOR3 screen (if a loan is in foreclosure) or the BNK3 screen (if a loan is in Bankruptcy).
WFHM Default Docs Team: Research needed endorsement.
If the blank endorsement is in the file for an original state [a state that requires filing the original note in a foreclosure proceeding, like Florida], execute the endorsement, send the original document to the attorney, and complete the Z02 step.

### (c) Fabricating Allonges To Satisfy Standing To Foreclose

Wells Fargo fabricates allonges in very nearly the same way to obtain evidence of standing to support their unlawful foreclosures. An "allonge" is a piece of paper annexed to a

negotiable instrument or promissory note, on which to write endorsements for which there is no room on the instrument itself.   Such must be so firmly affixed thereto as to become a part thereof.  Because the allonge is the piece of paper the endorsement is applied to, it has to be attached to the note at the time the endorsement is made. If not, it fails to transfer the note. *Adams v. Madison Realty & Development, Inc.,* 853 F.2d 163, 164 (3d Cir.1988).).

The WELLS FARGO manual on preparing allonges is presented as follows:

> Attorney: If an allonge is still needed after a note has been endorsed, forward the allonge attachment to Wells Fargo Default Docs area via email address Defaultallongemailbox@wellsfargo.com and add step Y44, ATTORNEY REQUESTED ALLONGE, to FOR3.

If the attorney needs an allonge but still has the original note, WELLS FARGO executes the allonge and then sends it back to the attorney who then attaches it to the note later.

> WFHM Default Docs Team: If property is located in an original doc state and attorney has the original note, review the allonge attachment to determine if we have signing authority to execute internally.
> • If WFHM does have signing authority, enter log code FCALGI (ALLONGE SENT FOR INTERNAL SIGNATURE)
> • If WFHM does not have signing authority, enter log code FCALGE (ALLONGE SENT OUT FOR EXECUTION) and mail document for 3rd party signature.
> • After allonge has been executed, enter log code FCALGA (ALLONGE COMPLETED/RETURNED TO ATTORNEY).
> • Complete the Y44 actual date with the date allonge was returned to attorney.

1.64        During a 2015 no-evidence summary judgment proceeding in state court with Relator, WELLS FARGO, by and through their attorneys Mark Cronenwett and Jeffrey Hiller, filed the 2.10.15 Affidavit of Katherine Ortworth affirmatively representing that the Relator's "Note" and other documents attached thereto were "*...the originals or exact duplicates of the originals...*".  The "Note" was filed without any "endorsement in blank and without recourse" or "Allonge" permanently affixed thereto and did not have any effect of making the Note payable to bearer.  The original note names NEW CENTURY (not Wells Fargo) as the lender and, contrary to Wells Fargo's argument, the note is not a "bearer

instrument" because it was payable to NEW CENTURY. Moreover, the Relator's original note in this case was not endorsed in blank or otherwise assigned to Wells Fargo. To circumvent their fraud, WELLS FARGO executed a forged and fraudulent *Transfer Of Lien* in February 2011 with the original lender NEW CENTURY, which had been dissolved in bankruptcy in 2007, during the period they were being investigated by the OCC. The OCC issued their Consent Order against WELLS FARGO on April 13, 2011.   As it pertains to the Relator's state court action against WELLS FARGO, in February 2015, WELLS FARGO filed a *Motion For More Time To Obtain More Evidence* and also filed a *Motion To Continue The Trial Setting*, which was granted.   WELLS Fargo obtained "four" Continuances since the litigation commenced in February 2011, which provides patent proof that they need additional time to forge and fabricate additional records to file in a judicial proceeding.

### (d)   The H John Kennerty 2010 Deposition
### Highlighting The Unlawful Custom and Practices Of Wells Fargo

1.65          During a May 20, 2010 Deposition of H John Kennerty @ pg 55-56, former WELLS FARGO employee, his testimony was compelling and supported the WELLS FARGO Foreclosure Manual for Attorneys and the custom and practice of WELLS FARGO to routinely have their own employees sign off on endorsements of promissory notes as follows:

> Q.   Does your department ever – does your department employees ever sign on endorsements of promissory notes?
> A.   Yes.
> Q.   On a regular basis?  Or just under particular circumstances?
> A.   Depending on your definition of regular basis.
> Q.   Why don't you give me your ----
> A.   In --- part of our process would be to do that when it was necessary or needed.
> Q.   When would it be necessary?
> A.   At the request of the foreclosing attorney

Q.   So if the foreclosing attorney provided the instruction to Wells Fargo to endorse the promissory note then your department would be the people who would do that?

A.   Yes.

Q.   And the instruction would only come from the foreclosing attorney?

A.   Yes.

Q.   And would the foreclosing attorney also tell you to whom the endorsement should be made payable to?

A.   Yes?

1.66   The Court in *In re: Cynthia Carrsow-Franklin*, Case No 10-20010 (RDD), United States Bankruptcy Southern District of New York (http://www.nysb.uscourts.gov/sites/default/files/opinions/198939_109_opinion.pdf) also reviewed deposition testimony of former employee H John Kennerty and concluded:

> "…It is clear, however, that he pretty much signed whatever outside counsel working on the default put in front of him and that these documents often included assignments, including the Assignment of Mortgage, drafted by Wells Fargo's outside enforcement counsel, to fill in missing gaps in the record…." (Doc. 109, p. 17, Case No. 10-20010-rdd, U.S. Bankruptcy Court, Southern District of New York)

In its January 28, 2015 opinion @ pg 17, the Court also concluded with emphasis that:

> "… [T]he blank indorsement, upon which Wells Fargo is relying, was forged," … "Nevertheless it does show a general willingness and practice on Wells Fargo's part to create documentary evidence, after-the-fact, when enforcing its claims, WHICH IS EXTRAORDINARY…." (Doc. 109, p. 17, Case No. 10-20010-rdd, U.S. Bankruptcy Court, Southern District of New York)

## IX.  THE MORTGAGE-BACKED SECURITIES MARKET

### (a)  Agency v Non-Agency MBS

1.67   Generally speaking, Mortgage Backed Securities ("MBS") are bonds representing an ownership interest in a pool of residential mortgage loans. Residential homeowners make mortgage payments which are ultimately pooled each month. These pooled payments are then "passed through" to MBS holders in the form of principal and interest cash flows

1.68   Mortgage Backed Securities ("MBS") in contrast to Commercial-Mortgage

56

backed securities ("CMBS"), are groups of home mortgages that are sold by the issuing banks and then packaged together into "pools" and sold as a single security and can be classified in two ways: "Agency" or "non-Agency" securities.

1.69        To create an "Agency MBS", a lending bank first pools together a group of mortgage loans that it has issued. The bank then presents this pool of mortgages to one of three quasi-government sponsored agencies designated to issue and guarantee MBS. These agencies may include the Government National Mortgage Association (GNMA or "Ginnie Mae"), the Federal National Mortgage Association (FNMA or "Fannie Mae"), or the Federal Home Loan Mortgage Corporation (FHLMC or "Freddie Mac"). GNMA bonds are backed by the full faith and credit of the U.S. government and thus are free from default risk. While FNMA and Freddie Mac securities lack this same backing, the risk of default is negligble. Securities issued by any of these entities are referred to as "Agency MBS."  Both Fannie Mae and Freddie Mac MBS generally offer higher current yields than Ginnie Mae MBS in order to compensate for their slightly lower perceived credit quality.  The agency issuing the MBS guarantees the timely payment of principal and interest to MBS investors. The principal and interest payments the mortgage borrowers pay to the bank are "passed through" to MBS investors each month.

1.70        In order to facilitate the flow of funds to the housing industry, the U.S. Government created the three major housing agencies to support the mortgage market.

> Ginnie Mae—The first MBS was issued in 1970 by the Government National Mortgage Association (GNMA). Ginnie Mae is a government-owned corporation that issues MBS backed by the full faith and credit of the U.S. Government. As a direct obligation, the timely payment of principal and interest is guaranteed, regardless of mortgage payments or default.

> Fannie Mae—The Federal National Mortgage Association (FNMA) is a stockholder-owned, government-sponsored corporation subject to Treasury regulations, and has a line-of-credit with the U.S. Government. Fannie Mae MBS are considered a moral obligation of the U.S. Government,

providing Federal agency credit quality.

Freddie Mac—The Federal Home Loan Mortgage Association (FHLMC) is a stockholder-owned, government-sponsored corporation established to increase mortgage credit and provide liquidity. Like Fannie Mae, Freddie Mac has a line-of-credit with the U.S. Government. Freddie Mac MBS are considered a moral obligation of the U.S. Government, offering Federal agency credit quality.

1.71     To create "Non-Agency MBS" Private entities, such as financial institutions, can also issue mortgage-backed securities (MBS).   In this case, the MBS are referred to as "Non-agency MBS" or "private label" securities. These bonds are not guaranteed by the U.S. government or any government-sponsored enterprise since they often consist of pools of borrowers who couldn't meet Agency standards. Many of these were the "Alt-A" and "sub-prime" loans that gained notoriety during the 2008 financial crisis. This, in conjunction with the lack of government backing, means that non-Agency MBS contain an element of credit risk (i.e, a possibility of default) not present in Agency MBS.

1.72     Historically, the heaviest issuance of Non-Agency MBS occurred from 2001 through 2007, and then ended in 2008 following the housing/financial crisis. According to JP Morgan's 2010 article "Non-Agency Mortgage Backed Securities, Managing Opportunities and Risks, "...*The outstanding balance of non-agency mortgages grew from roughly $600 billion at the end of 2003 to $2.2 trillion at its peak in 2007....*".   The rapid growth in the non-agency MBS market is widely cited as being a key catalyst for the mortgage crisis, since these securities provided a way for less creditworthy homebuyers to gain financing. This eventually led to an increase in delinquencies, causing Non-Agency MBS to collapse in value in 2008.  The "contagion" subsequently spread to higher quality securities, accelerating the crisis and causing new issuance to come to a halt.

### (b)  The Securitization Process

1.73     The process through which RMBS are created and sold is known as mortgage

loan securitization. In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

1.74   The securitization of a mortgage loan generally involves multiple parties. They are the:

  (1) "Borrower";
  (2) "Original Lender" (whomever is across the closing table from the Borrower);
  (3) "Original Mortgagee" (could be either the Original Lender or a "nominee" for the mortgagee, namely, Mortgage Electronic Registrations Systems, Inc. ("MERS");
  (4) "Servicer" of the loan as identified in the securitization "pooling and servicing agreement" ("PSA") (this is usually a bank or any entity with "servicer" in its name);
  (5) "Sponsor" is an entity identified in the PSA and the first link in the securitization chain of title between the Original Lender and the other parties to the PSA;
  (6) "Depositor" is the second link in the securitization chain of title and the entity between the Sponsor and the securitization Trustee;
  (7) "Trustee" is the sole and exclusive legal title owner of the securitized loan, the entity that must take physical delivery of the securitized notes and mortgages in order for the securitization to be valid, and the entity that issues MBS certificates to the purchasers of the MBS; and
  (8) "MBS purchaser"  This is the investor who buys MBS in reliance on the representations from the Trustee that the Trustee has valid legal title to the securitized notes and mortgages and who receives tax-exempt income from this investment.

1.75   There are three general types of securitizations. The first is public securitizations. These are registered with the SEC. The vast majority of public securitizations are governed by New York law. All public securitizations specifically require that the Trustee accept physical delivery of the securitized notes and mortgages prior to the "closing date" of the securitization trust.  The second is government-sponsored entity ("GSE") securitizations.  These are in two subcategories: Fannie Mae and Freddie Mac securitizations.  The actual securitization documents for Fannie Mae securitizations are not public. Fannie Mae does publish its securitization forms. In the Custodial Agreement, Fannie represents, like the

public securitization trustees referenced above, that it has received both the original note and fully executed assignments of mortgage prior to the "Issue Date" of the MBS. Like Fannie Mae securitizations, Freddie Mac securitization documents are not public. Freddie Mac posts its securitization forms and the Freddie Mac Custodial Agreement provides that "United States" law, to be construed in accordance with New York law, governs Freddie Mac's legal title to Freddie Mac securitized loans. Third, some securitizations are private and not accessible by any means short of litigation. The only available information about private securitizations will be in recorded documents in a foreclosure. There is not much additional public information available about private securitizations and their trust documents.

1.76        Highlighting trust procedures generally and as they pertained to the "Prospectus Supplement dated October 30, 2006" *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 30, 2006 (10.1.06 PSA Trust)*, the first step in each securitization is generally the acquisition of mortgage loans by a "Sponsor" (or "seller"), such as (*Sutton Funding*, Inc) and the sale of such loans by the "Sponsor/Seller" Sutton Funding to a "Depositor", typically a special-purpose affiliate of the sponsor. The "Depositor" for the 10.1.06 PSA Trust was (*Securitized Asset Backed Receivables LLC*).

1.77        The "Depositor" then conveys the pool of loans to the "Trustee", (WELLS FARGO).  In Section 2.02, the Trustee certifies physical receipt of the notes and mortgages before the closing date.  Pursuant to a "pooling and servicing agreement" that establishes various prioritized issue securities of interests in payments made by borrowers on the loans, the trust issues certificates representing those levels; the certificates are sold to an "Underwriter" (Barclays Capital Inc.); and the underwriter re-sells the certificates at a profit

60

to investors. The "Sponsor" (Sutton Funding), through its affiliated "Depositor", earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.

1.78        Pursuant to the PSA for each trust, a "Servicer" (HOMEQ Servicing) is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee. The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation and managing and selling foreclosed properties.  The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA. The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB. *See* 17 C.F.R. § 229.1121. The servicer provides data to the trustee to include in these remittance reports.

1.79        Each issue in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's. The most senior issue securities generally receive the highest ratings, AAA or AA. Junior issue securities receive lower ratings, but offer higher potential returns. Senior issue securities are generally entitled to payment in full ahead of junior issue securities, and shortfalls in principal and interest payments are generally allocated first to junior issue securities. This division of cash flows and losses is referred to as the "waterfall." Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the collateral securing, the underlying loans, which often number in the thousands.

1.80        Between 2001 and 2006, Wall Street banks moved aggressively into the

securitization markets, taking market share away from the GSEs.  Unlike the GSEs, the Wall Street banks focused primarily on Alt-A, subprime, and jumbo prime mortgage pools because of the higher fees that were available. Likewise, investors sought higher returns offered by Non-Agency MBS. As a result, Non-Agency loan originations and securitizations grew dramatically and from 2001 to 2006, non-GSE loan originations more than doubled and non-GSE securitizations more than quadrupled, while GSE loan originations and securitizations contracted.  During this time the non-GSE Alt-A and subprime securitization activity skyrocketed, increasing eight-fold during the period from $98 billion to $815 billion as shown by the following table:

| | 2001 | 2006 |
|---|---|---|
| GSE Loan Originations | $1.433 trillion | $1.040 trillion |
| GSE Securitizations | $1.087 trillion | $904 billion |
| Non-GSE Loan Originations | $680 billion | $1.480 trillion |
| Non-GSE Securitizations | $2 billion (including $87 billion subprime and 11 billion of Alt-A Securitizations) | $1.480 trillion (including $449 billion subprime and $366 of of Alt-A Securitizations) |

*Source: Inside Mortgage Finance (2007).*

### (c)  A Trustees Duties And Obligations

1.81        Trustees duties are spelled out in the Pooling and Servicing Agreements ("PSA's") under applicable state and federal law. These agreements govern the parties' respective rights and responsibilities in connection with the Trusts.

1.82        Mortgaged-backed securities (MBS) often use pooling and servicing agreements, pursuant to which an MBS trustee holds formal title to loans for the benefit of MBS investors, calculates and processes securities payments, and takes certain specific actions on behalf of investors. Although the trustee is the legal owner of record of the mortgage loans, the trustee does not own the loans for its own account or have an economic interest in the

loans. The beneficial owners of these mortgage loans are investors in the MBS securities, who typically are large institutions such as public and private pension funds, mutual funds and insurance companies. As is the case with all other ABS, the role of the securitization trustees in MBS transactions is limited. The trust instruments creating MBS securities and relevant law do not give the trustee any powers or duties with respect to foreclosure, maintenance, sale or disposition of properties that are collateral for the MBS securities. Those powers and duties are conferred exclusively on loan servicers, who generally are appointed by the depositor or seller of the loans to the MBS trust. While foreclosure and any legal action with respect to trust properties must be brought in the trustee's name as the legal owner of the loans, foreclosure activity and the post- maintenance, sale and disposition of the trust properties are managed entirely by the loan servicers. Although any claims against the trust must be brought against the trustee as the trust's legal representative, these cases are usually defended either by the original lender who sold the loans to the securitization trust or by the loan servicer. Occasionally, trustees will become actively involved in this type of litigation in a representative capacity to protect the interests of the investors who are beneficiaries of the securitization trusts. Trustees are not responsible for overseeing or monitoring the performance of the servicer other than with respect to confirming its timely receipt of remittances or any periodic reports or certificates in the required form. To enable servicers to independently perform their servicing obligations, trustees are generally required to provide powers of attorney to the servicer and execute documents as requested or directed by the servicers in furtherance of any loan servicing activities. In the event a servicer fails to perform its obligations, and such ongoing failure constitutes a servicer event of default, trustees may take additional action to pursue remedies on behalf of or as directed by the investors. Absent a servicer default, the trustee has no authority to direct or approve loan

servicing activities. (*See The Trustees Role In Mortgage Backed Securities*)

(https://www.aba.com/aba/documents/press/RoleoftheTrusteeinAsset-BackedSecuritiesJuly2010.pdf).

---

## X.  THE DEFENDANTS "MBS" ENRICHMENT SCHEMES AGAINST THE U.S. GOVERNMENT, SEC AND INVESTORS

---

### (a)   *Troubled Asset Relief Program (TARP) & WELLS FARGO Bailout*

1.83        On September 19, 2008 President Bush announced his financial bailout plan, the Emergency Economic Stabilization Act of 2008 to confront the national financial crisis. On October 1, the U.S. Senate passed an amended version of the bill, which was subsequently accepted by the House two days later. This legislation created the $700 billion Troubled Assets Relief Program (TARP).  Financial businesses (both commercial and investment banks) had invested heavily in mortgage-backed securities (MBS) and credit default swaps. Since the market had collapsed and no one was trading mortgage-backed securities, no one could say what they were worth, though it seemed clear they were worth less than face value. As a result, financial firms began hoarding cash instead of lending it out.  The Treasury began to back away from its original plan. On October 14, the US Treasury introduced its $250 billion *Capital Purchases Program* (**TARP II**) in which banks could voluntarily sell equity to the Treasury to boost their capital, while still retaining their MBS. A month later on November 12, Secretary Paulson formally cancelled the original TARP plan in favor of the CPP, advising "the most timely, effective step to improve credit market conditions was to strengthen bank balance sheets quickly through direct purchases of equity in banks." Banks participating in TARP II were the biggest institutions in the U.S. banking system.  In order of their Treasury equity, they included Citigroup, Bank of America, JP Morgan Chase, Wells Fargo, Goldman Sachs, Morgan Stanley, PNC Financial, US Bancorp,

GMAC, Capital One, Regions Financial, American Express, Bank of New York Mellon, State Street Bank, and Discover Financial. The new Obama administration returned the focus of the Federal bailout to its original intent by proposing a Public-Private Investment Program to purchase mortgage-backed securities from banks who were holding them. This proposal **(TARP III)** differed from the original plan in that it was designed to leverage tax revenues by bringing in private investment as well as other government agencies (the Federal Reserve & FDIC). The program was designed to remove as much as $1 trillion worth of troubled assets from banks, while the U.S. Treasury would only have to invest $75 to $100 billion. The U.S. Treasury Department invested about $200 billion in hundreds of banks through its *Capital Purchase Program* in an effort to prop up capital and support new lending. Because WELLS FARGO concealed knowingly and intentional con-compliance with pooling and servicing agreements, the U.S. government has been harmed by and through the U.S. Dept. Of The Treasury investment of $25,000,000,000 to WELLS FARGO on or about October 28, 2008 (See LINK):

http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/cap/Contracts%20and%20Agreements/Wells_Fargo_Agreement_Dated_26_October_2008.pdf

### (b) FANNIE MAE and FREDDIE MAC & Purchase of WELLS FARGO & DEUTSCHE BANK Toxic Mortgage-Backed Securities

1.84    In December 2013, Wells Fargo reached a $591 million deal with the Federal National Mortgage Association ("Fannie Mae") to resolve claims that it allegedly misled Fannie Mae about toxic mortgage-backed securities that it sold them prior to the housing collapse. WELLS FARGO was accused of misleading Fannie Mae about the quality of the loans it bundled and re-sold as mortgage-backed securities during the housing boom. When those loans went south, the federal government was forced to step in and bail out both Fannie Mae and Freddie Mac. Wells Fargo also said it would pay $869 million to settle

similar claims over approximately 6.7 million loans sold to Federal Home Loan Mortgage Corporation ("Freddie Mac"). A repurchase stipulation is written into a contract and typically comes into question if the buyer, in this case Fannie Mae, believes that the quality of the loans sold was not up to par with agreed upon standards. Fannie and Freddie don't directly make loans to borrowers. They buy mortgages from lenders, package them as bonds, guarantee them against default and sell them to investors. That helps make loans available and gives Fannie and Freddie a material role in the housing market. The two were rescued in a taxpayer bailout in 2008 as they sank under the weight of mortgage losses.

### (c) FHFA Sues Wells Fargo and Deutsche Over Toxic Mortgage-Backed Securities

1.85        The Federal Housing Finance Agency ("FHFA") sued 18 financial institutions in September 2011 over their sales of mortgage securities to Fannie and Freddie, which own or guarantee about half of all U.S. mortgages.   In August 2012, the SEC charged Wells Fargo's brokerage firm and a former vice president for selling investments tied to mortgage-backed securities without fully understanding their complexity or disclosing the risks to investors. Wells Fargo agreed to pay more than $6.5 million to settle the charges. (http://www.sec.gov/spotlight/enf-actions-fc.shtml). Similarly, in December 2013, Deutsche Bank (DBKGn.DE)(DB.N) also agreed to pay $1.9 billion to settle claims that it defrauded two U.S. government-controlled companies in the sale of mortgage-backed securities before the 2008 financial crisis. The deal, negotiated by the Federal Housing Finance Agency, is the second-largest regulatory settlement over claims banks engaged in fraud in packaging and selling mortgage-backed securities.

### (d) National Credit Union Sues Wells Fargo Over Toxic Mortgage-Backed Securities

1.86        In December 2014, the U.S. credit union regulator sued Wells Fargo & Co

alleging the bank failed to fulfill its duties as a trustee for 27 residential mortgage-backed securities trusts that soured and brought down five credit unions.  The lawsuit, filed by the National Credit Union Administration (NCUA) in a federal court in Manhattan, seeks a jury trial, damages and full compensation for legal costs associated with the case. The NCUA said it is bringing the case after five credit unions bought about $2.5 billion in residential mortgage-backed securities issued from trusts between 2004 and 2007.  Those underlying loans soured, as borrowers began to default on their mortgage payments and lost their homes to foreclosure. The losses on these investments, the NCUA said, eventually led those five credit unions to fail. Regulators said Wells Fargo, as trustee for those trusts, had obligations under the law to correct problems with the loans and to protect the credit unions' interests.(http://www.nafcu.org/News/2014_News/December/NCUA_sues_MBS_trustee_Wells_Fargo/)

### (e)  SEC Settles Claims with Wells Fargo over Concealing Risks with Mortgage-Backed Securities

1.87        In August 2012, the SEC charged Wells Fargo's brokerage firm and a former vice president for selling investments tied to mortgage-backed securities without fully understanding their complexity or disclosing the risks to investors. Wells Fargo agreed to pay more than $6.5 million to settle the charges. (http://www.sec.gov/spotlight/enf-actions-fc.shtml).  There have been other litigations with WELLS FARGO in connection with defective mortgage-backed securities.

(http://www.sec.gov/Archives/edgar/data/72971/000007297113000576/R21.htm)

### (f)  CFPB Settles with OCWEN Over Federal Consumer Law Violations In Connection With Mortgage Servicing and NY Department of Financial Services 2014 Investigation of OCWEN for Mortgage Servicing and SEC Violations

1.88        In December 2013, Ocwen Financial Corporation, reached a $2.2 billion

settlement agreement with the Consumer Financial Protection Bureau (CFPB) and 49 states. Richard Cordray, the director of the bureau, publicly stated that the Bureau *"...believes that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process...".* The settlement covers several types of activities from 2009 to 2012 by Ocwen and two other companies it recently acquired, Litton Loan Servicing and Homeward Residential Holdings. The companies were accused of charging borrowers unauthorized fees, deceiving consumers about foreclosure alternatives and providing false or misleading information about the status of foreclosure proceedings. Mr. Cordray said that because of these violations, *"...Ocwen made troubled borrowers even more vulnerable to foreclosure...."* Ocwen, which was founded in 1988, does not issue mortgages itself. Instead, it buys the rights to service the loans issued by banks, taking a cut of all the payments it receives from homeowners. Thereafter, on August 4, 2014, the N.Y. Department of Financial Services issued a second letter to OCWEN stating that it was reviewing what is called a "troubling transaction" with Altisource relating to the provision of force-placed insurance and observed *"...Ocwen expects to force-place policies on its borrowers in excess of $400 million net written premium per year; a 15% commission on $400 million would be $60 million per year..."* and appears to be inconsistent with public statements OCWEN has made, as well as representations in company SEC filings. (http://www.dfs.ny.gov/about/press2014/pr140804-ocwen-letter.pdf).

1.89    As it pertains to public reporting, Ocwen Financial Corporation, through its subsidiaries, claims to be a leading provider of residential and commercial mortgage loan servicing, special servicing and asset management services.

1.90    In their December 31, 2011 SEC FORM 10-K @ (pg 9) (http://www.sec.gov/Archives/edgar/data/873860/000101905612000280/ocn_10k.htm),

OCWEN stated as follows:

> "**...Our largest source of revenue is servicing fees. Purchased MSRs generally entitle us to an annual fee of up to 50 basis points of the average UPB of the loans serviced.** Under subservicing arrangements, where we do not pay for the MSR, we are generally entitled to an annual fee of between 6 and 38 basis points of the average UPB. Although servicing fees generally accrue to the servicer when a loan is delinquent, servicing fees are usually only collected when a borrower makes a payment or when a delinquent loan is resolved through modification, payoff (discounted or in full) or through the sale of the underlying mortgaged property following foreclosure (Real Estate Owned, or REO). Because we only record servicing fee revenue when it is collected, our revenue is a function of UPB, the number of payments that we receive and delinquent loans that resolve either through borrower payments, modifications (HAMP and non-HAMP) or sales of REO...."

1.91     In their December 31, 2011 SEC FORM 10-K @ (pg 9), OCWEN stated as follows:

> "...On flow servicing, we worked with Altisource and its Lenders One business (which generated approximately 8% of new loans originated in the United States in 2011) to create a new entity, Correspondent One, to securitize newly originated loans. Ocwen and Altisource each hold a 49% equity interest in this new entity. We believe that this venture can improve the economics for the members of Lenders One and allow Ocwen **to compete for servicing rights for newly originated Federal Housing Administration (FHA) loans..."**

1.92     In their August 18, 2014 SEC FORM 10-K @ (pg 11), *See LINK:* (http://shareholders.ocwen.com/secfiling.cfm?filingID=873860-14-16&CIK=873860)

OCWEN admitted to errors as follows:

> **Note 1A — Restatement of Previously Issued Consolidated Financial Statements**
> *Restatement*
> "...Subsequent to the issuance of our Original Form 10-K for the year ended December 31, 2013 and our Original Form 10-Q for the quarter ended March 31, 2014, **we determined there was an error in the application of the interest method used to calculate the appropriate allocation between principal and interest in connection with the accounting for a financing liability related to the Rights to MSRs sold to HLSS.** The error relates to the subsequent accounting for the financing liability and does not impact the initial accounting for the sale of Rights to MSRs to HLSS. As a result, the financial amounts noted below have been restated from amounts previously reported..."

1.93        In their August 18, 2014 SEC FORM 10-KA @ (pg 3), *See LINK:*

(http://yahoo.brand.edgar-online.com/displayfilinginfo.aspx?FilingID=10158606-30324-

179279&type=sect&TabIndex=2&dcn=0000873860-14-000014&nav=1&src=Yahoo)

OCWEN admitted to being non compliant with GAAP (Generally Accepted Accounting

Principals) as follows:

> **RESTATEMENT**
> On August 12, 2014, our Board of Directors and the Audit Committee of the Board
> of Directors (Audit Committee), after consultation with Deloitte & Touche LLP,
> the Company's independent registered public accounting firm, determined that the
> Company's consolidated financial statements for the fiscal year ended December
> 31, 2013 and the quarter ended March 31, 2014 could no longer be relied upon as
> being compliant with GAAP. Consequently, we have revised our financial results
> for the periods presented in this Amendment. Because these revisions are treated as
> corrections to our prior period financial results, the revisions are considered to be a
> "restatement" under GAAP. Accordingly, the revised financial information
> included in this Annual Report on Form 10-K/A has been identified as "As
> Restated." See Note 1A - Restatement and Revision of Previously Issued
> Consolidated Financial Statements to the Consolidated Financial Statements in
> Part II, Item 8 for further discussion.

> **XI. RELATOR STATE COURT ACTION REVEALS THE
> DEFENDANTS KNOWING, INTENTIONAL AND
> RECKLESS FRAUDULENT "MBS" ENRICHMENT
> SCHEME AGAINST THE U.S. GOVERNMENT, SEC
> AND INVESTORS VIOLATING THE FALSE CLAIMS
> ACT**

*(a) Relator State Court Defendant Revelations with
Mortgage Loan, Alleged Trust Conveyance & Knowing PSA Non-Compliance*

1.94        Approximately eight years following the 2008 financial crisis, the underlying

fraud of the Defendants in connection with the impaired value of the "Trust" and every other

MBS Trust they are connected to would surface and reveal a knowing, intentional and/or

reckless fraud in connection with the pooling and servicing agreements and other

representations made to the U.S. government and investors which remained well-concealed

until the discovery documents and court filings in the Relator's 2011 state court foreclosure

litigation unraveled the Defendants MBS fraudulent scheme as follows:

**2006:**  (a)  In June 2006, Relator obtained a mortgage loan in the amount of $195,000 from mortgage lender NEW CENTURY MORTGAGE CORPORATION ("NEW CENTURY", herein).  The original mortgage was recorded in Bexar county, Texas and the corresponding Note contained no "endorsement and/or allonge" attached thereto.  The Note stated in pertinent part:  "...*I understand the Lender may transfer this Note.  Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "...Note Holder*...."

       (b)  Four months after closing on the loan, NEW CENTURY mailed Relator a notice advising they transferred and assigned only "loan servicing" rights to loan servicer HOMEQ Loan Servicing.

       (c)  Five months later, on October 1, 2006, five entities executed a Pooling and Servicing Agreement, creating the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* ("10.1.06 Trust"): HOMEQ as "Servicer;" WELLS FARGO as "Trustee;" "DEUTSCHE BANK NATIONAL TRUST as "Custodian"; NC CAPITAL as "Responsible Party"; and SECURITIZED ASSET BACKED RECEIVABLES LLC as "Depositor".  The purpose of the Trust was that loans conveyed into the Trust by the Trust "closing date" of October 1, 2006 would be securitized for sale to investors.  As Trustee, WELLS FARGO was responsible for the assets that are allegedly held in the Trust.

       (d)  In pertinent part, Section 10.03 of the Trust affirmatively represents that the Trust was established under the laws of New York as follows:

> THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

       (e)  Relevant New York authority as it pertains to Trusts can be found at:

> **N.Y. Estates, Trusts and Powers Law §§ <u>7-1.18</u>, <u>7-2.4</u> EPTL 7-2.4 states:**
> If the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized by this article and by any other provision of law, is void.
> *(See Wells Fargo Bank, NA v. EROBOBO*, 2013 NY Slip Op 50675 – NY)

(f)   The Defendants falsely represented the Relator loan was timely conveyed into the Trust and assigned to WELLS FARGO in its capacity as "Trustee" by the Trust "closing date" of October 1, 2006 when it was not.  There is no evidence the Relator Note and Security Instrument were properly and timely negotiated, delivered or transferred to all parties in the securitization chain by the Trust "closing date" as required by the 10.1.06 PSA.

(g)   The only assignment that was "publicly recorded" after the Relator closed on her loan with NEW CENTURY in 2006 was a *Transfer of Lien* executed on February 2, 2011, approximately five years after the loan closed and three years after NEW CENTURY was a dissolved entity as the result of a 2007 liquidation bankruptcy.    The 2.2.11 *Transfer of Lien* was executed between WELLS FARGO and NEW CENTURY by their alleged OCWEN Attorney-In-Fact Christina Carter, a known "robo-signer" and purported to show a transfer of the Relator Note and Deed Of Trust from NEW CENTURY to WELLS FARGO, effective February 2, 2011.

**WEBSITE:**
http://api.ning.com/files/oy9fgeV30PEwLoJigjTNqRDeHpPyLLg798trIgD gpftqiUy5luJUzqCdrVIuKt9tFS81NVdBtGs0sSIs7i**vJuTk2KeaIjJ/christina _carter.jpg
**DOCUMENT: 5.24.10**
Florida Department Of State Notary Commissions Notary Public Commission Application For *Christina Carter*

**WEBSITE:**
http://www.nycourts.gov/reporter/3dseries/2011/2011_51208.htm
**DOCUMENT:  July 1, 2011**
*HSBC Bank USA, N.A. v Taher*
Slip Copy2011 WL 2610525, 2011 N.Y. Slip Op. 51208(U)

**WEBSITE:**
http://www.deb.uscourts.gov/sites/default/files/opinions/judge-kevin-j.carey/kjc2012020707-10416_1.pdf
**DOCUMENT: 2.7.12**
*In re New Century TRS Holdings, Inc., et al 1*
Case No. 07-10416 (KJC)

**WEBSITE:**
**http://www.deb.uscourts.gov/sites/default/files/opinions/judge-kevin-j.carey/kjc05060907-10416ord.pdf**
**DOCUMENT: 5.1.09**
*In re New Century TRS Holdings, Inc., et al*
Case No. 07-10416 (KJC)

WEBSITE:
http://www.deb.uscourts.gov/sites/default/files/opinions/judge-kevin-j.carey/kjc07030807-10416.pdf
**DOCUMENT: 7.2.08**
*In re New Century TRS Holdings, Inc., et al*
Case No. 07-10416 (KJC)

**WEBSITE:    March 2013 FEDERAL RULING ON "NEW CENTURY" LIQUIDATION BANKRUPTCY & FORECLOSURE**
http://scholar.google.com/scholar_case?case=17971354717619984846&q=ross+v+deutsche+&hl=en&as_sdt=3,44

1.95        Relator alleges and would prove that her loan was not properly securitized into the 10.1.06 Trust in the manner required under the 10.1.06 Pooling and Servicing Agreement and other pertinent documents and as a result, WELLS FARGO is not the owner and holder of the loan instruments.   WELLS FARGO Bank, N.A, as Trustee of the 10.1.06 Trust, claims to be the sole and exclusive owner of the securitized mortgage.  However, if WELLS FARGO is in fact the owner, it must have acquired legal title to the loan on or before October 1, 2006.  New York law states that transfers to a trust after the closing date of the trust are void.  **N.Y. Estates, Trusts and Powers Law §§ 7-1.18, 7-2.4**.  *Glaski v. Bank of America, N.A*., 218 Cal.Rptr.4th 1079 (2013); *Saldivar v. JPMorgan Chase*, 2013 WL 2452699 (Bky. SD Tex. 6/5/13) (holding that trustee mortgagee's position is void if notes and assignments of mortgage not delivered within 90 day of closing of trust); *Wells Fargo v. Erobobo*, 2013 WL 1831799 (NY Slip Op. 4/29/13) (holding that NY trust law governs securitization and that notes and assignments of mortgage must be physically delivered to trustee within 90 days of closing for trustee to have claim of ownership).  The **Internal Revenue Code** provides for 100 percent tax penalties for transfers to the trust after the closing date.

1.96        If Wells Fargo cannot show physical receipt of the note and mortgage prior to

October 1, 2006, its claim to the Relator home is void.  Similarly, if the only evidence Wells Fargo has of ownership is a document executed after October 1, 2006, its claim is void. Fraudulent assignments or transfers of mortgage exist in every securitized mortgage foreclosure.  They are always executed years after the closing of the securitization trust and typically by someone who has no idea what they are signing as Wells Fargo former employee John Kennerty's deposition testimony revealed.  They are also always executed in a state a long distance from, and outside the subpoena power of, the state in which the foreclosed property is located.  The significance of the too late assignment of mortgage is that Wells Fargo never acquired "legal or equitable title" to the securitized loan.  This is irreparable error.  It also exposes the MBS holders to 100 percent tax penalties.  Because of this, and consistent with the *Erobobo*, *Salidivar* and *Glaski* cases cited above, Wells Fargo does not and cannot have "legal capacity" or legal "standing" to make a claim to the property.  In short, the February 2, 2011 *Transfer of Lien* is irrefutable evidence that the 10.1.06 Trust is a "compromised trust" with substantial impaired value and no identifiable owner of the mortgage.

### (b)  Relator & WELLS FARGO Unlawful Foreclosure(s) Violating Consumer Laws and Using a Forged Transfer Of Lien

1.97        *1st Foreclosure Action*:   In 2010, HOMEQ filed a foreclosure action and withdrew the same because on information and belief, there was no "publicly recorded" assignment to WELLS FARGO as required by the 10.1.06 Trust.  There was no publicly recorded *Assignment* from New Century to anyone.

1.98        OCWEN purchased HOMEQ from Barclays in May 2010. (http://www.sec.gov/Archives/edgar/data/873860/000101905612000280/ocn_10k.htm).  (pg F-21).  Thereafter, OCWEN began the servicing of Relator's loan and in September 2010, OCWEN  mailed Relator a letter apprising her of an inflated debt balance with steep interest

and other unlawful sums. When Relator timely disputed the false debt through certified mail pursuant to RESPA, FDCPA and TDCA, OCWEN completely ignored every timely remitted debt dispute letter with impunity and never responded. Upon information and belief, after OCWEN LOAN SERVICING, LLC completed the purchase of HOMEQ from Barclays Capital in May 2010, OCWEN discovered that it also acquired all the dissolved NEW CENTURY mortgage loan assets remaining on the books of HOMEQ (and not placed in the NEW CENTURY liquidation trust) and instead of notifying the SEC and bankruptcy trustee of the same, it appears OCWEN schemed to work in concert with WELLS FARGO & DEUTSCHE Bank to steal the NEW CENTURY mortgage loan assets and fraudulently place them in the 10.1.06 Trust "five years" after the closing date and unlawfully collect the loan payments that should have been assigned to the liquidating trust. While this fraudulent scheme was never disclosed to the U.S. government, the SEC and/or to investors, OCWEN appears to retain "Sub Servicing Rights" in many trusts involving Wells Fargo. (http://shareholders.ocwen.com/secfiling.cfm?filingID=1019056-12-566). *(See pg 1).*

1.99      On February 2, 2011, OCWEN worked in concert with WELLS FARGO and their retained foreclosure attorneys Jeffrey Hiller and Mark Cronenwett to forge and fabricate a false *"Transfer Of Lien"* between WELLS FARGO and original lender NEW CENTURY (a dissolved entity as a result of a 2007 liquidation bankruptcy), using a false power of attorney executed between OCWEN and NEW CENTURY in 2005 (which predates the Relator's loan) and recorded the same in Bexar County real property records. Relator alleges that the Defendants attempted an unlawful foreclosure using documents they fabricated and knew were fraudulent and in violation of the 10.1.06 Trust PSA. The executed *Transfer Of Lien* five years after the 10.1.06 Trust closed was a knowing fraudulent attempt to cure fatal defects and non-compliance with 2006 PSA requirement to convey the loan into the Trust by

the "closing date" of October 1, 2006 with evidence of "proper recording" of the same. Relator also discovered that on August 27, 2008 and in connection with the 10.1.06 Trust, WELLS FARGO fraudulently concealed they executed a *Limited Power Of Attorney* with Barclay's Capital Real Estate, Inc dba HomEq Servicing (not OCWEN) where on the attachment thereto is listed the 10.1.06 Trust.

1.100      **2nd Foreclosure**:  One month prior to executing the fraudulent *Transfer of Lien* and without providing Relator a *Notice of Default/Notice Of Acceleration* and (20) day notice to cure, by and through their debt collector law firm of Mackie Wolf Zientz & Mann, OCWEN mailed Relator a January 13, 2011 *Acceleration Of Loan Maturity* and a *Notice Of Foreclosure Sale.*  Relator commenced a state court litigation in Bexar county, Texas *(Cause No 2011-CI-02839)*  in February 2011 to stop the unlawful foreclosure action.

### (c)   Relator State Court Litigation "2012/2015 Discovery" Uncovers WELLS FARGO Knowing and Intentional Fraud In Connection with 10.1.06 PSA (i.e. Ignore Chain of Title & No Certificaton Into Trust)

1.101      In connection with her Bexar county, Texas state court action *(Cause No. 2011-CI-02839),*  Relator propounded discovery in March 2012 on Defendants WELLS FARGO and OCWEN requesting "policies and procedures" in production request #22 as follows:

> Q:   "...*For the period between 2006-2012, provide and identify all documents for the periods between 2006-2011 evidencing the policy and procedures maintained by OCWEN and WELLS FARGO as it pertained to the handling of mortgage loan entries, recording, corrections, compliance with federal and state laws, and the handling of inquiries from Plaintiff (including those policies and procedures HOMEQ SERVICING provided to OCWEN and WELLS FARGO....*"

WELLS FARGO and OCWEN responded on April 23, 2012 as follows:

> A:   "...*Objection, overbroad, unduly burdensome.  Seeks information which is proprietary in nature and constitutes a protected trade secret....*"

1.102       Relator also sought "chain of title" disclosures in Interrogatory #9 as follows:

> Q:       "...*For the period between 2000-2012, and as it pertains to Creditor SABR 2006-NC3 identified in the September 13, 2010 OCWEN letter to Plaintiff, please identify the name of this CREDITOR and all chain of title documents providing this Creditor an interest in Plaintiff's mortgage and/or Deed Of Trust and Promissory Note...*".

WELLS FARGO and OCWEN responded on April 23, 2012 as follows:

> A:       "...*Objection, the request is vague and subject to multiple interpretations. Subject to and without waiving said objection, Wells Fargo and Ocwen direct the Plaintiff to the Assignment of Mortgage included herewith....*".

1.103       Relator also requested "agreements" affecting the Relator loan and as it pertained to the Defendants *Responses to Plaintiff's Requests For Production* in questions 1-8 regarding in pertinent part "...*all agreements between Wells Fargo and/or HOMEQ and/or OCWEN...*", the Defendants responded on April 23, 2012 as follows:

> "...*Objection, the request is overbroad and seeks information which is neither relevant or not reasonably calculated to lead to the discovery of admissible evidence...*" (emphasis added)

1.104       Three years later on January 30, 2015 and after Relator filed a *Motion For Traditional and No Evidence Summary Judgment* addressing WELLS FARGO "Lack Of Standing", WELLS FARGO found it relevant to file *Defendants' Third Supplemental Responses To Plaintiff's First Request For Production* and in paragraph four, they included a "LINK" to the "...*Pooling and Servicing Agreement ...we refer Plaintiff to the federal website as follows...*":

https://www.sec.gov/Archives/edgar/data/1378964/000091412106003360/00009 14121-06-003360.txt

1.105       The LINK was directed to an internet page with the document identified as the *Prospectus Supplement dated October 30, 2006* in connection with the *Securitized Asset*

*Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* **("10.30.06 Prospectus PSA").** This was an agreement between Wells Fargo and other parties including HOMEQ.

***(d) Relator State Court Litigation***
***(October 24, 2014 WELLS FARGO / OCWEN***
***Counter Motion For Summary Judgment)***
***Uncovers WELLS FARGO Knowing and Intentional Fraud***
***In Connection with 10.1.06 PSA***
***(i.e. Ignore Public Recording & No Certification Into Trust)***

1.106     As patent proof of WELLS FARGO and OCWEN knowing, intentional and/or reckless non-compliance with the 10.1.06 Trust PSA "public recording" requirement, on October 24, 2014, WELL FARGO et al filed a *Counter Motion For Final Summary Judgment* in the Relator state court action seeking a favorable court ruling on their asserted summary judgment ground in connection with "public recording" as follows:

> "...*Defendants are entitled to summary judgment on Plaintiff's claim to rescind foreclosure / standing because Plaintiff lacks standing to contest assignments and* **Defendants were under no obligation to record the assignments to Wells Fargo**..." *(Emphasis Added)*

1.107     Recording an interest in real property in Texas is permissive, not mandatory. TEX PROP CODE §12.001(a).  Although an unrecorded deed of trust is "binding on a party to the [deed of trust]," it is "void as to a creditor or to a subsequent purchaser for valuable consideration without notice" of the security interest created by the deed of trust. *Id* at §13.001(a)-(b).   Once a deed is recorded, section 192.007 of the TEX LOC GOV'T CODE requires that any release, transfer, assignment, or other action relating to the deed of trust be recorded in the same manner as the original deed of trust was recorded. TEX LOC GOV'T CODE § 192.007.   The Relator original deed of trust executed with NEW CENTURY was recorded on June 22, 2006.

1.108     As it pertained to the 10.1.06 Trust, the Defendants were required to follow the

securitization procedure for transferring each mortgage loan into the 10.1.06 Trust by the "closing date" as provided in the *10.30.06 Prospectus PSA* on pg. S-65 – S66 as follows:

### Delivery of Mortgage Loan Documents

In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(a) **the original mortgage note**, endorsed without recourse in blank by the last endorsee, including all intervening endorsements **showing a complete chain of endorsement from the originator to the last endorsee;**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(e) **the mortgage assignment(s), or copies of them certified by the applicable originator, escrow company, title company, or closing attorney, if any, showing a complete chain of assignment from the originator of the related mortgage loan to the last endorsee**--which assignment may, at the originator's option, be combined with the assignment referred to in clause(f) below;

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(h) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided). Pursuant to the pooling and servicing agreement, **the custodian will agree to execute and deliver on or prior to the closing date an acknowledgment of receipt of the original mortgage note, item (a) above, with respect to each of the mortgage loans delivered to the custodian, with any exceptions noted. The custodian will agree, for the benefit of the holders of the certificates, to review, or cause to be reviewed, each mortgage file within ninety days after the closing date**--or, with respect to any **Substitute Mortgage Loan delivered to the custodian, within 30 days after the receipt of the mortgage file by the custodian**--and to deliver a certification generally to the effect that, as to each mortgage loan listed in the schedule of mortgage loans,

o **all documents required to be reviewed by it pursuant to the pooling and servicing agreement are in its possession;**

o each such document has been reviewed by it and appears regular on its face and relates to such mortgage loan;

o based on its examination and only as to the foregoing documents, **certain information set forth on the schedule of mortgage loans accurately reflects the information set forth in the mortgage file delivered of such date; and**

o **each mortgage note has been endorsed as provided in**

79

the pooling and servicing agreement.

1.109        Additionally, there was also required to be "public recording" compliant  with

**Sec 2.01, Article II, Conveyance Of Mortgage Loans; Representation And Warranties**

in connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-*

*Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of*

*October 1, 2006* where a secure chain of title is a prerequisite for certification of mortgage

loans placed into the MBS trust by the "closing date" and in support of the same, the **10.1.06**

**PSA** states in relevant part:

(a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund.  On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) **In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian** for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) **The original Mortgage Note bearing all intervening endorsement showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee.**  To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party;

(ii) The original of any guarantee executed in connection with Mortgage Note;

(iii) **the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording.** ....

(iv) the originals of all assumptions, modification, consolidation and extension agreement, if any, **with evidence of recording thereon;**

(v) **the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable**

**originator to the last endorsee**(or, in the case of a MERS Designated Loan, MERS) **with evidence of recording thereon.**

*(e)  Relator State Court Litigation*
*(2.17.15 Plea To The Jurisdiction)*
*Uncovers WELLS FARGO Knowing and Intentional Fraud*
*In Connection with 10.1.06 PSA*
*(i.e. Ignore Trust Closing Date & No Certification Into Trust)*

1.110          In February 2015, Relator filed her "plea to the jurisdiction" alleging among

other things:

(1)   The Note and Security Instrument were not properly conveyed to WELLS FARGO Bank, NA *As Trustee* in the 10.1.06 Trust as required by the *10.1.06 PSA* and *10.30.06 Prospectus PSA* executed on 10.1.06 and which govern the 10.1.06 Trust.

(2)   The February 2, 2011 *Transfer of Lien* executed between WELLS FARGO and NEW CENTURY recorded with the Bexar County Clerk (five years after the 10.1.06 Trust "closing date" and three years after NEW CENTURY was dissolved in a liquidation bankruptcy proceeding) is a known and fabricated forgery and does not transfer Relators subject Note and Security Instrument to WELLS FARGO Bank, NA *As Trustee* for the 10.1.06 Trust.

(3)   WELLS FARGO Bank, NA *As Trustee* for the 10.1.06 Trust "lacks standing" to foreclose on any property not properly securitized into the Trust by the "closing date"

1.111          Responsive to the plea to jurisdiction filing, on February 17, 2015 WELLS

FARGO filed *WELLS FARGO BANK, NA As Trustee Response To Plaintiff's First Amended*

*Plea To The Jurisdiction* and incorporated by reference their 2.10.15 *Motion For More Time*

*To File Evidence In Response And, Subject Thereto, Response To Plaintiff's Motion For*

*Traditional And No Evidence Partial Summary Judgment By Wells Fargo Bank.*   On (page

2) therein, WELLS FARGO affirmatively states:

*"...Defendants file their Response to Plaintiff's Second Motion and show that Plaintiff lacks standing to contest the assignments of the loan documents. Furthermore, even if the Court considered Plaintiff's attacks, the summary judgment evidence conclusively establishes **WELLS FARGO is the last mortgagee of record and is entitled to foreclose**..."*

---

### XII. DEFENDANTS 2015 KNOWING, INTENTIONAL AND RECKLESS ACTS NON COMPLIANT WITH MBS TRUST POOLING AND SERVICE AGREEMENTS CAUSED THE U.S. GOVERNMENT FINANCIAL HARM AND VIOLATED THE FALSE CLAIMS ACT

---

*(a)  Damages To The Government:*
*False MBS Certifications Demonstrated by WELLS FARGO & OCWEN*
*In State Court Litigation*

1.112      The Defendants engaged in a knowing, intentional and/or reckless scheme to deceive the U.S. Government, SEC and investors by concealing false MBS certifications. As demonstrated by the Relator's currently pending state court action in *Cause No 2011-CI-02839*, there is compelling evidence in 2015 that the Defendants have knowingly, intentionally and/or recklessly concealed the impaired value of MBS Trusts by and through their fraudulent acts which include but are not limited to:  (1)  Intentionally ignoring federal consumer laws (i.e ignoring timely remitted "debt dispute" letters pursuant to FDCPA, RESPA and TDCA) to deliberately cause mortgage loans to be subject to unlawful foreclosures and thereby causing the MBS to rapidly decline in value; (2) Imposing unlawful "force-placed insurance" on borrowers to artificially inflate the value of MBS; (3) Imposing false fees for the public recording of mortgage assignments and transfers that were never publicly recorded and/or certified to provide a proper chain of title thereby artificially increasing the value of the MBS; (4) Providing 2012 discovery responses regarding compliance requirements with pooling and servicing agreements that are not complied with; (5) Filing summary judgment pleadings seeking favorable court rulings on Defendants non-

compliance with sacred pooling and servicing agreements requiring among other things, "public recording" and corresponding "proper certifications" of mortgage loans as a condition precedent to being placed in the trust by the registered "closing date" and which are also judicial admissions of the same; and (6) Enforcing a nefarious WELLS FARGO foreclosure training manual which promotes the fabrication and forging of mortgage instruments as corroborated by the deposition testimony of H John Kennerty which is non-compliant with pooling and servicing agreements and all laws.

1.113 Additionally, the Defendants knowingly, intentionally and/or recklessly disregarded the 2011 OCC Consent Order with WELLS FARGO requiring that "...*the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status...*".  The Defendants have also disregarded the pooling and servicing agreements requiring "public recording" of mortgages as a condition precedent to obtaining the certification necessary for the mortgage loan to be placed in the trust by the agreed "closing date", which has resulted in the "cloud on title" to hundreds of thousands of mortgage-backed securitized properties which Defendants have knowingly created and failed to extinguish "clouds on title" particularly where their non-judicial foreclosure actions styled "Notice of Foreclosure" are seeking to foreclose on properties subject to a mortgage issued by a dissolved entity or non-party with no valid and accurate "chain of title" to the foreclosing entity as required by the trust pooling and servicing agreements thereby causing a rapid decline in the value of the MBS.

1.114 Further, the Defendants have provided patent proof they lack the proper indorsement and/or allonges required to be permanently affixed to Notes to show a proper chain of title.  Defendants use a WELLS FARGO foreclosure training manual to resort to

forging and fabricating the same when necessary which is non-compliant with pooling and servicing agreements and all laws.  By knowingly, intentionally and/or willfully failing to comply with the fundamental PSA mortgage certification requirements outlined in pooling and servicing agreements as it pertains to securing a proper chain of title through "public recording" and/or "firmly affixed indorsements and/or allonges" to Notes, Relator submits that thousands of mortgage loans could not and are not being properly placed in Trusts thereby causing the rapidly declining value of the MBS.

1.115    The Defendants have also violated NEW YORK Trust laws when executing false, fabricated and forged *Transfers of Lien* in connection with a Note and Deed outside the pooling and trust "closing date" and have fraudulently attempted to use in legal proceedings the argument they are "...***the last mortgagee of record and is entitled to foreclose***..." to circumvent "standing" issues when the evidence in the Relator case shows there was never a complete chain of title and their February 11, 2014 *Transfer of Lien* executed with a dissolved entity five years after the 10.1.06 Trust "closing date" and when using a known "Robo-Signer" was void, as a matter of law. New York's EPTL §7-2.4 has erected an impenetrable legal barrier that prevents the Bank's trust from acquiring a note and mortgage after the Trust's closing date regardless of whether the transfer is being challenged by a nonparty or non-third- party beneficiary.  *(See Wells Fargo Bank, NA v. EROBOBO*, 2013 NY Slip Op 50675 – NY).

1.116    The Defendants by and through their litigation conduct have demonstrated a knowing and intentional disregard for pooling and servicing agreements that guide the mortgage-backed securities market.  As a result, they have knowingly failed to obtain the proper certifications to place mortgage loans into the trust (ie *mandatory public recording of assignments and transfers to endure proper chains of title*) causing substantially impaired

values of the same. The Defendants have perpetrated, and continue to perpetrate a knowing, intentional and/or reckless fraud on the US. Government, SEC and investors by grossly misleading and concealing from the U.S. government, SEC and investors that they are not selling true certified mortgage backed securities but rather, they are knowingly, intentionally and/or recklessly selling uncertified "non mortgaged-backed securities" with an undisclosed, substantially impaired value guaranteed to lead this country into another national foreclosure crisis and/or great depression.

### (b) Damages To The Government:
### Knowing Fraudulent Concealment Of Impaired Value of MBS

1.117      The Defendants engaged in a knowing, intentional and reckless scheme to deceive the U.S. Government, SEC and investors by concealing false and misleading information. The U.S. Government, SEC and investors are entitled to a presumption of reliance upon the integrity of the market. At all relevant times, the Defendants knowledge that the public documents and statements issued and/or disseminated in the name of the trusts show that they were contractually a party to materially false and misleading statements that concealed the impaired value of the trusts. The Defendants knew that the statements or documents would be issued or disseminated to the investing public, which relies on the truth stated in said documents. The Defendants knowingly and materially participated in or acquiesced through silence, in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws and the false claims act. As set forth herein in detail, the Defendants by the virtue of their own acts were privy to confidential proprietary information and participated in the fraudulent scheme to defraud the U.S. Government, SEC and investors.

### (c)  Damages To The Government:
### Knowing Artificial Inflated Value of MBS Trusts & No Safe Harbor

1.118        The Defendants engaged in a knowing, intentional and/or reckless scheme to

deceive the U.S. Government, SEC and investors by artificially inflating the value of MBS

Trusts through the collection of unlawful loan servicing fees when loans were fully

compliant (i.e. unlawful ultra-inflated force-placed insurance, interest and late fees) and/or

failure to incur the necessary fees to publicly record mortgage assignments and transfers as

required by pooling and servicing agreements to ensure a proper chain of title.    The

Defendants filed and concealed in financial statements and other published documents their

custom and practices to ignore pooling and servicing agreements and consumer laws with

impunity.   The US Government, SEC and investors suffered an economic loss when the

artificial inflated value of the MBS began rapidly declining and required the U.S.

Government to take swift and immediate action to correct the same.   Further, forward-

looking statements by their nature address matters that are, to different degrees, uncertain.

Forward-looking statements involve a number of assumptions, risks and uncertainties that

could cause actual results to differ materially.    The statutory safe harbor provided for

"forward-looking statements" under certain circumstances do not apply to any of the

allegedly false statements described in this complaint because the statements were not

described as forward looking when made.   More specifically, there was no meaningful

cautionary language identifying important fraudulent conduct factors that could cause actual

results to differ materially from those in the purportedly forward looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking

statements described herein, the Defendants are liable for those knowingly false forward-

looking statements because at the time each was made, the particular speaker knew that the

particular forward-looking statement was false and/or approved by an executive officer of the Defendants who knew those statements were false when made.

### (d) Damages To The Government:
### Knowing False MBS Certifications and Reckless Manipulation Of
### Publicly Recording Fees and Causing the US Government to be Overcharged For The
### Purchase Of Artificially Inflated MBS

1.119        Relator submits that the Defendants have knowingly, intentionally and/or recklessly concealed their manipulation of recording fees which they avoided by not "publicly recording assignments and transfers" and which artificially inflated the value of the MBS and caused the US Government to be overcharged for the same.   As proof in support, the Defendants WELLS FARGO and OCWEN filed an October 24, 2014 summary judgment in state court seeking a favorable court ruling that:

> "...*Defendants are entitled to summary judgment on Plaintiff's claim to rescind foreclosure / standing because Plaintiff lacks standing to contest assignments and **Defendants were under no obligation to record the assignments to Wells Fargo**...*" (Emphasis Added)

1.120        In November 2013, Wells Fargo & Co. reported in a regulatory filing that they paid $335 million to the Federal Housing Finance Agency as part of a settlement for allegedly making misleading disclosures on mortgage securities the bank sold to Fannie Mae and Freddie Mac.   In December 2013, Wells Fargo said it would pay $869 million to settle similar "toxic mortgage" claims over approximately 6.7 million loans sold to Federal Home Loan Mortgage Corporation ("Freddie Mac").   In that sale, WELLS FARGO falsely represented compliance with pooling and servicing agreements, which required incurring fees paid for the "public recording" of each mortgage and subsequent assignments and transfers, when they know they did not.  WELLS FARGO avoided the payment in full for all fees for recordation of documents reflecting the establishment, assignment or transfer of a secured interest in real property and knowingly failed to record documents with the intent of

avoiding the payment of multiple recording fees, which artificially inflated the value of the MBS. The U.S. government was overbilled for MBS as a result of the non-payment of those recording fees. A public recording fee is on average thirty dollars ($30.00). Thirty dollars multiplied by 6.7 million loans sold to Freddie Mac translates to approximately $201,000,000 that WELLS FARGO cost the U.S. Government to correct their fraudulent acts in connection with the sale of their mortgage–backed securitized loans that lacked proper recording of assignments to reflect a proper chain of title. That calculation does not include all other sales after 2009 or those mortgage-backed securitized loan sales made by WELLS FARGO to Fannie Mae and/or those mortgage backed security sales made by Deutchse Bank to Fannie Mae and Freddie Mac which were not properly publicly recorded and which would cause the damages to the US government to increase substantially.

1.121  In addition, Fannie Mae and Freddie Mac and other federal government agencies, including the U.S. Department of Housing and Urban Development, provide guarantees to lenders in the event that borrowers default on their mortgages. Each time a Defendant who lacked valid notes and mortgage assignments, submitted a claim for payment on such guarantee, said Defendant submitted a false claim for payment or approval. The U.S. government has been damaged to the extent that it has made payments on such guarantees.

1.122  Relator submits that the fraudulent conduct of Defendants in connection with mortgage-backed securities will continue to escalate as long as WELLS FARGO maintains an unlawful employee-attorney training manual providing instruction on how to fabricate and forge missing mortgage loan documents; disregards the 2011 OCC Consent Order and violates pooling and servicing agreements with impunity. There will also be a cascading effect of financial harm to over one hundred Trusts where WELLS FARGO and/or DEUTSCHE Bank are identified as the "Custodian", "Trustee" and/or "Loan Servicer" in

many more pooling and servicing agreements *(SEE Ex-A).*

1.123         As proof of the same, in connection with a 2015 Relator state court judicial

proceeding, WELLS FARGO and OCWEN filed the 2.10.15 Affidavit Of Katherine

Ortwerth with attached exhibits identified as "*...The records attached hereto are the*

*originals or exact duplicates of the originals...*".  Exhibit "A-5" was a document identified

as the *Pooling and Servicing Agreement, with attached Schedule I* ("PSA", *herein*).  The

front page of the document is identified as "*Securitized Asset Backed Receivables LLC Trust*

*Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing*

*Agreement Dated as of **October 1, 2006**.*   The Prospectus Supplement dated October 30,

2006 provides on  pg S -89  in pertinent part as follows:

THE POOLING AND SERVICING AGREEMENT

> The pooling and servicing agreement will be entered into among the
> depositor, the servicer, the trustee, the custodian and the responsible
> party. The pooling and servicing agreement will govern the rights
> and responsibilities of the parties responsible for administering the
> issuing entity.

1.124         Relator submits that at all times relevant to the 10.1.06 Trust PSA, the Defendants

knowingly, intentionally and/or recklessly proceeded to handle the mortgage-backed

securities pursuant to their own internal training manuals and never intended to permit the

pooling and servicing agreement to guide and govern their responsibilities to the U.S.

government, SEC  and /or investors.

*(e)  Damages To The Government*
*Reliance on Defendants Public Filings When Defendants Violated*
*Multiple Federal & SEC Violations*

1.125         *Federal Violations in Connection with False and Forged Signatures:*  Filing

false affidavits in connection with mortgage backed securities and attaching fabricated loan

records, fabricated *Transfer Of Lien*; fabricated *Power Of Attorney* to support a standing to

foreclose a property without providing any required certifications of legal or equitable ownership as required by the PSA is a violation of federal criminal statutes. Affixing or submitting false signatures on a mortgage document is a violation of federal and state law, and those signatures are without authority to complete the transaction. RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES §5.4(c) (1997) ("A mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures."). False signatures on a mortgage document or in SEC filings also obstructs the federal government's ability to audit for lawful compliance and mortgage fraud and potentially violates at least twenty- three federal criminal statutes as follows:

**Title 15, Chapter 2b – Securities Exchange Offenses**
15U.S.C.§78j–Manipulative and deceptive devices
15U.S.C.§78ff–Willful violations; false and misleading statements

**Title 18, Chapter 47 – Fraud and False Statement Offenses**
18 U.S.C.§1001–False Statements or Entries
18 U.S.C.§1005–Bank Entries, Reports and Transactions
18 U.S.C.§1010 - HUD and Federal Housing Administration transactions
18 U.S.C.§1016–Acknowledgment/Oath
18 U.S.C.§1028 - Fraud and related activity in connection with identification documents

**Title 18, Chapter 63 – Mail Fraud Offenses**
18U.S.C.§1341–Mail Fraud
18U.S.C.§1342 - Fictitious name or address
18U.S.C.§1343–Wire Fraud
18U.S.C.§1344–Bank Fraud
18U.S.C.§1346–Honest Services Clause
18U.S.C.§1348–Securities Fraud
18U.S.C.§1349–Attempt/Conspiracy to commit Chapter 63 offenses
18U.S.C.§1350–Certification of Financial Reports

**Title 18, Chapter 73 – Obstruction Offenses**
18U.S.C.§1505–Obstruction of Proceedings
18U.S.C.§1510–Obstruction of Criminal Investigations
18U.S.C.§1512–Witness Tampering
18U.S.C.§1516–Obstruction of Federal Audit
18U.S.C.§1517–Obstructing the Examination of a Financial Institution
18U.S.C.§1519–Destruction, Alteration, or Falsification of Records
18U.S.C.§1520–Destruction of Corporate Audit Records

**Title 18, Chapter 79– Crimes and Criminal Procedure**
18U.S.C. § 1621 - Perjury generally
18U.S.C. § 1622 - Subornation of perjury
18U.S.C. § 1623 - False declarations before grand jury or court

**Other Relevant Criminal Statutes**
18U.S.C.§371  - Conspiracy

**Other Related SEC Regulations**
17C.F.R.§240.10b-5–Employment of Manipulative and Deceptive Devices
17C.F.R.§240.10b-5-1–Insider Trading
17C.F.R.§240.10b5-2–Duties of trust/confidence in misappropriation insider trading cases
17C.F.R.§240.12b–Registration and Reporting
17C.F.R.§240.12b-2–Maintenance of records and preparation of required reports
17C.F.R.§240.13a–Reports of issuers of securities registered pursuant to section12

1.126    ***State Violations in Connection with False and Forged Signatures:*** False or fraudulent notary acknowledgements are also a violation of Texas law, and the underlying signature is void.    TEXAS PENAL CODE, Title 8.    Offenses Against Public Administration. Chapter 37.   Perjury and Other Falsification § 37.03 AGGRAVATED PERJURY, False statement under oath, false unsworn declaration …in connection with an official proceeding (Felony of Third Degree).  Texas contract law is clear that "[f]orgery is the making without authority of a false instrument in writing, *purporting to be the act of another.*" *Nobles v. Marcus,* 533 S.W.2d 923, 925–26 (Tex.1976) (emphasis added). Forgery makes an assignment *void*, not voidable. *Garcia v. Garza*, 311 S.W.3d 28, 44 (Tex. App. 2010);  *Bellaire Kirkpatrick Joint Venture v. Loots*, 826 S.W.2d 205, 210 (Tex. App. 1992).

### *(f) Damages To The Government*
### *Federal Taxes From Trusts' Loss Of Tax Status*
### *(Assignments After Trust Formation Closing Date)*

1.127    There are negative tax consequences for trusts acquiring loans after the closing date of the trust. MBS trusts are created as Real Estate Mortgage Investment Conduits, or "REMICS" (a type of special purpose vehicle used for the pooling of mortgage loans and

issuance of mortgage-backed securities). REMICS are defined under the U.S. Internal Revenue Code (Tax Reform Act of 1986).  The advantage of REMICS is that income from REMICS is tax exempt from double taxation. Because of the tax advantages, tax law limits and strictly regulates REMIC transactions.  All contributions, (*i.e.*, the delivery of the mortgage loans) into the trust, and to the REMIC must occur on the "start up date," or at most 90 days after this date, which is also the "cut-off date" specified in the MBS trust prospectus. All other contributions after the cut-off date are considered under the tax code as prohibited activities. Therefore, if a mortgage loan has not been identified by the cut-off date (*i.e.*, placed in the securitization pipeline by the originating bank), any transfer of the borrower's mortgage note and/or mortgage into the MBS trust after the cutoff date triggers a 100% penalty tax on the late contribution.

1.128         As evidenced by the 10.24.14 summary judgment filed by WELLS FARGO and OCWEN in the Relator's state court proceeding, the Defendants have judicially admitted they do not have a duty to "publicly record", which is a violation of the pooling and servicing agreements.  According to the PSA, if you do not publicly record assignments and transfers to show a proper chain of title, no certification can be provided for the mortgage loan to be transferred into the trust by the closing date.  As a result, 100% of the mortgage loans do not have proper publicly recorded assignments and transfers of mortgages with proper certifications into the MBS trusts by the trust closing date.   Where assignments or transfers of mortgages to their respective MBS trusts are made after the cut-off date, that event triggers taxes owed to the U.S. government, which remain unpaid and knowingly concealed in all SEC filings.

## XIII.  RELATOR REPORTS THE DEFENDANTS KNOWING, INTENTIONAL AND RECKLESS FRAUDULENT "MBS" SCHEME AGAINST THE U.S. GOVERNMENT, SEC AND INVESTORS AND VIOLATED THE FALSE CLAIMS ACT

1.129    The allegations asserted herein are based upon Relator's personal knowledge with respect to Defendants in connection with her loan and a corresponding unlawful foreclosure action, and upon information and belief as to all other matters, based upon, inter alia, the investigation conducted by Relator which included among other things, a review of Defendants' public documents and press releases, Defendants' public filings with the United States Securities and Exchange Commission, wire and media reports, securities analyst reports, Wells Fargo internal training manual for attorneys and related depositions produced in other litigations and a review of the Defendants' website.  Relator believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1.130    In 2014, Relator visited and/or apprised multiple government agencies of WELLS FARGO's knowing and intentional fraud in connection with her litigation and violations f state and federal law and pooling and servicing agreements for the express purpose of unlawfully acquiring real property with the specific intent to profit from such wrongful conduct.  Relator informed government official that the acts of the Defendants go beyond robo-signing and fabricating mortgage instruments as the Defendants have demonstrated a complete disregard for the requirements contained in pooling and servicing agreements. Relator shared multiple documents regarding violations with pooling and servicing agreements and WELLS FARGO's fabricating and/or forging multiple false documents, and filing the same in a judicial proceeding.  In March 2015, Relator apprised the SEC of the Defendants violations of pooling and servicing agreements and other litigations throughout

the country addressing the same.

1.131        As it pertains to the dissolved NEW CENTURY, multiple lawsuits throughout the

country have been filed addressing the fraudulent mortgage instruments filed by WELLS

FARGO in connection with foreclosure actions as follows:

> *(See Dissolved New Century & Defective Assignments - Nevada Case)*
> *HYMAS v. DEUTSCHE BANK NATIONAL TRUST COMPANY* – TRUST 2006-NC2 et
> al, 2:13-cv-01869, No. 44 (D.Nev. Dec. 22, 2014).

> *(See Dissolved New Century & Defective Assignments - Massachusetts Case)*
> *Ross v. Deutsche Bank Nat. Trust Co.,* 933 F.Supp.2d 225 (D.Mass.2013)

> *(See Dissolved New Century & Defective Assignments - New Mexico Case)*
> *Deutsche Bank  National Trust v Beneficial New Mexico Inc,* New Mexico Court of
> Appeals, 31,503 (N.M. Ct. App. 2014)

1.132        The lawsuits throughout the country addressing WELLS FARGO fatally defective

and/or fraudulent mortgage assignments that provide patent proof of lack of public recording

and/or lack of proper certifications into a trust prior to the "closing date" include but are not

limited to:

> *Wells Fargo Bank, NA v. EROBOBO,* 2013 NY Slip Op 50675 - NY: Supreme Court
> 2013 *In re Franklin,* No. 10•20010 (Bankr. S.D. N.Y. Jan. 29, 2015); *Bristol v Wells
> Fargo, Bank,* NA, No 4D12-4082 (Fla. 4th DCA 2014); *Wells Fargo Bank, NA v.
> Froimson,* 2014-Ohio-4468; *Wells Fargo Bank, N.A. v. Ullah,* 2014 U.S. Dist. LEXIS
> 14883 (S.D.N.Y. Feb. 6, 2014); *Lindsey v. Wells Fargo Bank,* N.A., 139. So. 3d 903,
> 906 (Fla. 1st DCA 2013); *Focht v. Wells Fargo Bank,* N.A., 124 So. 3d 308 (Fla. 2d
> DCA 2013); *Wells Fargo Bank NA v. Horn,* 2013-Ohio-2374, 9th Appellate District
> (June 10, 2013); *Cromarty v Wells Fargo,* NA, No 4D11-4435 (Fla 4th DCA April 17,
> 2013); *Wells Fargo Bank, N.A. v. Reeves,* 37 Fla. L. Weekly D1381a (Fla. 1st DCA
> June 13, 2012); *Wells Fargo v. Burrows,* 2012-Ohio-5995; *Rigby v Wells Fargo, NA,*
> No 4D10-3587 (Fla 4th DCA April 4, 2012); *Wells Fargo Bank, N.A. v. Heath,* 2012
> OK 54, ¶ 9 (Okla. 2012).; *Wells Far- go Bank v. Crespo,* 2012 WL 1192135 (App.
> Div. 2012),; *Wells Fargo Bank v Ballestas.* Case No. 01-10-00020-CV (TX Ct. App.
> 1, May. 12, 2011); *Wells Fargo Bank, N.A. v. Ford.* 418 N.J. Super. 592, 15 A.3d 327
> (App. Div. 2011); *Wells Fargo v McNee,* 2011 NY Slip Op 33325(U), November 28,
> 2011; *Wells Fargo Bank, N.A. v Wine,* 90 A.D.3d 1216, 1217 (N.Y. App. Div. 3d
> Dep't 2011); *Wells Fargo v Jordan* 2009 Ohio 1092; 2009 Ohio App. LEXIS 881
> (Ohio Ct. App., 8th App. Dist, 3/12/09); *Wells Fargo Bank v. Marchione,* 69 AD 3d
> 204 - NY: Appellate Div., 2nd Dept. 2009; *Wells Fargo, Litton Loan v. Farmer,* 867
> N.Y.S.2d 21 (2008); *Wells Fargo Bank, v. Byrd,* 178 Ohio App.3d 285, 2008-Ohio-
> 4603, 897 N.E.2d 722 (2008); *Wells Fargo v. Reyes,* 867 N.Y.S.2d 21 (2008).

1.133      ***WELLS FARGO Steep Attorney Fees Paid To Cover Up Their Continuing Fraud & Their Training Manual On Forging Missing Mortgage Documents***:  Relator has obtained the attorney fee records of WELLS FARGO and OCWEN in her state court action and discovered that the attorneys have been substantially compensated close to $100,000 for concealing, forging and/or  fabricating evidence in connection with Relator's loan and also in connection with their elaborate scheme to conceal their non-compliance with pooling and servicing agreements with impunity.  As a result, the U.S. Government, SEC and investors have continued to be financially harmed as purchasers of fraudulent MBS and/or defending financial institutions that were harmed by the Defendants' fraudulent MBS Trusts that caused financial harm when relying on asset backed securities prospectus' and other Trust information.

1.134      Collectively, the Defendants led by WELLS FARGO are creating and contributing to another potential financial mortgage crisis and misleading the U.S. Government, the Securities and Exchange Commission ("SEC") and investors as to the true value of approximately one hundred SEC registered MBA Trusts where WELLS FARGO is identified in pooling and servicing agreements as either the "Custodian", "Servicer" and/or "Trustee" ***(See Ex-A).***

---

**XIV.  CAUSES OF ACTION**

---

### COUNT I
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Against All Defendants**

1.135      To the extent wrongdoing occurred prior to May 6, 2009, this Complaint should be deemed to include violations of the FCA prior to recent amendments to that statute, *e.g.*, 31 U.S.C. § 3729(a)(1), (a)(2), and (a)(3).

1.136      Relator re-alleges and incorporates herein by reference all the allegations set forth in paragraphs 1.01 through 1.134 of this Complaint.

1.137      This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

1.138      As alleged in paragraphs 1.01-1.134, the Defendants created, sold or participated in mortgage-backed securities.  As further alleged, the mortgage-backed securities were composed of mortgages bundled to create the securities, in which the mortgages *lacked compliance* with the pooling and servicing agreement requirements to create a secured, real estate debt obligation for Certificateholders as follows:

(1)      Prudent loan servicing compliant with federal and state laws to avoid artificially inflating MBS values with inaccurate loan information;

(2)      Proper recording of truthful (not false and fabricated) real estate documents reflecting the establishment and/or each assignment and transfer of secured interests in real property and remitting recording fees to counties for each recording to avoid artificially inflated MBS values;

(3)      Proper endorsements on each mortgage Note showing a complete "chain of endorsement" from the originator to the last endorsee;

(4)      Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly "certified" into the trust

(5)      Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly certified into the trust by the trust "closing date"

(6)      Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office to demonstrate a proper "chain of title"

(7)      Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office reflecting the establishment and/or transfer of secured interests in real property, or beneficial interest in the underlying promissory note

1.139      The Defendant's knowing, intentional and/or reckless conduct includes but is not limited to their fraudulent concealment of their failure to: (1) properly service loans thereby artificially inflating the value of MBS; (2) obtain proper endorsements on notes; (3) pay

required fees to publicly record all assignments and transfers to obtain the necessary certification of chain of title for mortgage loans to be placed in the trust by the trust "closing date"; and (4) avoid artificially inflating the value of the MBS for failure to remit sums to properly record, caused each of the mortgage-backed securities sold to the Treasury, or other entity funded by the U.S. government to violate state and federal laws and advanced a scheme to transfer grossly impaired values of MBS to the Treasury, or other government funded entity.

1.140       Defendants received millions of dollars in U.S. government funds to provide services involving MBS that they at all times knowingly concealed were not properly publicly recorded and certified with the required chain of title into the trust by the trust closing date and received payments on federal government guarantees of mortgages. Defendants falsely represented, in connection with submitting claims on mortgage guarantees, that they properly documented the required chain of title to the note endorsements and/or proper chain of title for mortgages through proper "publicly recording" as required by pooling and servicing agreements.

1.141       The Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity purchasing the artificially inflated mortgage-backed securities or being asked to make a payment pursuant to a mortgage guarantee.

1.142       The United States, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made by the United States' fiscal intermediaries for claims that would otherwise would not have been paid. Through the payments and approvals, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT II
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Against all Defendants

1.143      Relator re-alleges and incorporates herein by reference all the allegations set forth in paragraphs 1.01 through 1.134 of this Complaint.

1.144      This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

1.145      As alleged in paragraphs 1.01-1.134, the Defendants created, sold or participated in mortgage-backed securities.  As further alleged, the mortgage-backed securities were composed of mortgages bundled to create the securities in which the mortgages *lacked compliance* with the pooling and servicing agreement requirements to create a secured, real estate debt obligation for Certificateholders as follows:

(1)    Prudent loan servicing compliant with federal and state laws to avoid artificially inflating MBS values with inaccurate loan information;

(2)    Proper recording of truthful (not false and fabricated) real estate documents reflecting the establishment and/or each assignment and transfer of secured interests in real property and remitting recording fees to counties for each recording to avoid artificially inflated MBS values;

(3)    Proper endorsements on each mortgage Note showing a complete "chain of endorsement" from the originator to the last endorsee;

(4)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly "certified" into the trust

(5)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly certified into the trust by the trust "closing date"

(6)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office to demonstrate a proper "chain of title"

(7)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office reflecting the establishment and/or transfer of secured interests in real property, or beneficial interest in the underlying promissory note

1.146      The Defendant's knowing, intentional and/or reckless conduct includes but is not

limited to their fraudulent concealment of their failure to: (1) properly service loans thereby artificially inflating the value of MBS; (2) obtain proper endorsements on notes; (3) pay required fees to publicly record all assignments and transfers to obtain the necessary certification of chain of title for mortgage loans to be placed in the trust by the trust "closing date"; and (4) avoid artificially inflating the value of the MBS for failure to remit sums to properly record, caused each of the mortgage-backed securities sold to the Treasury, or other entity funded by the U.S. government to violate state and federal laws and advanced a scheme to transfer grossly impaired values of MBS to the Treasury, or other government funded entity.

1.147     Defendants received millions of dollars in U.S. government funds to provide services involving MBS that they at all times knowingly concealed were not properly publicly recorded and certified with the required chain of title into the trust by the trust closing date and received payments on federal government guarantees of mortgages. Defendants falsely represented, in connection with submitting claims on mortgage guarantees, that they properly documented the required chain of title to the note endorsements and/or proper chain of title for mortgages through proper "publicly recording" as required by pooling and servicing agreements.

1.148     In connection with the submission of these claims in the sale of the mortgage-backed securities to the government, or government funded entity, each of the Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the Treasury, or other U.S. government funded entity purchasing mortgage- backed securities or being asked to make a payment pursuant to a mortgage guarantee.

1.149     The United States, unaware of the falsity or fraudulent nature of the claims made

by the Defendants, approved, paid and participated in payments made by the United States' fiscal intermediaries for claims that would otherwise would not have been paid.   Through the payments and approvals, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT III
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D)
### Against All Defendants

1.150     Relator re-alleges and incorporates herein by reference all the allegations set forth in paragraphs 1.01 through 1.134 of this Complaint.

1.151     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

1.152     As alleged in paragraphs 1.01-1.134, the Defendants created, sold or participated in mortgage-backed securities.   As further alleged, the mortgage-backed securities were composed of mortgages bundled to create the securities in which the mortgages *lacked compliance* with the pooling and servicing agreement requirements to create a secured, real estate debt obligation for Certificateholders as follows:

(1)     Prudent loan servicing compliant with federal and state laws to avoid artificially inflating MBS values with inaccurate loan information;

(2)     Proper recording of truthful (not false and fabricated) real estate documents reflecting the establishment and/or each assignment and transfer of secured interests in real property and remitting recording fees to counties for each recording to avoid artificially inflated MBS values;

(3)     Proper endorsements on each mortgage Note showing a complete "chain of endorsement" from the originator to the last endorsee;

(4)     Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly "certified" into the trust

(5)     Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly certified into the trust by the trust "closing date"

(6) Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office to demonstrate a proper "chain of title"

(7) Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office reflecting the establishment and/or transfer of secured interests in real property, or beneficial interest in the underlying promissory note

1.153 In connection with the MBS Trusts, the Defendants charged the MBS Trusts for unlawful services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments. The Defendants artificially inflated the value of MBS through fraudulent loan servicing (ie imposing ultra inflated force-placed insurance when the property was already insured) and giving the false appearance of additional money owed on the loan and also represented compliance with the PSA public recording of subsequent assignments and transfers to ensure a proper chain of title when there was none. As a result, the Defendants charged for MBA services that were unlawful or never provided and held possession, custody or control of property or money used, or to be used by the U.S. government knowingly delivered, or caused to be delivered to the U.S. government as an investor in the MBS Trusts, less than all of that money or property.

1.154 Through the Defendants' unlawful conduct, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT IV
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### Against All Defendants

1.155 Relator re-alleges and incorporates herein by reference all the allegations set forth in paragraphs 1.01 through 1.134 of this Complaint.

1.156 This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

1.157 As alleged in paragraphs 1.01-1.134, the Defendants created, sold or participated in mortgage-backed securities. As further alleged, the mortgage-backed securities were

composed of mortgages bundled to create the securities in which the mortgages *lacked compliance* with the pooling and servicing agreement requirements to create a secured, real estate debt obligation for Certificateholders as follows:

(1)    Prudent loan servicing compliant with federal and state laws to avoid artificially inflating MBS values with inaccurate loan information;

(2)    Proper recording of truthful (not false and fabricated) real estate documents reflecting the establishment and/or each assignment and transfer of secured interests in real property and remitting recording fees to counties for each recording to avoid artificially inflated MBS values;

(3)    Proper endorsements on each mortgage Note showing a complete "chain of endorsement" from the originator to the last endorsee;

(4)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly "certified" into the trust

(5)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly certified into the trust by the trust "closing date"

(6)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office to demonstrate a proper "chain of title"

(7)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office reflecting the establishment and/or transfer of secured interests in real property, or beneficial interest in the underlying promissory note

1.158    As a result of the unlawful conduct alleged herein, the Defendants charged the MBS Trusts for unlawful services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

1.159    Through the Defendants unlawful conduct, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT V
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Against all Defendants**

1.160       Relator re-alleges and incorporates herein by reference all the allegations set forth in paragraphs 1.01 through 1.134 of this Complaint.

1.161       This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

1.162       As alleged in paragraphs 1.01-1.134, the Defendants created, sold or participated in mortgage-backed securities.  As further alleged, the mortgage-backed securities were composed of mortgages bundled to create the securities in which the mortgages *lacked compliance* with the pooling and servicing agreement requirements to create a secured, real estate debt obligation for Certificateholders as follows:

   (1)    Prudent loan servicing compliant with federal and state laws to avoid artificially inflating MBS values with inaccurate loan information;

   (2)    Proper recording of truthful (not false and fabricated) real estate documents reflecting the establishment and/or each assignment and transfer of secured interests in real property and remitting recording fees to counties for each recording to avoid artificially inflated MBS values;

   (3)    Proper endorsements on each mortgage Note showing a complete "chain of endorsement" from the originator to the last endorsee;

   (4)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly "certified" into the trust

   (5)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office so the mortgage loans could be properly certified into the trust by the trust "closing date"

   (6)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office to demonstrate a proper "chain of title"

   (7)    Proper "publicly recorded" mortgages, assignments and transfers in the public recorders office reflecting the establishment and/or transfer of secured interests in real property, or beneficial interest in the underlying promissory note

1.163       As a result of the unlawful conduct alleged herein, the Defendants charged the

MBS Trusts for unlawful services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments.

1.164      Through the Defendants' knowing unlawful conduct as alleged herein including, but not limited to, falsely representing compliance with pooling and servicing agreements and where mortgages were not properly transferred in the securitization process for "lack of public recording" of all assignments and transfers to ensure a proper chain of title caused mortgage backed securities to not be backed by any mortgages. There is also a critical issue with the trust's lack of "standing" to foreclose if notes and mortgages were in fact, not certified and transferred into the securitization trust before the "closing date". In that scenario, the U.S. government and investors would have purchased "non mortgaged-backed securities" which would require a rescission of the MBS and investors receiving back their original payments at par and the sponsor left with notes and mortgages on its books and losses on the loans, not the U.S .Government and investors. Defendants conspired to violate state and federal laws and knowingly, intentionally and/or recklessly advanced a nefarious scheme to transfer grossly impaired values of securities to the Treasury, or other government funded entity. Defendants acted in concert to create fraudulent legal documentation and fraudulently concealed that the mortgage loans alleged to be in the trust in fact, lacked a proper chain of title resulting from the failure to "publicly record" all assignments and transfers. Said failure to record caused mortgage loans to never properly be certified and placed in the trust by the "closing date" thereby grossly impairing the value of the securities sold to the Treasury, or other government funded entity. Each of the mortgage-backed securities sold to the Treasury, or other government funded entity, was in violation of state and federal law. Further, the Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody or control to the U.S.

government. Defendants acted in concert to make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the U.S. government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the U.S. government.

1.165      Through the conduct set forth above, Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), § 3729(a)(1)(D), and § 3729(a)(1)(G).

### XV.  PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for relief and that judgment be entered against Defendants ordering as follows:

a.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.      Defendants pay an amount equal to three times the amount of damages the United States, has sustained because of Defendants' unlawful actions, plus a civil penalty against Defendants of not less than $5,000, and not more than $10,000 for each violation of 31 U.S.C. § 3729

c.      Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.      Relator be awarded all costs of this action, including attorneys' fees through appeal, pre and post judgment interest, expert fees, and costs pursuant to 31 U.S.C. § 3730(d);

e.      The United States be granted all such other equitable and/or injunctive relief afforded by law as the Court deems appropriate;

## XVI. REQUEST FOR A TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands a trial by jury.

Dated: 5.13.15

Respectfully Submitted,

/s/ Philip M Ross
**PHILIP M ROSS**
SBN 17304200
1006 Holbrook Road
San Antonio, Texas 78218
Tel: (210) 326.2100
E-Mail/Fax:  ross_law@hotmail.com
*Attorney for Nancy Alanis, Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2015, I arranged for hand delivery, the foregoing traditional filed complaint to the following individuals:

**US DISTRICT CLERK**
Western District of Texas
655 E. Cesar E. Chavez Blvd.,
Room G65☐
San Antonio, Texas 78206
(210) 472-6550

**RICHARD L. DURBIN, Jr.**
**ACTING US ATTORNEY**
**US ATTORNEY'S OFFICE**
Western District OF Texas
601 NW Loop 410
Suite 600
San Antonio, TX, 78216
Phones: (210) 384-7100

/s/ Philip M Ross

**Ex-A**

WELLS FARGO is identified in pooling and servicing agreements as either the "Custodian", "Servicer" and/or "Trustee" in over one hundred trusts as follows:

**GOVERNMENT LINK:**
http://www.sec.gov/Archives/edgar/data/1536694/000105640413000259/smt12001_35-5.txt

Sale and Servicing Agreement among ITLA Mortgage Loan Securitization 2002-1, L.L.C., Issuer, ITLA Capital Corporation, Seller and Master Servicer, Fairbanks Capital Corp., Servicer, **Wells Fargo Bank Minnesota, National Association, Trustee and Wells Fargo Bank Minnesota, National Association, Backup Servicer**
3/1/2002

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital Inc., Seller, **Wells Fargo Bank Minnesota N.A., Master Servicer and Trust Administrator,** Washington Mutual Mortgage Securities Corp., Seller and Servicer, Greenpoint Mortgage Funding, Inc., Seller and Servicer, Fairbanks Capital Corp., Servicer and Special Servicer, and U.S. Bank, National Association, Trustee-Pooling and Servicing Agreement-CSFB Mortgage-Backed Pass-through Certificates, Series 2003-AR30
12/1/2003

Fairbanks Capital Corp. as Servicer, Lehman Capital as Seller and **Wells Fargo Bank, MN NA, as Master Servicer** -Amortizing Residential Collateral Mortgage Pass-Through Certificates, Series 2001-BC6
10/1/2001

Pooling and Servicing Agreement -Asset Backed Securities Corporation, Depositor, DLJ Mortgage Capital, Inc., Seller, Fairbanks Capital Corp., Servicer, and **Wells Fargo Bank Minnesota NA, Trustee-**Asset Backed Securities Corporation Home Equity Loan Trust 2002-HE2
5/1/2002

Financial Asset Securities Corp., Depositor Fairbanks Capital Corp., Servicer and **Wells Fargo Bank Minnesota, National Association, Trustee** -Pooling and Servicing Agreement -First Franklin Mortgage Loan Trust 2002-FFA
9/1/2002

Financial Asset Securities Corp., Depositor, Fairbanks Capital Corp., Servicer and **Wells Fargo Bank Minnesota National Association, Trustee-**Pooling and Servicing Agreement -First Franklin Mortgage Loan Trust 2003-FF1
4/1/2003

Asset Backed Securities Corporation, Depositor, Fairbanks Capital Corp., Servicer and **Wells Fargo Bank Minnesota, NA, Trustee-**Pooling and Servicing Agreement-Asset Backed Securities Corporation Home Equity Loan Trust 2003-HEl
1/1/2003

ACE Securities Corp., Depositor, Ocwen Federal Bank FSB, A Servicer Option One Mortgage Corporation, A Servicer, Select Portfolio Servicing, Inc., A Servicer, **Wells Fargo Bank, N.A., Master Servicer** And Securities Administrator and HSBC Bank USA, National Association, Trustee-Pooling And Servicing Agreement-ACE Securities Corp. Home Equity Loan Trust, Series 2005-SD1, Asset Backed Pass-Through Certificates
1/1/2005

Asset Backed Securities Corporation, Depositor, DLJ Mortgage Capital, Inc., Seller, Select Portfolio Servicing, Inc., Servicer, Wells Fargo Bank, N.A., Master Servicer and U.S. Bank National Association, Trustee-Pooling And Servicing Agreement-Asset Backed Securities Corporation Home Equity Loan Trust, Series NC 2005-HE4
5/1/2005

Asset Backed Securities Corporation, Depositor, DLJ Mortgage Capital, Inc., Seller, Select Portfolio Servicing, Inc., Servicer, Mortgageramp Inc., Loan Performance Advisor, U.S. Bank National Association, Trustee and **Wells Fargo Bank, N.A., Master Servicer**, Paying Agent And Swap Administrator-Pooling and Servicing Agreement-Asset Backed Securities Corporation Home Equity Loan Trust, Series NC 2005-HE8
10/1/2005

GS Mortgage Securities Corp., Depositor, Litton Loan Servicing LP, Servicer, Select Portfolio Servicing, Inc., Servicer, Avelo Mortgage, L.L.C., Servicer, J.P. Morgan Trust Company, National Association, Custodian, U.S. Bank National Association, Custodian, Deutsche Bank National Trust Company, Custodian, LaSalle Bank National Association, Trustee, and **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator**-Pooling and Servicing Agreement-GSAMP Trust 2006-HE3
5/1/2006

GS Mortgage Securities Corp., Depositor, Litton Loan Servicing LP, Servicer, Select Portfolio Servicing, Inc., Servicer, Avelo Mortgage, L.L.C., Servicer, J.P. Morgan Trust Company, National Association, Custodian, U.S. Bank National Association, Custodian, Deutsche Bank National Trust Company, Custodian, LaSalle Bank National Association, Trustee and **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator**-Pooling And Servicing Agreement-GSAMP Trust 2006-HE4
6/1/2006

GS Mortgage Securities Corp., Depositor, Litton Loan Servicing LP, Servicer, Select Portfolio Servicing, Inc., Servicer, Avelo Mortgage, L.L.C., Servicer, J.P. Morgan Trust Company, National Association, Custodian, U.S. Bank National Association, Custodian, Deutsche Bank National Trust Company, Custodian, LaSalle Bank National Association, Trustee, and **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator**-Pooling and Servicing Agreement-GSAMP Trust 2006-HE5
8/1/2006

Asset Backed Securities Corporation, Depositor, DLJ Mortgage Capital, Inc., Seller, Nationstar Mortgage LLC, Servicer, Select Portfolio Servicing, Inc., Servicer, **Wells Fargo Bank, N.A., Master Servicer and Trust Administrator, Office tiger Global Real Estate Services Inc., Loan Performance Advisor and U.S. Bank National Association, Trustee** -Pooling And Servicing Agreement –Asset Backed Securities Corporation Home Equity Loan Trust, Series MO 2006-HE6
11/1/2006

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., Seller, **Wells Fargo Bank, N.A., Master Servicer, Servicer and Trust Administrator, Select Portfolio Servicing, Inc., Servicer, Special Servicer and Modification Oversight** Agent, and U.S. Bank National Association, Trustee-Series Supplement to Standard Terms of Pooling and Servicing Agreement -Adjustable Rate Mortgage Trust 2007-2
5/1/2007

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., a Seller, **Wells Fargo Bank N.A., a Servicer, Master Servicer and Trust Administrator,** Greenpoint Mortgage Funding, Inc., a Servicer and a Seller, Select Portfolio Servicing, Inc., a Servicer, Special Servicer, and Modification Oversight Agent and U.S. Bank National Association, Trustee-Pooling and Servicing Agreement-CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-2
2/1/2007

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., Seller, **Wells Fargo Bank N.A., Servicer, Master Servicer and Trust Administrator,** Universal Master Servicing LLC., Servicer, Washington Mutual Mortgage Securities Corp., Servicer, Select Portfolio Servicing, Inc., Servicer, Special Servicer and Modification Oversight Agent and U.S. Bank National Association, Trustee-Pooling and Servicing Agreement-CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-3
3/1/2007

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., Seller, **Wells Fargo Bank N.A., Servicer, Master Servicer and Trust Administrator,** Universal Master Servicing, LLC, Servicer, Select Portfolio Servicing, Inc., Servicer, Special Servicer and Modification Oversight Agent and U.S. Bank National Association, Trustee-Pooling and Servicing Agreement-CSAB Mortgage-Backed Pass-Through Certificates, Series 2007-1
4/1/2007

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., Seller, **Wells Fargo Bank N.A., Servicer, Master Servicer and Trust Administrator,** Universal Master Servicing, LLC., Servicer, Select Portfolio Servicing, Inc., Servicer, Special Servicer, and Modification Oversight Agent and U.S. Bank National Association, Trustee-Pooling and Servicing Agreement-CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-4
5/1/2007

Asset Backed Securities Corporation, Depositor, DLJ Mortgage Capital, Inc. Seller, Select Portfolio Servicing, Inc., Servicer, Officetiger Global Real Estate Services Inc., Loan Performance Advisor and **Wells Fargo Bank, N.A., Trustee**-Pooling and Servicing Agreement-Asset Backed Securities Corporation Home Equity Loan Trust, Series AMQ 2007-HE2
5/1/2007

Financial Asset Securities Corp., Depositor, Litton Loan Servicing LP, Servicer, **Wells Fargo Bank, N.A., Master Servicer and Trust Administrator** and Deutsche Bank National Trust Company, Trustee -Pooling and Servicing Agreement-Soundview Home Loan Trust 2007-2
9/1/2007

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., Seller, **Wells Fargo Bank N.A., Servicer, Master Servicer and Trust Administrator,** Banco Popular De Puerto Rico, Servicer and Back-Up Servicer, R&G Mortgage Corp., Servicer, Select Portfolio Servicing, Inc., Servicer, Special Servicer and Modification Oversight Agent and U.S. Bank National Association, Trustee-Pooling and Servicing Agreement-CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-5
7/1/2007

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., Seller, **Wells Fargo Bank N.A., Servicer, Master Servicer and Trust Administrator,** Bank of America, National Association, Servicer, Universal Master Servicing, LLC., Servicer, Select Portfolio Servicing, Inc., Servicer, Special Servicer, and Modification Oversight Agent and U.S. Bank National Association, Trustee-Series Supplement to Standard Terms of the Pooling and Servicing Agreement-CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-6
9/1/2007

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., Seller, **Wells Fargo Bank N.A., Servicer, Master Servicer and Trust Administrator,** Universal Master Servicing LLC., Servicer, Banco Popular De Puerto Rico, Servicer and Back-Up Servicer, Greenpoint Mortgage Funding, Inc., Servicer, Select Portfolio Servicing, Inc., Servicer, Special Servicer and Modification Oversight Agent and U.S. Bank National Association, Trustee -Pooling and Servicing Agreement-CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-7
1/11/2007

Aames Mortgage Investment Trust 2005-4, as Issuer, Morgan Stanley ABS Capital I Inc., As Depositor, **Wells Fargo Bank, N.A., as Trust Administrator and Master Servicer**, Aames Capital Corporation, as Servicer, Aames Investment Corporation, as Seller and Deutsche Bank National Trust Company, as Indenture Trustee-Transfer and Servicing Agreement-Aames Mortgage Investment Trust 2005-4
9/1/2005

Aames Mortgage Investment Trust 2006-1, as Issuer, Financial Asset Securities Corp., as Depositor, **Wells Fargo Bank, N.A., as Trust Administrator and Master Servicer**, Aames Funding Corporation, as Servicer, Aames Investment Corporation, as Sponsor and Deutsche Bank National Trust Company, As Indenture Trustee-Transfer And Servicing Agreement
4/1/2006

Reconstituted Servicing Agreement, dated as of February 1, 2007, between Greenwich Capital Financial Products, Inc., Countrywide Home Loans, Inc., Countrywide Home Loans Servicing LP, as servicer, and acknowledged by **Wells Fargo Bank, N.A., as trustee**-HarborView Mortgage Loan Trust 2007-1
2/1/2007

Inc., as depositor, Maia Mortgage Finance Statutory Trust, as seller, **Wells Fargo Bank, N.A., as master servicer and securities administrator**, and acknowledged by HSBC Bank USA, National Association, as trustee-Luminent Mortgage Trust 2006-2
2/1/2006

Banc of America Mortgage Securities, Inc., as Depositor, Bank of America, N.A., as Servicer and **Wells Fargo Bank, N.A., as Trustee**-Pooling and Servicing Agreement-Mortgage Pass-Through Certificates, Series 2005-5
5/26/2005

Credit Suisse First Boston Mortgage Securities Corp., Depositor, **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator**, Select Portfolio Servicing, Inc., Servicer and U.S. Bank National Association, Trustee-Pooling and Servicing Agreement -CSMC Trust 2012-CIM1
3/1/2012

Credit Suisse First Boston Mortgage Securities Corp., Depositor, **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator**, Select Portfolio Servicing, Inc., Servicer and U.S. Bank National Association, Trustee-Pooling and Servicing Agreement -CSMC Trust 2012-CIM2
6/1/2012

Securitized Asset Backed Receivables LLC, Depositor, Countrywide Home Loans Servicing LP, Servicer, Decision One Mortgage Company LLC, Responsible Party, and **Wells Fargo Bank, National Association, Trustee**-Pooling and Servicing Agreement-Securitized Asset Backed Receivables LLC Trust 2004-D01
7/1/2004

Securitized Asset Backed Receivables LLC, Depositor, Countrywide Home Loans Servicing LP, Servicer, Decision One Mortgage Company LLC, Responsible Party and **Wells Fargo Bank, National Association, Trustee**-Pooling and Servicing Agreement-Securitized Asset Backed Receivables LLC Trust 2004-D02
9/1/2004

Securitized Asset Backed Receivables LLC, Depositor, Countrywide Home Loans Servicing LP, Servicer, Mortgageramp Inc., Loan Performance Advisor, Fremont Investment & Loan, Responsible Party and **Wells Fargo Bank, National Association, Trustee** -Pooling and Servicing Agreement -Securitized Asset Backed Receivables LLC Trust 2005-FR3
7/1/2005

111

Securitized Asset Backed Receivables LLC, Depositor, Countrywide Home Loans Servicing LP, Servicer, Homeq Servicing Corporation, Servicer, Mortgageramp, Inc., Loan Performance Advisor, NC Capital Corporation, Responsible Party, WMC Mortgage Corp., Responsible Party and **Wells Fargo Bank, National Association, Trustee**-Pooling and Servicing Agreement-Securitized Asset Backed Receivables LLC Trust 2005 HE1
11/1/2005

Deutsche Alt-A Securities, Inc., Depositor, **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator**, Clayton Fixed Income Services Inc., as Credit Risk Manager and HSBC Bank USA, National Association, Trustee-Pooling and Servicing Agreement -Mortgage Pass-Through Certificates Series 2007-AB1
3/1/2007

Deutsche Alt-A Securities, Inc., Depositor and **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator** and HSBC Bank USA, National Association, Trustee-Pooling and Servicing Agreement-Mortgage Pass Through Certificates Series 2007-AR1
1/1/2007

Deutsche Alt-A Securities, Inc., Depositor and **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator** and Clayton Fixed Income Services Inc., Credit Risk Manager and HSBC Bank USA, National Association, Trustee –Pooling and Servicing Agreement-Mortgage Pass-Through Certificates Series 2007-AR2
2/1/2007

Deutsche Alt-A Securities, Inc., Depositor and **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator** and HSBC Bank USA, National Association, Trustee-Pooling and Servicing Agreement-Mortgage Pass-Through Certificates Series 2007-BAR1
2/1/2007

HSI Asset Securitization Corporation, Depositor, **Wells Fargo Bank, N.A., Master Servicer, Securities Administrator and Custodian**, Deutsche Bank National Trust Company, Trustee and Officetiger Global Real Estate Services Inc., Credit Risk Manager -Pooling and Servicing Agreement-HSI Asset Securitization Corporation Trust 2007-HE1
2/1/2007

HSI Asset Securitization Corporation, Depositor, **Wells Fargo Bank, N.A., Master Servicer, Securities Administrator and Custodian**, Deutsche Bank National Trust Company, Trustee and Officetiger Global Real Estate Services Inc., Credit Risk Manager -Pooling and Servicing Agreement-HSI Asset Securitization Corporation Trust 2007-HE2
4/1/2007

HSI Asset Securitization Corporation, Depositor, **Wells Fargo Bank, N.A., Master Servicer, Securities Administrator** and Custodian, Deutsche Bank National Trust Company, Trustee and Officetiger Global Real Estate Services Inc., Credit Risk Manager -Pooling and Servicing Agreement -HSI Asset Securitization Corporation Trust 2007-NC1
5/1/2007

Financial Asset Securities Corp., Depositor, Litton Loan Servicing LP, Servicer, **Wells Fargo Bank, N.A., Master Servicer** and Trust Administrator and Deutsche Bank National Trust Company, Trustee -Pooling and Servicing Agreement -Soundview Home Loan Trust 2007-2
9/1/2007

Credit Suisse First Boston Mortgage Securities Corp., Depositor, **Wells Fargo Bank, N.A., Master Servicer and Securities Administrator**, Select Portfolio Servicing, Inc., Servicer and Christiana Trust, A Division of Wilmington Savings Fund Society, FSB, Trustee-Pooling and Servicing Agreement-CSMC Trust
2012-CIM3 11/1/2012

112

ACE Securities Corp., Depositor, **Wells Fargo Bank Minnesota, National Association, Master Servicer and Securities Administrator** and Bank One, National Association, Trustee -Pooling and Servicing Agreement -ACE Securities Corp. Home Equity Loan Trust, Series 2002-HE3
12/1/2002

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital Inc., Seller, Select Portfolio Servicing Inc., Wells Fargo Bank, N.A., Wilshire Credit Corporation, Servicers, **Wells Fargo Bank, N.A., Master Servicer and Trust Administrator** and U.S. Bank National Association, Trustee-Pooling and Servicing Agreement-CSFB Mortgage Pass-Through Certificates, Series 2004-CF2
9/1/2004

Credit Suisse First Boston Mortgage Securities Corp., Depositor, DLJ Mortgage Capital, Inc., Seller, **Wells Fargo Bank, N.A., Master Servicer, Servicer, Back-Up Servicer and Trust Administrator,** Chase Manhattan Mortgage Corporation, Master Servicer, Washington Mutual Mortgage Securities Corp., Seller and Servicer, Fairbanks Capital Corp., Greenpoint Mortgage Funding, Inc., Servicers, Wilshire Credit Corporation, Special Servicer, and U.S. Bank National Association, Trustee -Pooling and Servicing Agreement -Mortgage-Backed Pass-Through Certificates, Series 2004-AR5
5/1/2004

**GOVERNMENT LINK:**
http://www.sec.gov/Archives/edgar/data/873860/000101905612000566/ex10_4.htm

http://www.nasdaq.com/markets/ipos/filing.ashx?filingid=8015535

Pooling and Servicing Agreement, dated as of July 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, OFFICETIGER GLOBAL REAL ESTATE SERVICES INC., as Loan Performance Advisor, FREMONT INVESTMENT & LOAN, as Responsible Party, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**
SABR 2006-FR3

Pooling and Servicing Agreement, dated as of August 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, FREMONT INVESTMENT & LOAN, as a Responsible Party, AEGIS MORTGAGE CORPORATION, as a Responsible Party, DECISION ONE MORTGAGE COMPANY, LLC, as a Responsible Party, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**
SABR 2006-HE1

Pooling and Servicing Agreement, dated as of September 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, FREMONT INVESTMENT & LOAN, as a Responsible Party, NC CAPITAL CORPORATION, as a Responsible Party, AEGIS MORTGAGE CORPORATION, as a Responsible Party, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**
SABR 2006-HE2

Pooling and Servicing Agreement, dated as of October 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, NC CAPITAL CORPORATION, as Responsible Party, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee,** and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Custodian
SABR 2006-NC3

Pooling and Servicing Agreement, dated as of October 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, WMC MORTGAGE CORP., as Responsible Party, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**
SABR 2006-WM2

Pooling and Servicing Agreement, dated as of November 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, BARCLAYS CAPITAL REAL ESTATE INC., D/B/A HOMEQ SERVICING, as Servicer, WMC MORTGAGE CORP., as Responsible Party, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian**
SABR 2006-WM3

Pooling and Servicing Agreement, dated as of November 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, BARCLAYS CAPITAL REAL ESTATE INC., D/B/A HOMEQ SERVICING, as Servicer, FREMONT INVESTMENT & LOAN, as Responsible Party, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian**
SABR 2006-FR4

Pooling and Servicing Agreement, dated as of December 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, BARCLAYS CAPITAL REAL ESTATE INC., D/B/A HOMEQ SERVICING, as Servicer, WMC MORTGAGE CORP., as Responsible Party, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian**
SABR 2006-WM4

Pooling and Servicing Agreement, dated as of January 1, 2007, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, BARCLAYS CAPITAL REAL ESTATE INC., D/B/A HOMEQ SERVICING, as Servicer, WMC MORTGAGE CORP., as a Responsible Party, NC CAPITAL CORPORATION, as a Responsible Party, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian**
SABR 2007-HE1

Pooling and Servicing Agreement, dated as of May 1, 2007, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, BARCLAYS CAPITAL REAL ESTATE INC., D/B/A HOMEQ SERVICING, as Servicer, WMC MORTGAGE CORP., as Responsible Party, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian**
SABR 2007-BR3

Pooling and Servicing Agreement, dated as of April 1, 2007, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, BARCLAYS CAPITAL REAL ESTATE INC., D/B/A HOMEQ SERVICING, as Servicer, WMC MORTGAGE CORP., as Responsible Party, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian**
SABR 2007-BR2

Pooling and Servicing Agreement, dated as of September 1, 2004, among PARK PLACE SECURITIES, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Master Servicer, and **WELLS FARGO BANK, N.A., as Trustee.**
PPSI 2004-WHQ1

Pooling and Servicing Agreement, dated as of October 1, 2004, among PARK PLACE SECURITIES, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Master Servicer, and **WELLS FARGO BANK, N.A., as Trustee.**
PPSI 2004-MHQ1

Pooling and Servicing Agreement, dated as of November 1, 2004, among PARK PLACE SECURITIES, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Master Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
PPSI 2004-WHQ2

Pooling and Servicing Agreement, dated as of February 1, 2005, among PARK PLACE SECURITIES, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Master Servicer, and **WELLS FARGO BANK, N.A., as Trustee.**
PPSI 2005-WHQ1

Pooling and Servicing Agreement, dated as of April 1, 2005, among PARK PLACE SECURITIES, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Master Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
PPSI 2005-WHQ2

Pooling and Servicing Agreement, dated as of May 1, 2005, among PARK PLACE SECURITIES, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Master Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
PPSI 2005-WHQ3

Pooling and Servicing Agreement, dated as of August 1, 2005, among PARK PLACE SECURITIES, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Master Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
PPSI 2005-WHQ4

Pooling and Servicing Agreement, dated as of November 1, 2005, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, COUNTRYWIDE HOME LOANS SERVICING LP, as Servicer, MORTGAGERAMP, INC., as Loan Performance Advisor, NC CAPITAL CORPORATION, as a Responsible Party, WMC MORTGAGE CORPORATION, as a Responsible Party, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**
SABR 2005-HE1

Pooling and Servicing Agreement, dated as of February 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, MORTGAGERAMP, INC., as Loan Performance Advisor, FREMONT INVESTMENT & LOAN, as Responsible Party, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**
SABR 2006-FR1

Pooling and Servicing Agreement, dated as of June 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, OFFICETIGER GLOBAL REAL ESTATE SERVICES INC., as Loan Performance Advisor, FREMONT INVESTMENT & LOAN, as Responsible Party, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**
SABR 2006-FR2

Pooling and Servicing Agreement, dated as of September 1, 2005, among ASSET BACKED FUNDING CORPORATION, as Depositor, HOMEQ SERVICING CORPORATION, as Servicer and **WELLS FARGO BANK, N.A., as Trustee.**
ABFC 2005-WMC1

Pooling and Servicing Agreement, dated as of April 1, 2004, among ASSET BACKED SECURITIES CORPORATION, as Depositor, DLJ MORTGAGE CAPITAL, INC., as Seller, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
ABSHE 2004-HE2

Pooling and Servicing Agreement, dated as of January 1, 2004, among GS MORTGAGE SECURITIES CORP., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee.**
GSAMP 2004-FM1

115

Pooling and Servicing Agreement, dated as of March 1, 2004, among GS MORTGAGE SECURITIES CORP., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee.**
GSAMP 2004-FM2

Pooling and Servicing Agreement, dated as of March 1, 2004, among FINANCIAL ASSET SECURITIES CORP., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**
FFML 2004-FFH1

Securitization Servicing Agreement, dated as of July 1, 2004, among LEHMAN BROTHERS HOLDINGS INC., as Seller, HOMEQ SERVICING CORPORATION, as Servicer, **WELLS FARGO BANK, N.A., as Master Servicer**, and LASALLE BANK NATIONAL ASSOCIATION, as Trustee
SAIL 2004-7

Securitization Servicing Agreement, dated as of October 1, 2004, among LEHMAN BROTHERS HOLDINGS INC., as Seller, HOMEQ SERVICING CORPORATION, as Servicer, **WELLS FARGO BANK, N.A., as Master Servicer**, and U.S. BANK NATIONAL ASSOCIATION, as Trustee.
FHLT 2004-3

Securitization Servicing Agreement, dated as of June 1, 2006, among LEHMAN BROTHERS HOLDINGS INC., as Seller, HOMEQ SERVICING CORPORATION, as Servicer, **WELLS FARGO BANK, N.A., as Master Servicer**, and U.S. BANK NATIONAL ASSOCIATION, as Trustee
SAIL 2006-3

Securitization Servicing Agreement, dated as of August 1, 2006, among LEHMAN BROTHERS HOLDINGS INC., as Seller, HOMEQ SERVICING CORPORATION, as Servicer, **WELLS FARGO BANK, N.A., as Master Servicer**, and U.S. BANK NATIONAL ASSOCIATION, as Trustee
SASC 2006-BC2

Securitization Servicing Agreement, dated as of November 1, 2006, among LEHMAN BROTHERS HOLDINGS INC., as Seller, HOMEQ SERVICING CORPORATION, as Servicer, **WELLS FARGO BANK, N.A., as Master Servicer**, and U.S. BANK NATIONAL ASSOCIATION, as Trustee.
SASC 2006-BC5

Pooling and Servicing Agreement, dated as of January 1, 2004, among MERRILL LYNCH MORTGAGE INVESTORS, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
MLMI 2004-WMC1

Pooling and Servicing Agreement, dated as of February 1, 2004, among MERRILL LYNCH MORTGAGE INVESTORS, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
FFML 2004-FF1

Pooling and Servicing Agreement, dated as of March 1, 2004, among MERRILL LYNCH MORTGAGE INVESTORS, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
MLMI 2004-WMC2

Pooling and Servicing Agreement, dated as of April 1, 2004, among MERRILL LYNCH MORTGAGE INVESTORS, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, N.A., as Trustee.**
MLMI 2004-WMC3

Pooling and Servicing Agreement, dated as of June 1, 2004, among MERRILL LYNCH MORTGAGE INVESTORS, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, N.A., as Trustee**
MLMI 2004-WMC4

Pooling and Servicing Agreement, dated as of October 1, 2004, among MERRILL LYNCH MORTGAGE INVESTORS, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, and **WELLS FARGO BANK, N.A., as Trustee.**
MLMI 2004-WMC5

Pooling and Servicing Agreement, dated as of January 1, 2005, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, COUNTRYWIDE HOME LOANS SERVICING LP, as a Servicer, OPTION ONE MORTGAGE CORPORATION, as a Servicer, HOMEQ SERVICING CORPORATION, as a Servicer, NC CAPITAL CORPORATION, ACCREDITED HOME LENDERS, INC., DECISION ONE MORTGAGE COMPANY LLC, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian,** and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee
MSAC 2005-HE1

Pooling and Servicing Agreement, dated as of March 1, 2005, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, COUNTRYWIDE HOME LOANS SERVICING LP, as a Servicer, OPTION ONE MORTGAGE CORPORATION, as a Servicer, HOMEQ SERVICING CORPORATION, as a Servicer, NC CAPITAL CORPORATION, ACCREDITED HOME LENDERS, INC., DECISION ONE MORTGAGE COMPANY LLC, AAMES CAPITAL CORPORATION, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Custodian**, and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee
MSAC 2005- HE2

Pooling and Servicing Agreement, dated as of August 1, 2005, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, COUNTRYWIDE HOME LOANS SERVICING LP, as a Servicer, HOMEQ SERVICING CORPORATION, as a Servicer, WMC MORTGAGE CORP., ACCREDITED HOME LENDERS, INC., DECISION ONE MORTGAGE COMPANY LLC, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee and as a Custodian**, LASALLE BANK NATIONAL ASSOCIATION, as a Custodian, and DEUTSCHE BANK NATIONAL TRUST COMPANY, as a Custodian
MSAC 2005-HE4

Pooling and Servicing Agreement, dated as of October 1, 2005, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, COUNTRYWIDE HOME LOANS SERVICING LP, as a Servicer, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as a Servicer, HOMEQ SERVICING CORPORATION, as a Servicer, WMC MORTGAGE CORP., NC CAPITAL CORPORATION, DECISION ONE MORTGAGE COMPANY LLC, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee** and as a Custodian, LASALLE BANK NATIONAL ASSOCIATION, as a Custodian and DEUTSCHE BANK NATIONAL TRUST COMPANY, as a Custodian
MSAC 2005-HE5

Pooling and Servicing Agreement, dated as of November 1, 2005, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, COUNTRYWIDE HOME LOANS SERVICING LP, as a Servicer, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as a Servicer, HOMEQ SERVICING CORPORATION, as a Servicer, WMC MORTGAGE CORP., NC CAPITAL CORPORATION, DECISION ONE MORTGAGE COMPANY LLC, **WELLS FARGO BANK, NATIONAL ASSOCIATION**, as a Custodian, LASALLE BANK NATIONAL ASSOCIATION, as a Custodian, and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee
MSAC 2005-HE6

Pooling and Servicing Agreement, dated as of December 1, 2005, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, COUNTRYWIDE HOME LOANS SERVICING LP, as a Servicer, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as a Servicer, HOMEQ SERVICING CORPORATION, as a Servicer, WMC MORTGAGE CORP., NC CAPITAL CORPORATION,

DECISION ONE MORTGAGE COMPANY LLC, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as a Custodian,** LASALLE BANK NATIONAL ASSOCIATION, as a Custodian and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee.
MSAC 2005-HE7

Pooling and Servicing Agreement, dated as of April 1, 2006, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, **WELLS FARGO BANK, N.A., as a Servicer,** HOMEQ SERVICING CORPORATION, as a Servicer, NC CAPITAL CORPORATION, as Responsible Party, and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee
MSAC 2006-NC3

Pooling and Servicing Agreement, dated as of May 1, 2006, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as a Servicer and as a Custodian,** HOMEQ SERVICING CORPORATION, as a Servicer, NC CAPITAL CORPORATION, as a Responsible Party, WMC MORTGAGE CORP., as a Responsible Party, DECISION ONE MORTGAGE COMPANY, LLC, as a Responsible Party, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, and LASALLE BANK NATIONAL ASSOCIATION, as a Custodian
MSAC 2006-HE3

Pooling and Servicing Agreement, dated as of May 1, 2006, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, HOMEQ SERVICING CORPORATION, as a Servicer, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as a Servicer,** JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as a Servicer, FIRST NLC FINANCIAL SERVICES, LLC, and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee
MSHEL 2006-3

Pooling and Servicing Agreement, dated as of June 1, 2006, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, COUNTRYWIDE HOME LOANS SERVICING LP, as a Servicer, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as a Servicer and as a Custodian,** HOMEQ SERVICING CORPORATION, as a Servicer, NEW CENTURY MORTGAGE CORPORATION, as a Servicer, NC CAPITAL CORPORATION, as a Responsible Party, WMC MORTGAGE CORP., as a Responsible Party, DECISION ONE MORTGAGE COMPANY, LLC, as a Responsible Party, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, and LASALLE BANK NATIONAL ASSOCIATION, as a Custodian
MSAC 2006-HE5

Pooling and Servicing Agreement, dated as of June 1, 2006, among MORGAN STANLEY ABS CAPITAL I INC., as Depositor, **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Master Servicer, as Securities Administrator and as a Servicer,** SAXON MORTGAGE SERVICES, INC., as a Servicer, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as a Servicer, HOMEQ SERVICING CORPORATION, as a Servicer, FIRST NLC FINANCIAL SERVICES, LLC, as a Responsible Party, DECISION ONE MORTGAGE COMPANY, LLC, as a Responsible Party, WMC MORTGAGE CORP., as a Responsible Party, IXIS REAL ESTATE CAPITAL INC., and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee
MSIX 2006-1

Pooling and Servicing Agreement, dated as of April 1, 2004, among PEOPLE'S CHOICE HOME LOAN SECURITIES CORP., HOMEQ SERVICING CORPORATION, as Servicer, **WELLS FARGO BANK, N.A., as Master Servicer and Securities Administrator,** and HSBC BANK USA, NATIONAL ASSOCIATION, as Trustee
PCHLT 2004-1

Pooling and Servicing Agreement, dated as of March 1, 2006, among MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC., as Depositor, HOMEQ SERVICING CORPORATION, as Servicer, **WELLS FARGO BANK, N.A., as Master Servicer, Trust Administrator and Custodian, and U.S. BANK NATIONAL ASSOCIATION as Trustee**
MABS 2006-WMC1